UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KIMMARA SUMRALL**, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-2277 (TNM) |
| **JANINE ALI**, | |
| Defendant. | |

**MEMORANDUM ORDER**

Plaintiff Kimmara Sumrall and Defendant Janine Ali frequently attend protests about the war in Gaza. The problem is that they are on opposite sides. Last fall, Sumrall proudly displayed her Jewish heritage at a protest by tying an Israeli flag around her neck. She alleges that Ali approached her from behind and yanked it, choking her. "If speech provokes wrongful acts on the part of hecklers, the government must deal with those wrongful acts directly." *Meinecke v. City of Seattle*, 99 F.4th 514, 517–18 (9th Cir. 2024). Sumrall asks for a modest stay-away order against Ali so that she feels comfortable continuing to attend pro-Israel protests and counter-protests. The Court grants her preliminary injunction request.

**I.**

On November 13, 2024, Sumrall and Ali were on opposing sides of a protest about the war in Gaza.[1] An advocacy group called Code Pink planned to lobby in favor of Palestinian causes in the Dirksen Senate Building that day. Compl., ECF No. 1, ¶¶ 12, 19. Code Pink

---

[1] The Superior Court of the District of Columbia found Ali not guilty of simple assault after a criminal trial. D.C. Superior Ct. Trial Tr. ("Trial Tr. Day 2"), ECF No. 8-2, at 21. The parties agree that this Court may take judicial notice of the transcript, filed as an attachment to the defense motion opposing preliminary injunctive relief. Temp. Restraining Order Hr'g Tr., ECF No. 14, at 34:24–35:21; *see* Fed. R. Evid. 201(b)(2).

invited Ali to join. D.C. Super. Ct. Trial Tr. ("Trial Tr. Day 1"), ECF No. 8-1, at 82:23–83:2. The group's members gathered in their characteristic pink attire in a Senate cafeteria. Def. Opp'n Mot. Preliminary Injunction, ECF No. 8, at 7; Trial Tr. Day 1 at 22:20–23:4. As they assembled, Sumrall arrived to attend a pro-Israel protest that had been "organized in response" to the Code Pink demonstration. Pl. Mot. Preliminary Injunction, ECF No. 5-1, at 3. She wore an Israeli flag as a cape tied at her neck with nylon twine. *Id.*; Trial Tr. Day 1 at 49:10–12. Several U.S. Capitol Police officers were also present. Trial Tr. Day 1 at 32:10–35:20.

The parties agree, at least, about the actors' basic movements before the incident. Sumrall was the first in the cafeteria, standing at the top of a crowded ramp lined with officers. Trial Tr. Day 1 at 61:11–19. She was talking on her phone. Trial Tr. Day 1 at 17:24–18:3. Ali was running late to meet her protest group so she walked alone toward the ramp to meet them. Def. Opp'n PI Mot. at 7. Capitol Police Officer Reed Bonney was standing nearby, about five to eight feet away, facing Sumrall. Trial Tr. Day 1 at 16:22–17:10; Prelim. Injunction Hr'g Tr. 20:12, ECF No. 25 ("PI Hr'g Tr."). Ali passed close behind Sumrall on the ramp. Trial Tr. Day 1 at 49:20–25, 122:25–123:1.

That is where the agreement ends. Officer Bonney testified in the criminal trial that he saw Ali "walk behind [Sumrall] and grab an Israeli flag that the victim had wrapped around her neck." Trial Tr. Day 1 at 18:1–3. He added before this Court that he could see most of Ali's body from his vantage point in front of Sumrall. PI Hr'g Tr. at 21:16. Specifically, he could see her right hand, which was empty, as it grabbed the flag and yanked downward. PI Hr'g Tr. at 21:20. He described the interaction as a "simple assault" that was not "accidental." Trial Tr. Day 1 at 16:6–7, 18:15–18. Kimrall reported feeling someone yank her flag from behind and "jerk[ her] head back, choking [her]," though she could not see who did it. Trial Tr. Day 1 at

2

62:4–17. She said that she looked around to see only police officers and Ali, walking away. Trial Tr. Day 1 at 69:17–18. Officer Bonney said that Kimrall had an immediate, clear reaction, yelling for the police to arrest Ali. PI Hr'g Tr. at 10:17; Compl. ¶ 13.

Ali claims that she did nothing wrong. It would have been impossible, she says, because she was holding her phone in her right hand, the one closer to Sumrall, after calling her group to meet them. Trial Tr. Day 1 at 91:10–92:13. Plus, a disability prevents her from using all of her fingers, so she could not have grabbed the flag while holding her phone. Trial Tr. Day 1 at 85:8–92:13, 96:24–97:4. And her left hand was similarly occupied with her purse. Trial Tr. Day 1 at 110:1–6. A relative of a Code Pink demonstrator testified that she saw no contact between the two women as Ali passed by on the ramp. Trial Tr. Day 1 at 123:9–124:1. Defense argues that either Sumrall stepped backward on her own flag or Ali's shawl, called a keffiyeh, entangled with the flag accidentally. Def. Opp'n PI Mot. at 7; Trial Tr. Day 1 at 71:19–24.

What happened next is also disputed. Officer Bonney followed Ali into the Code Pink group "and pulled her out" to arrest her. Trial Tr. Day 1 at 20:7–11. He testified that "as [he] was bringing her out of the group, away from the group, she said, 'All I did was grab it.'" Trial Tr. Day 1 at 23:4–12. Ali claims that she was not wearing her hearing aids that day so, in response to the officer's question about whether she pulled the flag, she responded, "I pulled it?" Trial Tr. Day 1 at 98:5–7. Officer Bonney clarified that he did not ask her a question to elicit the response; he says that she spontaneously spoke as they were walking away from her group. PI Hr'g Tr. at 11:22–12:5.

Sumrall says that since the incident, she has feared for her physical safety. Ten days after the first hearing in her civil case, she alleges that she received a threatening phone call. Compl. ¶ 39. Sumrall also lives with the "threat of future encounters" because Ali still participates in

3

pro-Palestinian protests that Sumrall would like to attend as a pro-Israeli counter-protestor. Compl. ¶ 37; Temp. Restraining Order Hr'g Tr. ("TRO Hr'g Tr."), ECF No. 14, at 27:13–30:24. Sumrall says that the Code Pink rhetoric at these rallies heightens her fear of discrimination. For example, in March, she alleges, unrebutted, that Ali attended a public event where individuals dressed in Israeli flags picked up bloody dollar bills thrown by a costumed Uncle Sam. Compl. ¶ 37. The parties effectively agree that the two women want to attend the same protests in the future, so there is a strong likelihood, if not certainty, of crossing paths again. PI Hr'g Tr. at 59:22–62:8.

Sumrall filed a *pro se* civil case in the Superior Court of the District of Columbia and received a temporary stay away order. D.C. Super. Ct. Stay Away Order, ECF No. 5-2. Meanwhile, the United States filed misdemeanor assault charges against Ali based on the same incident. *United States v. Ali*, 2024-CMD-12091 (D.C. Super. Ct. May 19, 2025). While the stay away order was in place, Sumrall attended at least one event as a pro-Israel protestor. PI Hr'g Tr. at 32:11–16. She says that she felt comfortable doing so because of the stay away order. PI Hr'g Tr. at 58:2–15. Ali was not present at the event. PI Hr'g Tr. at 58:6–8. Sumrall was indisputably obstreperous towards the host, who testified before this Court. PI Hr'g Tr. at 35:12–13.

A few months later, Ali was acquitted of simple assault after a criminal bench trial. Trial Tr. Day 2 at 21. Shortly afterward, the state civil case was scheduled for an evidentiary hearing about whether to extend the civil stay away order. D.C. Super. Ct. Order, ECF No. 5-3. Sumrall struggled to summon her main witness, Officer Bonney, to testify. Mem. Op. at 9, ECF No. 4, *Sumrall v. Ali*, 25-mc-00110 (D.D.C. July 9, 2025). As a federal officer, he had sovereign immunity to that court's subpoena that he did not waive. *Id.* She sought a federal subpoena

4

from a different judge in this district, but the judge declined to issue a subpoena in a Superior Court case. Mem. Op., ECF No. 5-5, at 1–2. About one week later, Sumrall filed a complaint before this Court to seek a civil stay away order. Compl. This Court granted a temporary restraining order. TRO Hr'g Tr. at 31:12–32:23.

Sumrall represented that she planned to voluntarily dismiss her civil case in Superior Court that day. TRO Hr'g Tr. at 4:13–25. It has since been dismissed. Pl. Suppl. Br., ECF No. 17, at 1. The Court held a preliminary injunction hearing with witnesses and evidence. PI Hr'g Tr. *passim*. The briefing is ripe for decision. This Court has federal question jurisdiction under 28 U.S.C. § 1331.

## II.

A preliminary injunction is an extraordinary remedy granted sparingly. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The movant must "by a clear showing, carr[y] the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Plaintiffs carry that burden with four showings: "(1) a substantial likelihood of success on the merits, (2) that [they] would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy*, 454 F.3d at 297.

A district court should hold an evidentiary hearing and make factual findings if faced with disputed issues of material fact on a motion for a preliminary injunction. *See Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004). These findings of fact receive "special deference" on appeal and will not be disturbed absent clear error. *City of Las Vegas v. Lujan*, 891 F.2d 927, 931 (D.C. Cir. 1989). Given the contested factual issues here, the Court held such a hearing, and its factual determinations are reflected in this Memorandum Order.

### III.

Sumrall has carried her burden to receive narrowly tailored preliminary injunctive relief. First, she has shown a likelihood of success on the merits in two ways: (1) that neither abstention nor claim splitting should dissuade this Court from exercising its jurisdiction over this federal-question case; and (2) that her § 1981 claim and at least one state-tort predicate are likely to succeed. Next, she has shown that the "cognizable danger" of future discrimination, especially given the past battery, meets the irreparable harm standard. Finally, the balance of the equities favors a narrowly tailored injunction to respect both Ali and Sumrall's rights to protest.[2]

### A.

Before turning to the dispute itself, the Court first addresses Ali's doubts about the Court's ability to hear this case. Ali says the Court should dismiss the case because Sumrall's hook for federal jurisdiction—her § 1981 claim—is pretextual. Def. Opp'n PI Mot. at 4. To be sure, courts "must guard against" attempts to sneak state-law claims into federal court through ginned up federal grievances. *See id.* (quoting *Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999)). But such jurisdictional dismissals are typically reserved for "wholly frivolous federal claim[s]." *Lovern*, 190 F.3d at 655. Beyond protesting that Sumrall's § 1981 claim is "exaggerated and specious," Def. Opp'n PI Mot. at 4, Ali has given the Court no reason to question its legitimacy. Sumrall alleges a racially discriminatory battery that was the subject of both a civil and criminal proceeding in Superior Court. *See supra* Section I. The Court has no reason to doubt Sumrall's sincerity in invoking federal law.

---

[2] At the preliminary injunction evidentiary hearing, Ali's counsel suggested that this Court should simultaneously grant her a stay-away order against Sumrall. Of course, there is no cross-complaint or motion to justify such an order against Plaintiff. PI Hr'g Tr. at 73:1–74:19 ("[A]re you aware of any cases where a judge had done that, where the motion is only from one party? No, I haven't . . . .").

6

Ali next asks the Court to voluntarily abstain from hearing the case. Def. Opp'n PI Mot. at 5. But the law is "heavily weighted in favor of the exercise of jurisdiction" and federal courts only willingly cede it in "exceptional circumstances." *Edge Inv., LLC v. Dist. of Columbia*, 927 F.3d 549, 554 (D.C. Cir. 2019) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)). Ali does not point to any such circumstances here, nor does the Court see any. *See* Def. Opp'n PI Mot. at 4–5. More, Defense conceded at the preliminary injunction hearing that abstention does not apply here. PI Hr'g Tr. at 78:5–19. So abstention is unwarranted.

Ali also suggests that claim splitting bars Sumrall's case because her claims mirror those in her prior Superior Court case. *See* Def. Suppl. Opp'n, ECF No. 18. Generally, "the pendency of an action in [a] state court is no bar to proceedings concerning the same matter in [a] Federal court having jurisdiction." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).[3] But Ali says claim splitting is an exception to this principle. *See* Def. Suppl. Opp'n. In support, she points to the D.C. Circuit's recent explanation of claim splitting in *Steele v. United States*, — F.4th —, 2025 WL 2013668 (D.C. Cir. July 18, 2025).

Claim splitting "borrows from" the more-familiar doctrine of "claim preclusion." *Id.* at *6. Both require prior litigation (1) "involving the same claims or cause of action," (2) "between the same parties or their privies," and (3) before "a court of competent jurisdiction." *Id.* at *6–7. But while claim preclusion arises after final judgment, claim splitting "bar[s] duplicative litigation filed *before* final judgment." *Id.* at *6 (emphasis added). This bar prevents the use of a second case to reassert voluntarily dismissed claims that would have become preclusive had they

---

[3] D.C. Superior Court has "jurisdiction equivalent to that exercised by state courts." *Palmore v. United States*, 411 U.S. 389, 392 n.2 (1973). So the D.C. Circuit applies *Colorado River* to Superior Court as though it were a state court. *See Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 351 (D.C. Cir. 2003).

7

reached final judgment. *See id.* at *7. Put another way, the doctrine "obliges a plaintiff to assert all causes of action arising from a common set of facts in one lawsuit." *Id.* at *7 (quoting *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011)). And it "extends not only to claims that were actually litigated, but also to those that should or could have been." *Id.*

In *Steele*, for instance, the plaintiffs initiated their case "to relitigate causes of action that were voluntarily withdrawn and later denied reinstatement in" an earlier case in the same district court. *Id.* at *6. But the court shot down the plaintiffs' second case because "[p]arties may not maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant." *Id.* (cleaned up). The case involved only duplicative litigation "in the same [*federal*] court" though. *Id.* So on the facts of *Steele*, the Circuit had no occasion to evaluate whether claim splitting applies to prior state suits in light of *Colorado River*.

Granted, *Steele*'s plain text does not clearly limit claim splitting to federal court because the test references only "*a* court of competent jurisdiction." *Steele*, 2025 WL 2013668, at *7 (emphasis added). But there is good reason to hesitate before taking the rules for federal fora and blindly extending them to state courts. *Colorado River* makes clear that there is a "difference in general approach between state-federal concurrent jurisdiction and wholly federal concurrent jurisdiction." *Colorado River*, 424 U.S. 817. Besides, any reading of *Steele* that includes state courts in the sweep of "a court" would be invoking dicta. The case does not reference—much less turn on—state court litigation. More, an overly broad reading of the claim splitting test would largely swallow claim preclusion.[4] There would be no need for claim preclusion because every state claim would be federally barred from the moment of filing.

---

[4] Though *Steele*'s three-prong test does not explicitly say so, the opinion elsewhere suggests that the first case must still be ongoing when the second case begins. *See Steele*, 2025 WL 2013668, at *6 (explaining that parties cannot "maintain two separate actions involving the same subject matter *at the same time*" (emphasis added)). Otherwise, claim splitting would completely swallow claim preclusion—and the D.C. Circuit surely would have announced

8

Other circuits have considered this question and reached the same conclusion. For instance, the Second Circuit found that *Colorado River* limits claim splitting to federal court. *See Kanciper v. Suffolk Cnty. Soc. for the Prevention of Cruelty to Animals, Inc.*, 722 F.3d 88 (2d Cir. 2013). In *Kanciper*, the district court used claim splitting to dismiss a plaintiff's case because she already had an overlapping state-court suit. For support, the district court relied on the Tenth Circuit's opinion in *Katz*, 655 F.3d at 1212. Like *Steele, Katz* found that claim splitting dooms a case when there is already an overlapping suit "in the same district court, involving the same subject matter . . . against the same defendants." *Id*. at 1219. The district court then extended this rule to state-court claims. But the Second Circuit vacated, citing *Colorado River*. *See Kanciper*, 722 F.3d at 92.

The Tenth Circuit also reached the same outcome in a non-precedential opinion post-*Katz,* finding that *Colorado River* limits claim splitting to federal court. *See Wyles v. Sussman*, 661 F. App'x 548, 551 (10th Cir. 2016) ("[A]lthough the district court and the parties appeared to assume that the claim-splitting rule applies equally to attempts to maintain identical actions in state and federal court, case law indicates otherwise."). In short, abstention doctrine—not claim splitting—is the right lodestar for exercising jurisdiction over cases concurrently pending in state court; applying claim splitting to all pending cases would undermine the Supreme Court's abstention command in favor of exercising federal jurisdiction. *Colorado River*, 424 U.S. at 817. And abstention provides no help to Ali here, as she now recognizes.

Now back to Sumrall's case. Sumrall voluntarily dismissed her *pro se* Superior Court case, so there is no longer an overlapping litigation. *See supra* Section I. But Ali maintains that

---

such a drastic change in the law. So even if claim splitting did apply to state court, it would not prevent future litigation of cases that were voluntary dismissed. In those situations, there is no final judgment (so claim preclusion does not apply) and the case is not ongoing (so claim splitting does not apply).

under *Steele*, claim splitting bars Sumrall's claims because she already—or at least *should* have already—brought them in her earlier Superior Court case. Def. Suppl. Opp'n at 1–2. But *Steele* does not go so far. It prevents overlapping cases in district court, but *Colorado River* permits the overlap for state court cases. *See id.* Thus, Sumrall's prior Superior Court case "is no bar to proceedings concerning the same matter" in district court. *Colorado River*, 424 U.S. 817.

More, regardless of claim splitting's defensive viability here, Ali likely forfeited the argument by failing to mention it in her initial brief. *See Entergy Ark., LLC v. FERC*, 134 F.4th 576, 580 (D.C. Cir. 2025) ("Forfeiture ordinarily applies whenever a party relies on an argument not raised in its [initial] brief."). It was the Court, not the parties, that first identified it as a possible issue and asked for briefing on it. Min. Order July 23, 2025. And while Ali says claim splitting warrants dismissal, Def. Suppl. Opp'n at 16, there is no motion to dismiss now before the Court. So even if claim splitting *did* apply here, the Court would hesitate to dismiss a case based on a forfeited argument that implicates the strategic decisions of a litigant who was *pro se* at the time.

## B.

Sumrall has shown that she is likely to succeed on the merits of her § 1981 claim. The statute declares:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."

42 U.S.C. § 1981(a).

Congress enacted this statute originally as part of the Civil Rights Act of 1866, a post-Civil War statute ensuring that "newly freed slaves received the same rights as other citizens." *Historical Background*, Congress.gov (2025).[5] The provision protects racial minorities from private acts that infringe their rights to contract, sue, and otherwise enjoy "full and equal benefit of all laws" "for the security of persons and property." *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 387–88 (1982). The statute only reaches "purposeful discrimination," *id.* at 389, that was the "but-for" cause of the targeted action, *Comcast Corp. v. Nat'l Ass'n of Af. Am.*, 589 U.S. 327, 335 (2020).

"To make out a claim under section 1981 a plaintiff must demonstrate that he was (1) treated differently than others who were similarly situated (2) because of his race." *Berger v. Iron Workers Reinforced Rodmen Loc. 201*, 843 F.2d 1395, 1412 n.7 (D.C. Cir. 1988). That discrimination must have affected the individual's "full and equal benefit of all laws" "for the security of persons and property," language which "provide[s] remedies for a broad range of actions that could be characterized as various state torts." *Banks v. Chesapeake & Potomac Tel. Co.*, 802 F.2d 1416, 1421 (D.C. Cir. 1986). Specifically, "[a] § 1981 violation may occur when a private individual injures the security of persons and property in violation of a state law [prohibiting assault and battery] and does so with a racially discriminatory purpose." *Wong v. Mangone*, 450 Fed. App'x 27, 30 (2d Cir. 2011) (cleaned up).

The D.C. Circuit uses *McDonnell-Douglas* burden shifting to evaluate § 1981 discrimination claims, even those arising outside the employment context. *See Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017). But courts do not conduct the burden-

---

[5] https://www.congress.gov/crs_external_products/IF/HTML/IF12535.web.html.

shifting analysis when there is direct evidence of discrimination. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). Direct evidence is "hard to come by" so "its presence generally entitles a plaintiff to a jury trial," *Moini v. Wrighton*, 602 F. Supp. 3d 162, 172 (D.D.C. 2022) (cleaned up)—or, here, a preliminary injunction, where the burden "track[s] the burdens at trial," *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009).

The parties contest (1) whether Ali purposefully discriminated against Sumrall and (2) whether that action deprived her of the "equal benefit of all laws" "for the security of persons." Neither side questions whether Sumrall is part of a racial minority within the meaning of the statute. *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 618 (1987) (holding that Jews are a racial minority protected by § 1981); Def. Opp'n Mot. PI at 13–15. The Court takes each dispute in turn.

First, Sumrall has sufficiently shown that Ali purposefully discriminated against her on the basis of race. A preponderance of the evidence reveals that Ali likely committed the battery. Officer Bonney's testimony described the event in detail, how Ali committed it, and that Sumrall reacted strongly, clearly, and immediately. *See supra* Section I. He testified that Ali confessed her behavior as he arrested her. *Id.* Having considered Officer Bonney's demeanor and responses at the recent hearing, the Court finds him to be a highly credible witness. He was the only truly neutral witness who appeared in the criminal trial or at the preliminary injunction hearing.[6] Meredith Wallace, who testified for the defense at the criminal trial, attended the November protest to support Code Pink. Trial Tr. Day 1 at 112:21–114:5. To credit Ali's version of events, the Court would have to assume that both Officer Bonney and Sumrall were

---

[6] Andy Shallal testified at the preliminary injunction hearing about Sumrall's attendance at a protest after the stay-away order. He also is not a neutral witness because his wife is on the board of Code Pink. PI Hr'g Tr. at 48:5-18.

12

committing perjury, even though they have no prior association and Officer Bonney was unconnected to either side. PI Hr'g Tr. at 7:8–24.

Granted, as Ali argues, the Superior Court acquitted Ali of simple assault because the evidence did not rise beyond a reasonable doubt. Trial Tr. Day 2 at 21:15–19.[7] But this Court evaluates a civil preliminary injunction using a lower preponderance standard. *Callicotte v. Carlucci*, 698 F. Supp. 944, 951 (D.D.C. 1988). After weighing all the evidence before it, the Court discredits Ali's evidence that contradicts Officer Bonney's testimony. So the Court finds that Ali likely committed battery against Sumrall, an "intentional harmful or offensive touching or use of force upon the physical person of another." *Cardozo v. United States*, 315 A.3d 658, 670 (D.C. 2024). The evidence shows at minimum an offensive touching—that is, when Ali briefly choked Sumrall by yanking on the flag tied around her neck. *See supra* Section I. To be sure, a different outcome may be required after discovery. But based on the evidence currently before this Court, Sumrall is likely to succeed on her battery allegations.

Next, that battery was direct evidence of discrimination that likely would not have occurred but for racial animus. Direct evidence is "a smoking gun," *Amadeo v. Zant*, 486 U.S. 214, 226 (1988), "that itself shows racial or gender bias," *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013). One "statement alone [that] is direct evidence" is enough to send a case to trial. *Ayissi-Etoh*, 712 F.3d at 576–77. "A[n action] that can plausibly be interpreted in two different ways—one discriminatory and the other benign—does not constitute direct

---

[7] The acquittal has no preclusive effect on the civil suit in this Court. *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 359 (1984).

13

evidence." *Braxton v. Walmart, Inc.*, 2023 WL 2028698, at *3 (10th Cir. Feb. 16, 2023) (cleaned up).

Purposefully yanking on an Israeli flag tied around a Jewish person's neck to choke them is direct evidence of racial discrimination. The Star of David—emblazoned upon the Israeli flag—symbolizes the Jewish race. *Star of David*, Encyclopedia Britannica (2025) ("The yellow badge that Jews were forced to war in Nazi-occupied Europe invested the Star of David with a symbolism indicating martyrdom and heroism.").[8] Battery, particularly involving a racial symbol, is strong evidence of racial discrimination. *Cf. Wong*, 450 Fed. App'x at 28–29 (racially motivated battery violated § 1981). It is more severe than "[r]acial slurs or statements" that constitute direct evidence. *E.g.*, *Ayissi-Etoh*, 712 F.3d at 576. And targeting the Star of David is as racially motivated as "the highly offensive racial slur, 'n*****,'" which "constitutes direct evidence." *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007) (alteration added) (collecting cases); *see also Herster v. Bd. of Supervisors of La. St. Univ.*, 887 F.3d 177, 186 (5th Cir. 2018) (finding direct evidence when employers said an employee was "too black to do various tasks" or explicitly refused to "hire a black person").

Ali has proffered no "benign" interpretation whatsoever for choking Sumrall and it is hard to imagine one. *Braxton*, 2023 WL 2028698, at *3. Her closest argument contends that the Israeli flag represents the state of Israel rather than the Jewish race, so her action is merely anti-Israel, not antisemitic. PI Hr'g Tr. at 74:23–76:1. But it is quite a stretch to say that yanking on a flag tied around someone's neck is an objection to state policies; battery is not a legitimate form of protest. *See Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) ("[A] physical assault is

---

[8] https://www.britannica.com/topic/Star-of-David.

14

not by any stretch of the imagination expressive conduct protected by the First Amendment."). Ali did not have reason to think Sumrall was herself affiliated with the Israeli government. Rather, it is much more likely that she was intentionally attacking a Jewish person wearing a Jewish flag as a symbol of her racial heritage. As Sumrall's counsel contended at the preliminary injunction hearing, if yanking on a flag emblazoned with the Star of David tied around a Jewish person's neck at a pro-Israel protest is not discrimination, "I don't know what is." PI Hr'g Tr. at 83:3–5 (arguments of counsel).

Finally, Ali contests that Sumrall's pleading of a state tort is not enough to show a deprivation of the "equal benefit of all laws" "for the security of persons." Def. Opp'n PI Mot. at 14–15. But Ali's cited cases both explicitly state that § 1981 "provide[s] remedies for a broad range of actions that could be characterized as various state torts." *Banks*, 802 F.2d at 1421; *Phillip v. Univ. of Rochester*, 316 F.3d 291, 297–98 (2d Cir. 2003) ("[T]here is no persuasive reason why racially motivated torts that deprive a plaintiff of the equal benefit of laws or proceedings for the security of persons and property should be outside the ambit of federal authority . . . ."). Sumrall has shown that Ali committed at least one state tort, battery, against her that would not have occurred but for racial discrimination.[9]

For these reasons, the Court holds that Sumrall has shouldered her burden to demonstrate a likelihood of success on the merits.

---

[9] The Court need not address Sumrall's other alleged torts for now. *Capitol Hill Baptist v. Bowser*, 496 F. Supp. 3d 284, 292 (D.D.C. 2020).

## IV.

Sumrall also has shown that absent narrowly tailored preliminary relief, she will be irreparably harmed. To obtain the extraordinary remedy of a preliminary injunction, a plaintiff must show prospective injury that is "both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). She must establish that the injury is "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (cleaned up) (emphasis original). The harm must not be reparable using damages or other forms of relief. *Chaplaincy*, 454 F.3d at 298.

Sumrall alleges two forms of irreparable harm: discrimination and fear of physical assault. Sometimes, courts have determined that "being subjected to discrimination is by itself an irreparable harm." *Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C. 2016) (citing *Smith v. City of Jackson*, 544 U.S. 228, 249 (2005) (O'Connor, J., concurring))[10]; *Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan*, 518 F. Supp. 993, 1016 (S.D. Tex. 1981) ("It is well established that victims of discrimination suffer an irreparable injury regardless of actual pecuniary damage."). This is particularly so when there is "future discriminatory conduct to be prevented." *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 2019 WL 2010523, at *6 n.2 (D.D.C. May 7, 2019).

The Court has already found that Ali likely engaged in assaultive, discriminatory conduct. *See supra* Section III.B. She has shown no remorse or taken accountability for her battery. More, the parties agree that Sumrall and Ali will be at the same protests again. PI Hr'g Tr. at 70:6–14, 60:1–61:23. So the discriminatory harm has a high risk of recurrence. *Wisc. Gas*

---

[10] The Court cites this case for the general discriminatory harm proposition. Religious discrimination, the subject of *Singh*, is not covered by § 1981. *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 93 n.19 (D.D.C. 2006).

*Co.*, 758 F.2d at 674.  The two women will likely again be in close proximity at emotionally charged events.  Sumrall's evidence suggests she will likely endure racially discriminatory comments during a future anti-Israeli protest given Code Pink's extreme rhetoric, *see supra* Section I; and but for a stay away, Ali will be in a position to again assault her.

Allegations of "physical threats" and "stalking behavior" also have supported irreparable harm findings.  *See Tolson v. Stanton*, 844 F. Supp. 2d 53, 58 (D.D.C. 2012).  Sumrall essentially seeks a civil protection order, so the Court finds persuasive the D.C. Court of Appeals' standards governing them.  *Ramirez v. Salvaterra*, 232 A.3d 169, 183–89 (D.C. 2020).  That standard rests on an even higher irreparable-harm principle.  *Id.* at 184 (requiring "imminent threat of *illegal* action" that is "real," "not conjectural," citing the Corpus Juris Secundum Injunctions "irreparable harm" standard (emphasis added)).  The D.C. Court of Appeals requires plaintiffs seeking civil protection orders to (1) allege "good cause," or facts showing a "cognizable danger of a recurrent violation" after considering the "entire mosaic of the case"; and (2) "balance the potential harms to the parties," including "[s]afety, and resulting peace of mind."  *Id.* at 188.  Issuing stay-away orders may be appropriate where one party "has engaged in assaultive or threatening conduct."  *Tyree v. Evans*, 728 A.2d 101, 106 (D.C. 1999).

The "entire mosaic" of the case includes a battery and, after the civil hearing in Superior Court, a threatening phone call, allegations of unidentified men threatening Sumrall on the street, and idling cars outside her house late at night that fled when she approached.  Compl. ¶¶ 39–41 (alleging that a man wrapped in a keffiyeh approached her in the street to say, "I would stab you and leave you dead in the street if I could").  Since these events, Sumrall has "installed upgraded security cameras on her property."  Compl. ¶ 43.  Most of these incidents have not been attributed to Ali and, to be clear, the Court is not finding that they are.  Def. Opp'n PI Mot. at 8.

17

But Sumrall's allegations betray a reasonable sense of fear for her safety and "peace of mind" that would be assuaged with a modest, three-yard stay away order, at least as to one source of concern. And, again, the parties have agreed that there is a "cognizable danger" that Ali will attend the same protests as Sumrall again. PI Hr'g Tr. at 70:6–14; 60:1–61:5.

In sum, the compelling combination of racial discrimination and fear of physical assault surmounts the irreparable harm barrier here. With the "entire mosaic" considered, Sumrall has shown irreparable harm.

## V.

Finally, the balance of equities and the public interest favor a modest, three-yard stay away order. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008). Evidence of past physical harm can tip the balance of hardships sharply in the harmed party's favor. *See generally Int'l Ass'n Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 452 (7th Cir. 2022) (finding physical injury important for a preliminary injunction). Here, the history of battery favors an order against Ali; its narrowness ensures both women can still be present at the same event. The parties are "in violent agreement" that they both have First Amendment rights to speak their minds about the war in Gaza. PI Hr'g Tr. at 72:8–12. This three-yard order will accomplish that. There is no history of Sumrall seeking out Ali to repel her from events, though a Superior Court five-yard stay-away order has been in place for several months. PI Hr'g Tr. at 61:15–19.

The public interest also favors an injunction. Sumrall has alleged that her fear of repeated battery has "chill[ed her] freedom to express herself under the First Amendment in

18

support of Israel." PI Hr'g Tr. at 57:22–58:1.[11] There is a "public interest" in the "promotion of free expression and robust debate." *Belushi v. Woodward*, 598 F. Supp. 36, 37 (D.D.C. 1984). Another court in this district declined to enjoin publication of a book because it would harm the public interest in free debate, even though the plaintiff had shown a likelihood of success on copyright infringement grounds. *Id.* at 37–38 (also holding that available legal remedies undermined irreparable harm). Even more so here, where all other factors favor injunction, the public interest favors Sumrall's unfettered participation in protests and counter-protests.

Ali contends that Sumrall's expression has not been chilled whatsoever. She proffered a witness and video evidence showing that Sumrall has protested an event at least once since the battery. PI Hr'g Tr. at 32:11–16. But a plaintiff need only be "deterred [from] at least some political activity" to show expressive harm. *Fire Fighters*, 56 F.4th at 450–51 (so stating in the First Amendment context). "That the [plaintiff] continued to engage in *some* political activity does not foreclose their contention that they were deterred from engaging in other activities. A loss is a loss . . . ." *Id.* (emphasis original); *accord Agudath Israel of Am. v. Cuomo*, 938 F.2d 620, 636 (2d Cir. 2020) (finding "error" when a court found no irreparable harm because "congregants could continue to observe their religion with modifications"). Here, too, it is of no moment that Sumrall participated in *some* protest activity after the battery—and the Superior Court civil stay-away order then in place made her feel safe to protest. PI Hr'g Tr. at 58:2–15.

---

[11] Though the parties have framed their arguments on this point in terms of the First Amendment, query whether § 1981 protects plaintiffs against First Amendment chill from other private actors. Section 1981 rests on Congress's power to enforce the Thirteenth Amendment. *Runyon v. McCrary*, 427 U.S. 160, 168–70 (1976). It has almost exclusively been applied to "prohibit[] racial discrimination in the making and enforcement of private contracts," particularly in employment and schooling. *Id.*; *see, e.g.*, *General Bldg. Contractors Ass'n*, 458 U.S. at 389–91 (stating that § 1981 is coextensive with the Equal Protection Clause, as glossed in *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003)). The statutory text prohibits racial discrimination in contracting, the ability to "sue, be parties, give evidence," "the full and equal benefit of all laws and proceedings for the security of persons and property," and "like punishment, pains, penalties, taxes, license, and exactions" as are "enjoyed by white citizens." 42 U.S.C. § 1981(a). Neither precedent nor the statute directly suggests that § 1981 contemplates a cause of action against private actors infringing a plaintiff's freedom of speech.

19

A narrowly tailored, three-yard stay away order will preserve the public interest in both parties' expression.

## VI.

Weighing these factors together, the Court will grant Sumrall's motion for a preliminary injunction.[12]  The terms of the stay-away order against Janine Ali are as follows:

 1. Stay at least three yards away from Kimmara Sumrall;

2. Stay at least 100 yards away from Kimmara Sumrall's home and place of employment[13];

3. Have no contact with Kimmara Sumrall by any means whatsoever;

4. Do not communicate or attempt to communicate with Kimmara Sumrall, either directly or through any other person by telephone, written message, electronic message, or any form of social media or otherwise;

4. This Order is effective immediately and will remain in place pending further order of this Court.

**SO ORDERED**.

Dated: August 4, 2025

/s/
TREVOR N. McFADDEN, U.S.D.J.

---

[12] Sumrall decreased her injunctive request from five yards to three at the hearing.  PI Hr'g Tr. at 83:19–25.

[13] Counsel confirmed Ali is familiar with the relevant addresses for Sumrall's home and place of employment, though they are not on the public docket.  TRO Hr'g Tr. at 37:4–19.