**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **KIMMARA SUMRALL** ) | |
| ) | |
| *Plaintiff,* ) | **Case No. 1:25-cv-02277** |
| ) | |
| **v.** ) | |
| ) | |
| **JANINE ALI** ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR RECONSIDERATION**

# TABLE OF AUTHORITIES

**Cases**

*Adams ex rel. Harris v. Boy Scouts of Am.–Chickasaw Council,*
    271 F.3d 769 (8th Cir. 2001)........................................................    21

*Al-Tamimi v. Adelson,*
    916 F.3d 1 (D.C. Cir. 2019)........................................................    13

*Anderson v. Bessemer City,*
    470 U.S. 564 (1985)........................................................    26

*Arabaitzis v. Unum Life Ins. Co. of Am.,*
    351 F. Supp. 3d 11 (D.D.C. 2018)................................................    2

*Arendale v. City of Memphis,*
    519 F.3d 587 (6th Cir. 2008)........................................................    6

*Banks v. Chesapeake & Potomac Telephone Co.,*
    802 F.2d 1416 (D.C. Cir. 1986)................................................    16-18

*Bilello v. Kum & Go, LLC,*
    374 F.3d 656 (8th Cir. 2004)........................................................    21, 22

*\*Bostock v. Clayton Cty.,*
    590 U.S. 644 (2020)........................................................    *passim*

*\*Bray v. Alexandria Women's Health Clinic,*
    506 U.S. 263 (1993)........................................................    28

*Brown v. Philip Morris, Inc.,*
    250 F.3d 789 (3d Cir. 2001)........................................................    20, 22

*Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.,*
    630 F.3d 217 (D.C. Cir. 2011)........................................................    1, 2

*Castaneda v. Partida,*
    430 U.S. 482 (1977)........................................................    35

*Cent. Presbyterian Church v. Black Liberation Front,*
    303 F. Supp. 894 (E.D. Mo. 1969)................................................    19, 20

*Chapman v. Higbee Co.,*
    256 F.3d 416 (6th Cir. 2001)........................................................    21

*Chapman v. Higbee Co.,
   319 F.3d 825 (6th Cir. 2003)......................................................... 21, 23-24

Chapman v. IRS,
   2018 U.S. Dist. LEXIS 244092 (D.D.C. Apr. 19, 2018)............... 1, 2

City of Las Vegas v. Lujan,
   891 F.2d 927 (D.C. Cir. 1989)....................................................... 25

Cobell v. Norton,
   391 F.3d 251 (D.C. Cir. 2004)....................................................... 25

Collins v. Hardyman,
   341 U.S. 651 (1951)...................................................................... 12

Conn. Nat'l Bank v. Germain,
   503 U.S. 249 (1992)...................................................................... 3

De La Fuente v. DNC Servs. Corp.,
   2019 U.S. Dist. LEXIS 68738 (D.D.C. Apr. 23, 2019)................ 15

Domino's Pizza, Inc. v. McDonald,
   546 U.S. 470 (2006)...................................................................... 13-15

Elmore v. Harbor Freight Tools USA, Inc.,
   844 F.3d 764 (8th Cir. 2016)......................................................... 22

E.M. v. Shady Grove Reproductive Sci. Center, P.C.,
   2020 U.S. Dist. Lexis 232743 (D.D.C. 2020).............................. 25

Entergy Ark., LLC v. FERC,
   134 F.4th 576 (D.C. Cir. 2025)..................................................... 26

Exxon Shipping v. Baker,
   554 U.S. 471 (2008)...................................................................... 2

Firestone v. Firestone,
   76 F.3d 1205 (D.C. Cir. 1996)....................................................... 2

Frankel v. Regents of the Univ. of Cal.,
   744 F. Supp. 3d 1015 (C.D. Cal. 2024)......................................... 27, 28

Goodman v. Lukens Steel Co.,
   482 U.S. 656 (1987)...................................................................... 15-17

*Griffin v. Breckenridge,
   403 U.S. 88 (1971)........................................................................ passim

*Hecox v. Little*,
   79 F.4th 1009 (9th Cir. 2023)......................................................... 28

*Henderson v. Amerson*,
   2025 U.S. Dist. LEXIS 125665 (M.D. Ala. June 23, 2025)......... 14

*Herzfeld v. Barmada*,
   2025 U.S. Dist. Lexis 150403 (D.D.C. Aug. 5, 2025)................. 39, 40

*Humphries v. Newman*,
   2021 U.S. Dist. LEXIS 254494 (D.D.C. Mar. 2, 2022)............... 15

*Int'l Ass'n Fire Fighters, Loc. 365 v. City of E. Chicago*,
   56 F.4th 437 (7th Cir. 2022)........................................................ 37

*In re Navy Chaplaincy*,
   928 F. Supp. 2d 26 (D.D.C. 2013)................................................ 25

*\*Jones v. Alfred H. Mayer Co.*,
   392 U.S. 409 (1968)..................................................................... passim

*Jones v. R. R. Donnelley & Sons Co.*,
   541 U.S. 369 (2004)..................................................................... 5

*Keystone Tobacco Co., Inc. v. U.S. Tobacco Co.*,
   217 F.R.D. 235 (D.D.C. 2003)..................................................... 1

*Kinnon v. Arcoub, Gopman & Assocs., Inc.*,
   490 F.3d 886 (11th Cir. 2007)..................................................... 35

*Landau v. Corp. of Haverford Coll.*,
   2025 U.S. Dist. LEXIS 1402 (E.D. Pa. Jan. 6, 2025)................. 35, 36

*Leidos, Inc. v. Hellenic Republic*,
   881 F.3d 213 (D.C. Cir. 2018)..................................................... 2

*Mahone v. Waddle*,
   564 F.2d 1018 (3d Cir. 1977)....................................................... 19-23

*Mayers v. Ridley*,
   465 F.2d 630 (D.C. Cir. 1972)..................................................... 16

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)..................................................................... 25

*Mazloum v. D.C. Metro. Police Dep't*,
   522 F. Supp. 2d 24 (D.D.C. 2007)................................................ 15

*McCord v. Bailey,*
   636 F.2d 606 (D.C. Cir. 1980)......................................................  16

*Moini v. Wrighton,*
   602 F. Supp.3d 162 (D.D.C. 2022)...............................................  26

*Moonblatt v. District of Columbia,*
   572 F. Supp. 2d 15 (D.D.C. 2008)...............................................  15

*Mora v. United States Customs & Border Prot.,*
   2025 U.S. Dist. LEXIS  116591 (D.D.C. June 18, 2025).............  1

*Oncale v. Sundowner Offshore Servs.,*
   523 U.S. 75, (1998)......................................................................  35

*Owens v. Okure,*
   488 U.S. 235 (1989).....................................................................  18

*Pac. Shores Props., LLC v. City of Newport Beach,*
   730 F.3d 1142 (9th Cir. 2013)....................................................  28

**Patterson v. McLean Credit Union,*
   491 U.S. 164 (1989).....................................................................  5-8

*Phillip v. Univ. of Rochester,*
   316 F.3d 291 (2d Cir. 2003).........................................................  21-23

*Provisional Gov't of the Republic of New Afrika v. Am. Broad.*
   *Cos.,* 609 F. Supp. 104 (D.D.C. 1985).......................................  18, 19

*Runyon v. McCrary,*
   427 U.S. 160 (1976).....................................................................  11, 20, 22, 23

*Santa Fe Industries, Inc. v. Green,*
   430 U.S. 462 (1977).....................................................................  6

*Seminole Tribe v. Florida,*
   517 U.S. 44 (1996).......................................................................  11

*Shaare Tefila Congregation v. Cobb,*
   785 F.2d 523 (4th Cir. 1986).......................................................  21

*Shaare Tefila Congregation v. Cobb,*
   481 U.S. 615 (1987).....................................................................  27

*Shalala v. Ill. Council on Long Term Care, Inc.,*
   529 U.S. 1 (2000).........................................................................  13

*StandWithUs Center for Legal Justice v. CodePink et al*,
2:24-cv-06253, (C.D. Cal.)............................................................ 32

*The Civil Rights Cases,*
109 U.S. 3 (1883)......................................................................... 20

*United States v. Price*,
383 U.S. 787 (1966)..................................................................... 8, 16

*United States v. Ron Pair Entertainment, Inc.*,
489 U.S. 235 (1989)..................................................................... 23

*Wilson v. Garcia,*
471 U.S. 261, 105 S. Ct. 1938 (1985)........................................ 17, 18

*Wright-Phillips v. United Airlines, Inc.*,
2021 U.S. Dist. LEXIS 63925 (D.N.J. Apr. 1, 2021)................... 20

*Youngblood v. Hy-Vee Food Stores, Inc.*,
266 F.3d 851 (8th Cir. 2001)....................................................... 21, 22

## Statutes and Rules

13th Amendment to the United States Constitution………………... 13, 19, 20

14th Amendment to the United States Constitution………………... 12, 13

*§ 1 of the Civil Rights Act of 1866………………………………... 7-9, 11

§ 2 of the Civil Rights Act of 1866……………………………….... 8

42 U.S.C. § 1981………………………………………………….... *passim*

42 U.S.C. § 1982………………………………………………….... *passim*

42 U.S.C. § 1983………………………………………………….... 17

42 U.S.C. § 1985……....………………………………………….... 12, 13, 24

F.R.C.P. 54(b)................................................................................. 1, 2

F.R.C.P. 59(e)................................................................................. 1, 2

F.R.E. 401………………………………………………………….... 36

S.60, 39th Congress…………………………………………………    9

**Other Authorities**

J. tenBroek, Equal Under Law (1965 ed.)........................................    9

Report of C. Schurz, S. Exec. Doc. No. 2, 39th Cong., 1st Sess.......    10

# TABLE OF CONTENTS

I.    Introduction…………………………………………………………...    1

II.   Standard of Review………………………………………………...    1

III.  Argument…………………………………………………………...    3

    A.  Plaintiff is likely to succeed on the merits of her claim because this Court has federal question jurisdiction under § 1981 and properly applied the facts to the law……………………………...    3

        1.  The plain text and purpose of § 1981, as elucidated by Supreme Court guidance and binding precedent, mandates this Court's federal question jurisdiction……...    3

        2.  The Most Compelling D.C. Circuit and Out-of-Circuit Guidance Favor Asserting Federal Question Jurisdiction.    16

        3.  This Court properly determined that Defendant battered Plaintiff and the battery was discriminatory…………….    24

    B.  This Court properly determined that Plaintiff established irreparable harm………………………………………………….    36

    C.  This Court properly determined the balance of equities favors Plaintiff………………………………………………………...    37

    D.  This Court properly determined public interest considerations favor Plaintiff…………………………………………………….    40

IV.   Conclusion………………………………………………………….    41

## I.    Introduction

Defendant Janine Ali ("Defendant") moves this Court under F.R.C.P. 54(b) and 59(e) to reconsider its grant of a preliminary injunction to Plaintiff Kimmara Sumrall ("Plaintiff") in which Defendant is required to maintain three yards' distance from Plaintiff's person, one-hundred yards from her home and workplace, and otherwise have no direct or indirect contact with Plaintiff. ECF No. 26 at 20. Defendant's request centers on arguments that this Court's findings, analysis, and grant of the injunction were clearly erroneous. A careful look at Defendant's Motion, however, clarifies that she fails to demonstrate any clear error. As described more fully below, this Court properly held that the Equal Benefit Clause of 42 U.S.C. § 1981(a) governs this matter and Plaintiff met her burden for a preliminary injunction by establishing the relevant criteria tilted in her favor. Reconsideration is therefore unwarranted and this Court should deny Defendant's Motion.

## II.    Standard of Review

F.R.C.P. 54(b) notes "any order or other decision, however designated, that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims." "When considering a motion for reconsideration made pursuant to Rule 54(b), a 'clear error of law' in the prior ruling is a quintessential example of when reconsideration is appropriate." *Mora v. United States Customs & Border Prot.*, Civil Action No. 24-3136 (BAH), 2025 U.S. Dist. LEXIS 116591, at *19 (D.D.C. June 18, 2025) (quoting *Keystone Tobacco Co., Inc. v. U.S. Tobacco Co.*, 217 F.R.D. 235, 237 (D.D.C. 2003)). "This rule 'recognizes a court's inherent power to reconsider an interlocutory order 'as justice requires.'" *Chapman v. IRS*, No. 1:17-cv-00254-TNM-DAR, 2018 U.S. Dist. LEXIS 244092, at *1 (D.D.C. Apr. 19, 2018) (McFadden, J.) ( (quoting *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*,

1

630 F.3d 217, 227 (D.C. Cir. 2011)) (cleaned up). Justice may require reconsideration if "the court patently misunderstood a party, made a decision beyond the adversarial issues presented to the court, made an error in failing to consider controlling decisions or data, or . . . a controlling or significant change in the law or facts has occurred since the submission of the issue to the Court." *Id*. at *1-2 (internal quotations and citations omitted). Here, Defendant argues for Rule 54(b) reconsideration "based on clear legal error." Def.'s Mem. at 5.[1]

F.R.C.P. 59(e) notes "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." As recognized by this Court, "Rule 59(e) . . . may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Arabaitzis v. Unum Life Ins. Co. of Am*., 351 F. Supp. 3d 11, 14 (D.D.C. 2018) (McFadden, J.) (quoting *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018) (quoting *Exxon Shipping v. Baker*, 554 U.S. 471, 486 n.5 (2008)). "Courts may grant a Rule 59(e) motion only (1) if there is an intervening change of controlling law; (2) if new evidence becomes available; or (3) if the judgment should be amended in order to correct a clear error or prevent manifest injustice." *Id*. (citing *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)) (quotations and citation removed). Defendant also argues for reconsideration here on the basis of clear error. Def.'s Mem. at 5.

---

[1] Citations to Defendant's Memorandum of Law are to pages as stamped by ECF and not as originally marked by Defendant.

### III.    Argument

#### A.    Plaintiff is likely to succeed on the merits of her claim because this Court has federal question jurisdiction under § 1981 and properly applied the facts to the law.

##### 1.    The plain text and purpose of § 1981, as elucidated by Supreme Court guidance and binding precedent, mandates this Court's federal question jurisdiction.

The Equal Benefit Clause of 42 U.S.C. § 1981(a) reads: "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws . . . for the security of persons and property." Equally important, 42 U.S.C. § 1981(c) reads in full: "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." Defendant argues that Plaintiff cannot succeed on the merits of her claim because "§ 1981 protects against specific forms of racial discrimination related to contracts and/or state action," "§ 1981 claims are limited to those circumstances," and "Plaintiff showed neither that her freedom to contract had been violated nor that there was any nexus to state action required for a claim under § 1981." Def.'s Mem. at 8. Defendant is correct on the last point but the statute's plain text buttressed by Supreme Court guidance and binding precedent indicate that Defendant is wrong in dichotomizing § 1981 such that claims against private actors may only sound in contract. As a result, her first two premises are invalid, and just as a tripodal table collapses with two of its legs, so too for Defendant's conclusion that Plaintiff failed to prove a likelihood of success on her § 1981 claim because of jurisdictional issues.

The Supreme Court has long held "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). As a corollary, "[w]hen the express terms of a statute give us one answer

and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton Cty.*, 590 U.S. 644, 653 (2020). Not only does the plain text of the statute clarify Plaintiff's cause of action, but there is neither competition with extratextual considerations nor unintended consequences. The statute's copiously documented history and purpose reinforces a plain text reading that § 1981 applies to private actors like Defendant.

§ 1981 unambiguously grants plaintiffs a cause of action against private actors for the totality of enumerated rights, not limited to contracts, including the rights forming the basis of Plaintiff's claim. For starters, § 1981(c) expressly states that the rights enumerated in § 1981(a) may be impaired by "nongovernmental" actors like Defendant, and nothing within its text indicates that Congress intended to burden litigants and courts alike by forcing them to sort out which of the rights enumerated in § 1981(a) can be infringed by the state, others by private actors, and perhaps even others by both. This is a completely atextual, illogical reading of the plain language in § 1981(c). As cautioned by the Supreme Court, there is no such thing "as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception. Instead, when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Bostock*, 590 U.S. at 670. The broad rule of § 1981(c) is that each and every right enumerated in § 1981(a) has a corresponding cause of action against private *and* state actors who violate those rights.

Even without recourse to § 1981(c), every right as plainly written in § 1981(a) can plausibly be infringed by private actors, even if some infringement scenarios seem more likely than others. Take, for example, the right to "be subject to like punishment, pains, penalties, [and] taxes." One could easily envision scenarios—especially given the grip non-state actors like the

Ku Klux Klan held over the post-war South—in which these militias intimidated judges, prosecutors, and tax authorities to mete out punishments or tax people unequally on the basis of race. Take, for another example, the rights "to sue, be parties, [and] give evidence." In *Patterson*, the Supreme Court squarely recognized that private actors may impede such judicial access, holding § 1981's guarantee of "'the same right . . . to . . . enforce contracts . . . as is enjoyed by white citizens' . . . covers wholly *private* efforts to impede access to the courts." *Patterson v. McLean Credit Union*, 491 U.S. 164, 177-78 (1989) (emphasis retained). Defendant's dichotomy would have us believe that private efforts to impede court access sound in § 1981 only when access is sought to "enforce contracts" but does not when sought for another reason despite the statute literally guaranteeing a broad right "to sue, be parties, [and] give evidence" untethered from contract. As private racial discrimination in judicial access clearly does not hinge on litigation sounding in contract, then causes of action against private actors are not limited to contract claims. Rather, they extend to every last corner in which a violation of rights by a private actor occurs, including the right to equal benefit under the law as described more fully below. Defendant's key framework of limiting the § 1981 right of action against private actors to contracts is incorrect.

Critically, *Patterson* was not only decided before but, in fact, also helped catalyze the 1991 amendments to § 1981, which included § 1981(c), because Congress found too narrow its reading of § 1981. *See Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 373 (2004). In short, *Patterson* (1) refused to recognize racial harassment as violating § 1981, leading to the addition of § 1981(b), irrelevant for purposes here, and (2) invited briefing and argument on whether *Runyon*, described below, erred in holding that § 1981 applies to private acts of discrimination. While the Supreme Court in *Patterson* ultimately upheld its earlier decision, Congress took no

chances and "§ 1981(c) was directed at preserving the Supreme Court's decision in *Runyon*." *Arendale v. City of Memphis*, 519 F.3d 587, 598 (6th Cir. 2008). Either way, even a Supreme Court that "confine[d] § 1981 within the narrowest possible scope, selecting the most pinched reading," *Patterson*, 491 U.S. at 189 (Brennan, J., dissenting), understood that § 1981 reached private actors far more expansively than Defendant contends. *Patterson* is all the more interesting because the court noted, in light of "a rule" that courts "should be and are 'reluctant to federalize' matters traditionally covered by state common law," that "interpreting § 1981 to cover racial harassment amounting to a breach of contract would federalize all state-law claims for breach of contract where racial animus is alleged." *Id*. at 183 (quoting *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479 (1977)). *Patterson* however, affirmed the federalization of § 1981 with respect to making and enforcing contracts, rejecting the idea that "1981 incorporates *only* those protections afforded by the States," *id*. at 182-83 (emphasis added), and therefore accepting that § 1981 federalizes the protections of state contract law and beyond. The hesitancy against federalization does not apply when "when Congress plainly directs" courts to federalize state law. *Id*. at 183. The text of § 1981 indicates no more of a plain directive for federalization in making and enforcing contract cases as it does for equal benefit under the law. In two instances, therefore, the most restrictive Supreme Court opinion on § 1981 actually cuts against Defendant's restrictive view here.

The pertinent portions of *Patterson* cannot be understood without reference to the earlier *Jones* decision, which fully erodes Defendant's position. In *Jones*, the Supreme Court "considered whether § 1982 . . . prohibits private discrimination [in property matters] on the basis of race." *Patterson*, 491 U.S. at 189 (Brennan, J., dissenting) (discussing *Jones v. Alfred H. Mayer Co*., 392 U.S. 409 (1968)). That statute reads in full: "All citizens of the United States

shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. Noticeably absent from the statute is mention of private actors. Nonetheless, the majority "began its careful analysis in *Jones* by noting the expansive language of § 1982, and observing that a black citizen denied the opportunity to purchase property as a result of discrimination by a private seller cannot be said to have the 'same right' to purchase property as a white citizen." *Patterson*, 491 U.S. at 192 (Brennan, J., dissenting) (describing *Jones*, 392 U.S. at 420-421)). Similarly, a Jewish citizen who is denied the opportunity to visit the U.S. Capitol free of battery cannot be said to have the same right to benefit equally under laws for the security of person at the time she is battered.

Defendant argues that "[t]he alleged battery does not amount to a denial of the equal benefit of the D.C. battery and assault laws (or any other laws) because Plaintiff was not denied the benefit of those laws. She was able to enforce those laws by having Defendant prosecuted in D.C. Superior Court." Def.'s Mem. at 10. This is contrary to *Jones*. The denial of a right, be it property or equal benefit, occurs when that right is infringed. Whether or not one may subsequently vindicate that right in a proceeding is irrelevant. Using Defendant's argument, minorities who are refused the right to purchase or convey property on equal terms by private actors can never have a cause of action for the discriminatory transaction because they have a cause of action for the discriminatory action, an absurdity.

"The [*Jones*] Court also noted that, in its original form, § 1982 had been part of § 1 of the Civil Rights Act of 1866," reading in full:

> [C]itizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and

personal property, and <u>to full and equal benefit of all laws and proceedings for the security of person and property</u>, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

*Patterson*, 491 U.S. at 192 (Brennan, J., dissenting) (quoting Act of Apr. 9, 1866, ch. 31, § 1, 14 Stat. 27. Section 1) (emphasis added). Lo and behold, there too is the original § 1981(a), Equal Benefit Clause included. Referring to this originating statute, the Supreme Court held "[w]e think that history leaves no doubt that, if we are to give [the law] the scope that its origins dictate, we must accord it a sweep as broad as its language." *Jones*, 392 U.S. at 409 (quoting *United States v. Price*, 383 U.S. 787, 801 (1966)) (formatting in original). Defendant simply cannot explain how, in light of *Jones*, property rights but not "full and equal benefit" rights can be infringed by private actors, and this is all the more so given that § 1981 derives from the same statute as § 1982. The Supreme Court also found dispositive that "if § 1 had been intended to grant nothing more than an immunity from *governmental* interference, then much of § 2 would have made no sense at all." *Jones* 392 U.S. at 424 (emphasis retained). § 2 "was carefully drafted to exempt private violations of § 1 from . . . criminal sanctions . . . There would, of course, have been no private violations to exempt if the only 'right' granted by § 1 had been a right to be free of discrimination by public officials." *Id*. at 425-26. Therefore "the structure of the 1866 Act, as well as its language, points to the conclusion . . . that § 1 was meant to prohibit *all* racially motivated deprivations of the rights enumerated in the statute" whether committed by private or governmental actors. *Id*. at 426 (emphasis retained).

While *Bostock* is clear that "legislative history can never defeat unambiguous statutory text, historical sources can be useful for a different purpose," specifically regarding what the statutory language meant to the drafters, and the Supreme "Court has sometimes consulted the understandings of the law's drafters as some (not always conclusive) evidence." 590 U.S. at

674-75. This is exactly what the Supreme Court did in *Jones*, noting that "[t]o the Congress that passed the Civil Rights Act of 1866, it was clear that the right to do these things [protected by § 1982] might be infringed not only by 'State or local law' but also by 'custom, or prejudice.'" 392 U.S. at 423 (quoting S.60, 39th Congress).[2] The Supreme Court looked to S.60, a contemporaneously proposed bill "to enlarge the powers of the Freedmen's Bureau . . . by extending military jurisdiction over certain areas in the South where, 'in consequence of any State or local law, . . . *custom, or prejudice*, any of the civil rights . . . belonging to white persons . . . are refused or denied to negroes.'" *Id*. at 423 n.30 (quoting S.60, 39th Congress) (cleaned up, emphasis retained). Critically, this bill not only sought to protect the rights of black Americans that would be enshrined in § 1982 from countervailing private "custom" or "prejudice" but also "the right . . . to have full and equal benefit of all laws and proceedings for the security of person and estate,"[3] in other words, the rights enshrined in the Equal Benefit Clause of § 1981. "Of course an 'abrogation of civil rights made in consequence of . . . custom, or prejudice might as easily be perpetrated by private individuals or by unofficial community activity as by state officers armed with statute or ordinance.'" *Id*. (quoting J. tenBroek, Equal Under Law 179 (1965 ed.) (internal quotations omitted).

The historical context of § 1981, tracing back to its first incarnation of § 1 of the Civil Rights Act of 1866, is replete with examples and concerns over the brutalization foisted upon newly freed black Americans in a way indicating that Congress understood that private actors can violate the rights of others to the full and equal benefit of laws for the security of person and property. "Accounts in newspapers North and South, Freedmen's Bureau and other official documents, private reports and correspondence were all adduced to show that private outrage and

---

[2] *See* https://www.congress.gov/bill/39th-congress/senate-bill/60/text at 6.

[3] *Id*.

atrocity were daily inflicted on freedmen" including "white citizens who assaulted Negroes or who combined to drive them out of their communities." *Jones*, 392 U.S. at 427-28 (internal quotations and citations omitted). "Indeed, one of the most comprehensive studies then before Congress stressed the prevalence of private hostility toward Negroes and the need to protect them from the resulting persecution and discrimination." *Id*. 428 (citing Report of C. Schurz, S. Exec. Doc. No. 2, 39th Cong., 1st Sess., 2, 17-25). Take, for example, the following two of innumerable harrowing accounts from the Schurz Report in which black Americans were denied their right to the full and equal benefit of all laws for the security of persons and property:

> 9th and 10th of August, several negroes came into town with bullet and buckshot wounds in their bodies. From their statements, which, however, were only corroborating information previously received, it appeared that the reckless and restless characters of that region had combined to keep the negroes where they belonged. Several freedmen were shot in the attempt to escape, others succeeded in eluding the vigilance of their persecutors; large numbers, terrified by what they saw and heard, quietly remained under the restraint imposed upon them, waiting for better opportunities.
>
> . . .
>
> In a report to General Swayne, assistant commissioner of the Freedmen's Bureau, in Alabama, communicated to me by the general, Captain Poillon, agent of the bureau at Mobile, says of the condition of things in the southwestern part of the State, July 29: "There are regular patrols posted on the rivers, who board some of the boats; after the boats leave they hang, shoot, or drown the victims they may find on them, and all those found on the roads or coming down the rivers are almost invariably murdered. The bewildered and terrified freedmen know not what to do—to leave is death; to remain is to suffer the increased burden imposed upon them by the cruel taskmaster . . . "[4]

"The report concluded that, even if anti-Negro legislation were 'repealed in all the States lately in rebellion,' equal treatment for the Negro would not yet be secured." *Id*. 429 (citing Report of C. Schurz, S. Exec. Doc. No. 2, 39th Cong., 1st Sess., 2, 35). "In this setting, it would have been

---

[4] https://d1lexza0zk46za.cloudfront.net/history/american-documents/documents/cschurz-south-report-1865.pdf, at 19-20

strange indeed if Congress had viewed its task as encompassing merely the nullification of racist laws in the former rebel States," *id*., or targeting solely state actors in drafting the Equal Benefit Clause.

The holding of *Jones* is not limited to § 1982 but reaches the whole of § 1981 in virtue of the Supreme Court's reliance on § 1 of the Civil Rights Act of 1866. As explicitly noted in *Runyon*, which extended *Jones* to § 1981, this "holding necessarily implied that the portion of § 1 of the 1866 Act presently codified as 42 U.S.C. § 1981 likewise reaches purely private acts of racial discrimination." *Runyon v. McCrary*, 427 U.S. 160, 170 (1976). In other words, *Jones* did not conclude *ex nihilo* that the property rights enshrined in § 1 applied to private discrimination. Rather, it held that *because the entirety of § 1 applied to private discrimination*, then what ultimately became § 1982 must also apply to private discrimination. As noted above, the "holding in *Jones* was that the '[1866] Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein - *including* the right to purchase or lease property.'" *Runyon*, 427 U.S. at 170 (quoting *Jones*, 392 U.S., at 436) (emphasis added). The Equal Benefit Clause is also an enumerated right under § 1. Therefore, under the holding of *Jones* as explicitly acknowledged in *Runyon*, the Equal Benefit Clause's application to private actors is precedent binding on this and all other courts. In *Seminole Tribe*, the Supreme Court noted "[w]hen an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Seminole Tribe v. Florida*, 517 U.S. 44, 67 (1996). There is simply no reading of *Jones* in which the Supreme Court's recognition that § 1 broadly applied to private actors is not necessary to its ultimate conclusion, rendering this determination binding precedent.

Finally lest there be any remaining doubt on whether private actors can violate the rights guaranteed in the Equal Benefit Clause, one need only look to 42 U.S.C. § 1985(3), reading in relevant part:

> If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages.

"On their face, the words of the statute  fully encompass the conduct of private persons." *Griffin v. Breckenridge*, 403 U.S. 88, 96 (1971). If private actors can conspire to violate and injure one's "equal protection of the laws, or of equal privileges and immunities under the laws," then clearly they can also violate one's right "to the full and equal benefit of all laws . . . for the security of persons and property." Critically, *Griffin* resolved a pressing constitutional question that has direct bearing on this matter. Twenty years prior, the Supreme Court decided *Collins v. Hardyman*, 341 U.S. 651 (1951), "which in effect construed the above language of § 1985(3) as reaching only conspiracies under color of state law." *Griffin*, 403 U.S. at 92. This determination was made in consideration of a long history of cases holding "that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States"  and a belief that § 1985(3) is dependent on that section. *Collins*, 341 U.S. at 658. *Griffin* eroded this paradigm.

While *Griffin* recognized "[a] century of Fourteenth Amendment adjudication has . . made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons," it immediately countered by noting "there is nothing inherent in the phrase that requires the action working the deprivation to come from the State" and that "the failure to mention any such requisite can be viewed as an important indication of congressional intent to speak in § 1985 (3) of all deprivations of 'equal protection of the laws'

12

and 'equal privileges and immunities under the laws,' whatever their source." *Griffin*, 403 U.S. at 97. If this is starting to sound a lot like *Jones*, it should, from which *Griffin* indicated it took direction. *Id*. If *Jones* can be used to support a cause of action against private actors on the basis of language similar to the Equal Benefit Clause *in an entirely different statute*, then all the more so that *Jones* is used properly here to reach language found in the original statute. *Griffin* also looked beyond the Fourteenth Amendment, and again to *Jones*, holding "Congress was wholly within its powers under § 2 of the Thirteenth Amendment in creating a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men." *Id*. at 105. All the more so for § 1981.

Defendant's single, seemingly contrary Supreme Court authority to the entirety of the above analysis does not override the binding effect of *Jones* and other cited cases because "the Supreme Court 'does not normally overturn, or . . . dramatically limit, earlier authority *sub silentio*.'" *Al-Tamimi v. Adelson*, 916 F.3d 1, 12 (D.C. Cir. 2019) (quoting *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000)). Looking to *Domino's*, Defendant correctly asserts "that § 1981 is not a vehicle to litigate all forms of racial animus." Def.'s Mem. at 9 citing (*Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479 (2006)). *Domino's*, however, which makes no mention of *Jones*, centered on "whether a plaintiff who lacks any rights under an existing contractual relationship . . . and who has not been prevented from entering into such a contractual relationship, may bring suit under . . . § 1981." 546 U.S. at 472. In that case, a business owner, who was not in contractual privity with Domino's, nonetheless sued Domino's for racial discrimination under § 1981 because Domino's allegedly breaching its contract with the business for racial reasons. *Id*. at 473-74. Analyzing the issue solely through § 1981's Right

to Contract Provision, the Supreme Court found for Domino's as the business owner lacked standing, serving only as an agent for the contracting party and not the party itself or a third party beneficiary. *Id*. at 474-75.

Admittedly, Defendant's primary purpose in citing *Domino's* is not to write the Equal Benefit Clause out of § 1981 but rather demonstrate, as the discussion's sub-heading suggests, "Plaintiff's Allegations of Harassment and Assault Are Not Tethered to Any Contractual Relationship." Def.'s Mem. at 8. Nonetheless, Defendant's quoted portions of *Domino's* read out-of-context may suggest that § 1981 is too narrow for Plaintiff's case, and other courts have rejected Equal Benefit Clause claims on this basis. *See, e.g.*, *Henderson v. Amerson*, 2025 U.S. Dist. LEXIS 125665, at *8-17 (M.D. Ala. June 23, 2025). For example, Defendant looks to a passage noting § 1981 is "limited to situations involving contracts," Def.'s Mem. at 9 (citing *Domino's*, 546 U.S. at 479), but by this the Supreme Court meant the Right to Contract Provision is limited to contracting parties and does not provide relief to their aggrieved owners or shareholders. After all, Defendant readily admits elsewhere § 1981 extends beyond contracts and unto other realms, particularly "state action." Def.'s Mem. at 8. The Supreme Court also noted concerns over making § 1981 "an omnibus . . . would produce satellite § 1981 litigation of immense scope." Def.'s Mem. at 9 (citing *Domino's*, 546 U.S. at 479). The concerns of satellite litigation, however, center on things like "class actions by all the minority employees of the nonbreaching party to a broken contract." *Domino's*, 546 U.S. at 479. The Supreme Court did not want to extend § 1981 standing to peripheral players. Therefore, this is not "the sort of overbroad theory the Supreme Court warned against in *Domino's*," Def.'s Mem. at 13, and to the extent ruling in favor for Plaintiff (again) will open "'floodgates' to new claims against pro-Palestinian activists," *id*., *Bostock* advises that courts pay no mind to floodgate hysteria because "people are

entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration" like policy. 590 U.S. at 666. The appropriate recipient of Defendant's objection to applying the equal benefit clause to private actors is not this Court but Congress. *Id.* at 680-81 ("The place to make new legislation, or address unwanted consequences of old legislation, lies in Congress.").

Defendant looks in-circuit to *Humphries v. Newman*, 2021 U.S. Dist. LEXIS 254494, at *7 (D.D.C. Mar. 2, 2022) as fleshing out *Domino's*, but while *Humphries* notes per *Domino's* "Any claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship' under which the plaintiff has rights," it immediately goes on to note the plaintiff did not "identify *any other conduct* by Defendants that would be covered by this statute." Def.'s Mem. at 9 (emphasis added). In other words, the court understood that *Domino's* did not erase the Equal Benefit Clause or § 1981's proscription of "other conduct" unrelated to contracts, as was made explicit by another in-circuit case, *Malzoum*, which after detailed review of *Domino's* noted: "*Domino's* does not require a contractual relationship for a Section 1981 claim, but only requires that where a contract is the basis of a Section 1981 claim, the plaintiff must have rights to assert under the contract." *Mazloum v. D.C. Metro. Police Dep't*, 522 F. Supp. 2d 24, 37 (D.D.C. 2007); *see also De La Fuente v. DNC Servs. Corp.*, 2019 U.S. Dist. LEXIS 68738, at *15 n.10 (D.D.C. Apr. 23, 2019); *Moonblatt v. District of Columbia*, 572 F. Supp. 2d 15, 25 (D.D.C. 2008).

Those holding *Domino's* erased the Equal Benefit Clause also cannot meaningfully justify their position in light of *Goodman*, which overturned "a pretrial order that the Pennsylvania 6-year statute of limitations governing claims on contracts . . . applied to . . . § 1981 claims" and instead applied "the 2-year statute applicable to personal injuries." *Goodman v.*

*Lukens Steel Co.*, 482 U.S. 656, 659-660 (1987). In holding as such, the Supreme Court rejected the contention "that § 1981 deals primarily with economic rights, more specifically the execution and enforcement of contracts, and that the appropriate limitations period to borrow is the one applicable to suits for interference with contractual rights." *Id*. at 660. Rather, "Section 1981 has a much broader focus than contractual rights. The section speaks not only of personal rights to contract, but . . . to equal rights under all laws for the security of persons and property." *Id*. at 661. In reaching this holding, the Supreme Court rejected Justice Brennan's thoughtful dissent arguing that "Section 1981, in its original conception and its current application, is primarily a proscription of race discrimination in the execution, administration, and enforcement of contracts." *Id*. at 670 (Brennan, J. dissenting). Therefore, while Defendant wisely does not outright argue *Domino's* erases the Equal Benefit Clause, some of the language she cites has elsewhere been erroneously used for such purposes and refutation is required.

## 2. The Most Compelling D.C. Circuit and Out-of-Circuit Guidance Favor Asserting Federal Question Jurisdiction.

Taking direction from *Griffin*, the D.C. Circuit has long held "[i]t is well established that civil rights statutes should be read expansively in order to fulfill their purpose." *Mayers v. Ridley*, 465 F.2d 630, 635 (D.C. Cir. 1972) (citing *Griffin*, 403 U.S. at 97)). The D.C. Circuit has similarly acknowledged that "[a]ccording to the Supreme Court, the Reconstruction civil rights acts are to be 'accorded a sweep as broad as their language.'" *McCord v. Bailey*, 636 F.2d 606, 614 (D.C. Cir. 1980) (quoting *Jones*, 392 U.S. at 437) (quoting *Price*, 383 U.S. at 801)) (cleaned up).

*Banks v. Chesapeake & Potomac Telephone Co.*, 802 F.2d 1416 (D.C. Cir. 1986) provides additional insight. There, like the Supreme Court in *Goodman* decided the following year, the D.C. Circuit was tasked with determining the statute of limitations for § 1981, having to choose

between borrowing the one-year period set by D.C.'s civil rights statute (the District of Columbia Human Rights Act of 1978), the three-year period for general personal injuries, *Id*. at 1417-20, and the one-year period for specific torts including assault and battery. *Id*. at 1426. Without *Goodman* on the books, the D.C. Circuit needed to reason by analogy, and looked to *Wilson v. Garcia*, 471 U.S. 261, 105 S. Ct. 1938 (1985) for guidance, which held that a state's personal injury statute of limitations applies to 42 U.S.C. § 1983 claims instead of its civil rights statute. The D.C. Circuit acknowledged the Supreme Court's analysis that "the historical context of the Civil Rights Act of 1871," specifically "the campaign of violence in the South," is "what motivated Congress to enact the statute." *Banks*, 802 F.2d at 1420-21 (citing *Garcia*, 105 S. Ct. at 1948). Further, "the unifying theme of the Civil Rights Act was the Constitution's command that . . . no person be deprived of life, liberty, or property without due process of law or be denied the equal protection of the laws." *Id*. The D.C. Circuit found "the reasoning of *Garcia* to be persuasive in [the § 1981] context as well . . . Both § 1983 and § 1981 provide remedies for a broad range of actions that could be characterized as various state torts." *Banks*, 802 F.2d at 1021.

Defendant wisely exploits ambiguous language in *Banks*, which the court "consider[ed] . . . in dicta only," *id*. at 1427, noting that "that although § 1981 provided remedies for a broad range of actions, the statute was 'not designed to provide a remedy for intentional torts such as assaults [or] batteries.'" Def.'s Mem. at 11 (quoting *id*.). Concurring Judge Buckley noted "this analysis is at odds with the remainder of the majority opinion." *Banks*, 802 F.2d at 1438 n.4 (Buckley, J., concurring). In response, the majority clarified "[o]ur review of the Civil Rights Act leads us to believe that Congress intended § 1981 to be a personal injury remedy, but not *solely* for intentional personal injuries." *Banks*, 802 F.2d at 1428 n.21 (emphasis altered). In other

17

words, § 1981 was not designed to provide a remedy for intentional torts, such as the battery at issue here, for the same reason Tylenol Cold & Flu was not designed to remedy a cold: both have broader remedial purposes that swallow and incorporate narrower aims. The D.C. Circuit provided this commentary in rejecting D.C.'s one-year statute of limitations for specific torts such as assault and battery, instead opting for the broader personal injury statute's three-year period. Once again deferring to *Garcia*, the D.C. Circuit noted:

> the Court in *Garcia* did not rest its conclusion that § 1983 claims were best characterized as personal injury claims on the ground that the statute was intended merely to provide a remedy for physical violence. Rather, the Court also emphasized that violations of the Fourteenth Amendment's antidiscrimination command are injuries 'to the individual rights of the person.'

*Id.* at 1427 (citing *Garcia*, 105 S. Ct. at 1948)). While the portion Defendant latches onto admittedly reads strange in isolation—something not lost unto all three judges deciding *Banks*—the court merely sought to emphasize § 1981's breadth, a crucial step in concluding that the statute of limitations for intentional torts was inappropriately narrow for § 1981 claims. Clarifying this point was important for the court because under *Garcia*, courts must "select in each State, the one most appropriate statute of limitations." *Banks*, 802 F.2d at 1421 (quoting *Garcia*, 105 S. Ct. at 1947)). Forced to select only one limitations period, the D.C. Circuit opted for the broader personal injury statute, and this determination was vindicated several years later in *Owens v. Okure*, 488 U.S. 235 (1989) with respect to § 1983. There, the Supreme Court held "[t]he intentional tort analogy is particularly inapposite in light of the wide spectrum of claims which § 1983 has come to span." *Id.* at 249. The same holds for § 1981 and why narrowing it to torts like assault and battery, and the corresponding statute of limitations, is inappropriate.

The only other in-circuit cases Defendant cites on this issue is *Provisional Gov't of the Republic of New Afrika v. Am. Broad. Cos.*, 609 F. Supp. 104 (D.D.C. 1985). As correctly

summarized by Defendant, "[t]he plaintiff alleged that news coverage broadcast by the network associated them with criminal activity and violated their civil rights." Def.'s Mem. at 10 (citing *id*. at 110). Relevant here, the civil rights allegations centered on § 1981 and §1985(3). *Republic*, 609 F. Supp. at 106. Relying on a highly problematic Third Circuit opinion, *Mahone v. Waddle*, 564 F.2d 1018 (3d Cir. 1977), discussed immediately below, the court held the Equal Benefit Clause "does not reach purely private discrimination." Def.'s Mem. at 10 (citing *Republic*, 609 F. Supp. at 109).

*Mahone* is the first meaningful federal appellate ruling on the Equal Benefit Clause, and as negative as it is for Plaintiff, it is equally incongruent and unconvincing. *Mahone* commenced with a survey of several prior cases touching on this issue, 564 F.2d at 1027-28, including *Cent. Presbyterian Church v. Black Liberation Front*, 303 F. Supp. 894 (E.D. Mo. 1969), a case in which a militant black liberation group, indisputably a private actor, interrupted services at a predominately white church and subsequently harassed parishioners. The church also received anonymous calls threatening violence and destruction. *Id*. at 898. Relying heavily on *Jones*, the court found the parishioners' rights under the Equal Benefit Clause were violated and issued a preliminary injunction. *Id*. at 899-902. As described by *Mahone*, *Central Presbyterian* "held that the defendants' interruptions of the Church's Sunday services had deprived the church and its members of the right guaranteed by section 1981 to equal benefit of the laws for the security of property." *Mahone*, 564 F.2d at 1027. Commenting on this and associated cases, the Third Circuit noted its "own examination of the language of section 1981 leads us to believe that its reach is as wide as these cases would indicate," and that "evidence of the contemporary understanding of the Civil Rights Act of 1866, the Act from which section 1981 derives," shows that "the Act was a complete statutory analog to the thirteenth amendment. The Act was not

19

intended to have merely limited effect; rather, it was to eradicate all discrimination against blacks and to secure for them full freedom and equality in civil rights." *Id.* at 1027-28. Then, apparently developing a case of instantaneous amnesia about *Central Presbyterian* and historical amnesia over the fact that the crux of the Thirteenth Amendment—eradicating slavery and associated discrimination—reached private and state actors alike, the Third Circuit went on to erroneously opine "[t]he state, not the individual, is the sole source of law, and it is only the state acting through its agents, not the private individual, which is capable of denying to blacks the full and equal benefit of the law." Def.'s Mem. at 11 (quoting *Mahone*, 564 F.2d at 1029). As *Mahone* centered on defendants who were acting under color of law, *Mahone*, 564 F.2d at 1020-21, its commentary on the Equal Benefit Clause was superfluous dicta. The Third Circuit revisited *Mahone* in 2001, again in dicta, citing a purported "substantial line of authority holding that only state actors can be sued under the 'full and equal benefit' clause of § 1981." *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 799 (3d Cir. 2001). *Brown* gives nary a word to all the above cited Supreme Court authority to the contrary. Erroneously, "courts in th[e] [Third] Circuit continue to apply . . . *Brown* and *Mahone*." *Wright-Phillips v. United Airlines, Inc.*, 2021 U.S. Dist. LEXIS 63925, at *26 (D.N.J. Apr. 1, 2021).

*Mahone* and its progeny are incomprehensible in light of *Jones*, *Runyon*, and *Griffin*, harkening to a discredited, post-Reconstruction view of rights in which "[a]n individual cannot deprive a man of his right[s]. He may, by force or fraud, interfere with the enjoyment of the right in a particular case, but unless protected in these wrongful acts by some shield of State law or State authority, he cannot destroy or injure the right." *Jones*, 392 U.S. at 453 (Harlan, J. dissenting) (quoting *The Civil Rights Cases*, 109 U.S. 3, 17 (1883)) (cleaned up). *Jones*, of course, was issued over such dissent by Justice Harlan, and along with *Runyon* rejected this

conception of rights. The Third Circuit was therefore wrong in concluding the Equal Benefit Clause could be divorced from these holdings focused on portions of § 1981 "necessarily . . . concerned with relations between private individuals." *Mahone*, 564 F.2d at 1029. The state law predicates at issue here are also no less concerned with relations between private individuals. Just as refusing to contract with someone on the basis of their race violates a right guaranteed by § 1981, so too does attacking someone in violation of laws designed to prevent such attacks. This is to say nothing about the clear directive from *Griffin* recognizing that private parties may violate rights functionally identical to those granted in the Equal Benefit Clause.

Defendant also cites *Shaare Tefila Congregation v. Cobb*, 785 F.2d 523 (4th Cir. 1986), but as its analysis is entirely dependent on *Mahone*, *id*. at 525-26, it can be dispensed with for similar reasons. Finally Defendant cites several 8th Circuit cases, beginning with its lead case— which in reality is a "lead" three sentences on the Equal Benefit Clause—*Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001). Def.'s Mem. at 11-12. This case can also be dispensed with because it is entirely dependent on *Mahone* and the Sixth Circuit's original opinion *Chapman v. Higbee Co.*, 256 F.3d 416 (6th Cir. 2001), which was ultimately vacated and overturned on rehearing, finding the Equal Benefit Clause applies to private actors as discussed below. *See Chapman v. Higbee Co.*, 319 F.3d 825 (6th Cir. 2003). While Defendant is correct that "[t]he Eighth Circuit has consistently reaffirmed the same rule," Def.'s Mem. at 11, these cited reaffirmations are equally lackluster. *Adams ex rel. Harris v. Boy Scouts of Am.–Chickasaw Council*, 271 F.3d 769 (8th Cir. 2001) was decided shortly after *Youngblood* and relies on the same erroneous *Mahone* and original *Chapman* opinions. *Bilello v. Kum & Go*, LLC, 374 F.3d 656, 661 (8th Cir. 2004) rehashes and applies *Youngblood* in a short paragraph while acknowledging the Sixth Circuit overturned *Chapman*, mentions the Second Circuit's *Phillip v.*

*Univ. of Rochester*, 316 F.3d 291, 298-99 (2d Cir. 2003) holding contrary to *Youngblood*, and hedges by noting "[u]nder Eighth Circuit practice, we are bound to follow our precedents" and "[e]ven if this circuit, sitting en banc, were to reverse its prior holdings . . . we believe the facts alleged . . . do not support a viable section 1981 equal benefit claim under the standards articulated by the Sixth and Second Circuit." *Bilello*, 374 F.3d at 661 n.4. It appears the Eighth Circuit has never meaningfully tried to justify *Youngblood* in the intervening years, and continues to default back to its "cardinal rule in the Eighth Circuit that one panel is bound by the decision of a prior panel." *Elmore v. Harbor Freight Tools USA, Inc.*, 844 F.3d 764, 767 (8th Cir. 2016) (cleaned up, citations omitted).

Defendant argues "[t]aken together, these decisions reflect the majority view, which the U.S. District Court in the District of Columbia has followed," Def.'s Mem. 12, but in reality what these cases amount to are an internally inconsistent opinion from the Third Circuit, an opinion from the Fourth Circuit entirely dependent on the former and largely forgotten because the Supreme Court reversed its holding on other grounds, a line of cases from the Eighth Circuit for which that court has apparently given up trying to justify on the merits, and a court in this district that outsourced its analysis to *Mahone*. Even in the light most charitable to Defendant, she has only three circuits on her side while Plaintiff has two. This is not the blow out Defendant implies when labeling her cases the "majority view," and the lead cases from the Second and Sixth Circuits favoring Plaintiff are highly detailed and persuasive in analyzing the Equal Benefit Clause as opposed to the cases favorable to Defendant.

In *Phillip*, the Second Circuit noted "*Mahone*, the primary and largely unexamined source for the holdings in *Youngblood* and *Brown*, merits close examination." 316 F.3d at 294. Looking to "*Runyon*, the original legislative history [of § 1981], and *Mahone's* key analytical

flaw" that "because states, not individuals, make laws [it follows] only the state can take away the protection of the laws it created," the Second Circuit "respectfully differ[ed] with the contrary conclusion reached by the Eighth and Third Circuits." *Id*. at 295-296. On *Runyon*, the court rejected the notion that it has "no application to an equal benefit clause claim." *Id*. at 295. Instead, "the [Supreme] Court held simply that '42 U.S.C. § 1981 . . . reaches purely private acts of racial discrimination," with no indication that the Supreme Court saw this as limited to only contracts. *Id*. (quoting *Runyon*, 427 U.S. at 170). On § 1981's legislative history, *Phillip* looked to *Jones* and examined "the extensive description [before the Reconstructionist Congress] of racial abuses that individuals perpetrated, coupled with the Senate sponsor's broad view of the legislation's aims," finding the court "should read Section 1981 as broadly as is consistent with the actual language of each clause." Id at 296 (citing *Jones* 392 U.S. at 426-37). Finally, on *Mahone's* analytical flaw, it looked to "the face of the amended statute," § 1981(c)'s reference to private actors, finding "clarity of the statutory language" in the Equal Benefit Clause's application to private actors. *Id*. at 294.

While the careful analysis in *Phillip* is dispositively persuasive, it is supplemented by Sixth Circuit's final decision in *Chapman*, after the earlier ruling upon which *Youngblood* depended was vacated for rehearing en banc. *Chapman*, like *Phillip*, is not a mere three sentences on the topic at hand. Rather, it squarely centered on "whether section 1981 provides a cause of action against a private party under its equal benefit clause." *Chapman*, 319 F.3d at 828. Looking to Supreme Court guidance later reflected in *Bostock* above, the court began its analysis by noting "where 'the statute's language is plain, the sole function of the courts is to enforce it according to its terms.'" *Id*. at 829 (quoting *United States v. Ron Pair Entertainment, Inc*., 489 U.S. 235, 241 (1989)). From this, the court launched in a simple but obvious syllogism:

> Section 1981 is unambiguous. According to subsection (c), the rights protected by section 1981 are 'protected against impairment by nongovernmental discrimination.' Section 1981 explicitly protects the right 'to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens;' therefore, that right is 'protected against impairment by nongovernmental discrimination.'

*Id*. at 829-30. Rejecting arguments that § 1981(c) reaches only § 1981(a)'s contract provisions, the court determined "the principle of *expressio unius est exclusio alterius* would seem to preclude this court from grafting additional limitations into the statute," given that § 1981(c) is already expressly limited in application to § 1981(a). *Id*. at 830. Going further, and similar to the above analysis on *Griffin*, the court held "*Griffin's* interpretation of section 1985(3)'s equal protection provision suggests that section 1981's analogous clause would protect against private impairment even absent subsection (c)'s explicit instruction." *Id*. at 831.

Ultimately, while Defendant is correct that "Plaintiff neither alleged nor demonstrated anything more than a private interaction between the parties," this is irrelevant, and Defendant is wrong that "[t]here is no allegation nor showing that Plaintiff was denied protection of the laws." Def.'s Mem. at 13. Plaintiff's Complaint pleads numerous state law predicates to an Equal Benefit Clause violation, including battery, as properly found by this Court. The holding is entirely in line with binding Supreme Court precedent found in *Jones*, laying in § 1 of the Civil Rights Act of 1866, additional Supreme Court guidance found in cases like *Runyon* and *Griffin*, the plain text of § 1981 and its legislative intent, and the most compelling analysis on the issue from the D.C., Second, and Sixth Circuits, the last of which perfectly applying *Griffin*.

### 3. This Court properly determined that Defendant battered Plaintiff and the battery was discriminatory.

Defendant notes that "[i]n a preliminary injunction context, where there is any factual dispute, the plaintiff is 'obliged to establish a *clear and compelling* legal right thereto based upon

24

*undisputed facts*.'" Def.'s Mem. at 13 (quoting *E.M. v. Shady Grove Reproductive Sci. Center, P.C.*, 2020 U.S. Dist. Lexis 232743 (D.D.C. 2020) (quoting *In re Navy Chaplaincy*, 928 F. Supp. 2d 26, 36 (D.D.C. 2013)) (emphasis retained). Taken literally and in isolation, this directive would preclude preliminary injunctions from ever being issued when there are disputed facts, barring all evidentiary hearings. In reality, this directive at most means what this Court already recognized: "[t]he movant must 'by a clear showing, carr[y] the burden of persuasion.'" ECF No. 26 at 5 (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). To the extent that facts are disputed while the motion is being considered, these become undisputed for purposes of granting the preliminary injunction upon a finding of facts by the court. *See Id*. (citing *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004)) ("A district court should hold an evidentiary hearing and make factual findings if faced with disputed issues of material fact on a motion for a preliminary injunction.")). Critically, "[t]hese findings of fact receive 'special deference' on appeal and will not be disturbed absent clear error." *Id*. citing (*City of Las Vegas v. Lujan*, 891 F.2d 927, 931 (D.C. Cir. 1989)).

The only special deference Defendant gives, however, is not to this Court's factfinding but that of the D.C. Superior Court in Defendant's trial with entirely different evidentiary standards. Defendant argues that "weighing all evidence at the preliminary injunction hearing in Plaintiff's favor, Plaintiff did not meet her burden, *especially given* that the D.C. Superior Court found inconsistencies in the testimony of Plaintiff and Officer Bonney, which was part of the record considered by the Court." Def.'s Mem. at 13 (emphasis retained). By Defendant's own admission, therefore, this Court already considered the trial transcript. This Court had the opportunity to hear Officer Bonney's live testimony addressing any alleged inconsistencies in his prior testimony, and the opportunity to judge his credibility, as well as argument pointing out

inconsistencies in the Defendant's prior testimony.  In other words, to the extent that Officer Bonney's testimony was impeached by inconsistencies before the D.C. Superior Court, it was rehabilitated in live testimony before this Court. There can be no clear error in this Court deferring to its own credibility determinations rather than Defendant's assessments of another court's credibility determinations. *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) ("when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."). For purposes of the present procedural posture, the undisputed record is that Defendant attacked Plaintiff by tugging on her Israeli flag while it was tied around Plaintiff's neck. The question, then, can only turn on whether Defendant's attack was racially discriminatory in light of the evidence and argumentation previously presented to this Court, as new evidence and argumentation are waived. ECF No. 26 at 10 (quoting *Entergy Ark., LLC v. FERC*, 134 F.4th 576, 580 (D.C. Cir. 2025)) ("Forfeiture ordinarily applies whenever a party relies on an argument not raised in its [initial] brief.")).

Plaintiff and Defendant are in agreement that the elements of a § 1981 are: "(1) that the plaintiff is a member of a racial group; (2) that the defendant intended to discriminate against the plaintiff on the basis of race; and (3) that the discrimination concerned an activity enumerated § 1981." Def.'s Mem. at 14 (citing *Moini v. Wrighton*, 602 F. Supp.3d 162, 172 (D.D.C. 2022)). They further agree that Plaintiff satisfies the first element, but not surprisingly disagree on the last two. As argued above, Plaintiff also satisfies the third element. Therefore, all that remains is Defendant's argument that this Court incorrectly determined that Defendant targeted Plaintiff on

the basis of her race. This question, however, in part turns on what it means for Plaintiff to belong to a member of the Jewish racial group.

Our starting point is *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987), the Supreme Court's hearing on appeal of a Fourth Circuit ruling cited by Defendant as discussed above. There, the Supreme Court considered whether an attack on a synagogue—by definition centering on religion—sounded in the Civil Rights Act of 1866, whose protections center on race but not religion. The Supreme Court suggested the affirmative, noting "Jews . . . were among the peoples then considered to be distinct races and hence within the protection of the statute." *Id.* at 617-18. Under *Shaare Tefila*, discriminating against Jews as a people on the basis of their religion entails discrimination on the basis of their race. An attack on a Jewish place of *worship* may constitute an attack on the Jewish *race*. The Supreme Court understood the intermingling of Jewish racial and religious identity. A trait that could be the object of antisemitic religious discrimination, such as Plaintiff's identification with and expression of support for the Jewish State, can also be the object of antisemitic racial discrimination. Courts have credited arguments by Jewish plaintiffs that Zionism is a sincerely held tenant of their Judaism. In *Frankel*, for example, the plaintiffs were "three Jewish students who assert[ed] they have a religious obligation to support the Jewish state of Israel" and were discriminated against on this basis. *Frankel v. Regents of the Univ. of Cal.*, 744 F. Supp. 3d 1015, 1022 (C.D. Cal. 2024). Not mincing words, the court held:

> In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith. This fact is so unimaginable and so abhorrent to our constitutional guarantee of religious freedom that it bears repeating, *Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith*.

*Id*. at 1020 (emphasis retained). Under the spirit of *Shaare Tefila*, they were equally discriminated against on the basis of their race. As Plaintiff pled under oath, Plaintiff's affinity to Israel is not only a religious mandate for her, but otherwise intimately connected with her racial identity. Ver. Compl., ECF No. 1, at ¶¶ 5-9.

The Supreme Court has aptly noted "[a] tax on wearing yarmulkes is a tax on Jews." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). The same must hold for discriminating against those who observe the Sabbath, keep kosher, or express their Jewish race in other ways such as supporting Israel. Per Pew Research, 82% of "U.S. Jews say caring about Israel is an important or essential part of what being Jewish means to them," 58% are "emotionally attached to Israel," and 32% believe "God gave the land that is now Israel to the Jewish people."[5] In comparison only 17% keep kosher at home[6] and "[o]n a typical day," 20% "wear something that is distinctively Jewish, such as a kippa (yarmulke)."[7] As yarmulkes are for men and the cited Pew query included other Jewish articles, less than 10% wear yarmulkes. If wearing a yarmulke is a proxy for the Jewish race, then all the more so for supporting Israel.

Attacking Jews on any of these bases constitutes "[p]roxy discrimination," the use of "seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Hecox v. Little*, 79 F.4th 1009, 1024-25 (9th Cir. 2023) (quoting *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013)). The Jewish State of Israel and Zionism are "so closely associated with" Jews that to discriminate against

---

[5] https://www.pewresearch.org/religion/2021/05/11/u-s-jews-connections-with-and-attitudes-toward-israel/

[6] https://www.pewresearch.org/religion/2021/05/11/jewish-practices-and-customs/

[7] https://www.pewresearch.org/religion/wp-content/uploads/sites/7/2021/04/PF_05.11.21.Jewish_Survey_Topline.pdf at 35.

them on this basis constitutes "facial discrimination against" Jews. By definition, Zionism involves both the Jewish nation—which in civil rights terms corresponds to race and national origin—and the Jewish religion.[8]

Defendant argues her attack on Plaintiff "is not direct evidence of an antisemitic motive, anymore than burning an Israeli flag would be at such a demonstration." Def.'s Mem. at 14. She is correct, but not in the way she prefers. All things equal, burning an Israeli flag is direct evidence of antisemitism and actionable under § 1981 if the flag belonged to a Jewish person and was burned without their consent.[9] After all, if one takes a yarmulke off a Jew's head and burns it, that is obviously antisemitic discrimination. Given, however, that affinity to Israel dwarfs wearing yarmulkes as a proxy for the Jewish race, then destroying a Jew's Israeli flag or attacking them for wearing one is too. When people think of yarmulkes, they have only one race in mind, and so too for Israel. Just as no court would reasonably believe attacking someone for wearing a yarmulke is motivated by a general objection to headcoverings or a distaste for yarmulkes as an object of fashion completely divorced from their association with the Jewish race, this Court correctly determined it strained credulity to believe anything other than antisemitic animus motivated Defendant's attack, adopting Plaintiff Counsel's argument that "if yanking on a flag emblazoned with the Star of David tied around a Jewish person's neck at a pro-Israel protest is not discrimination, 'I don't know what is.'" ECF No. 26 at 15 (quoting Pl. Hr'g Tr. at 83:3–5)). Moreover, Defendant did not merely target the Israeli flag but rather

---

[8] https://www.merriam-webster.com/dictionary/Zionism

[9] This analysis is not confined to the Israeli flag. Confiscating and burning a Catholic's Vatican flag would be direct evidence of anti-Catholic bigotry and not plausibly interpreted as protesting, say, the Church's positions on abortion or homosexuality. Similarly, stealing and burning a Saudi, Indian, or even American flag would be direct evidence of anti-Saudi, Indian, or American bigotry. One could easily envision a business in the United States, owned by a non-American, in which the employer takes and destroys an American flag from an American employee's desk. That conduct would be direct evidence of anti-American.

attacked an individual joining a counterprotest organized by a Jewish group seemingly known by Defendant given its deep protest-counterprotest history with Code Pink.

Defendant further explores this issue in addressing this Court's finding that the public interest favors an injunction, but it is best addressed here. She attempts to erode the connection between the Israeli flag and Jewish race by noting "[s]ome evangelical Christians, and many Americans generally, use the Israeli flag to show support of Israel—just as many Americans displayed Ukrainian flags after the 2022 invasion by Russia." Def.'s Mem. at 22-23. That's true, but even Defendant seems to recognize that wearing a Jewish Star necklace signifies the Jewish people. Def.'s Mem. at 23. Does the fact that Louis Armstrong wore one make it any less of a signifier for the Jewish people?[10] Then why would Evangelicals or other supporters of Israel displaying the Israeli flag? Moreover, if a Russian person attacked a Ukrainian person wearing a Ukrainian flag in the midst of repeated dueling protests between those supportive of Russia's invasion of Ukraine and a notorious Ukrainian-American group, that attack would be discriminatory even if many people of non-Ukrainian heritage also display the Ukrainian flag in other contexts.

Defendant also correctly notes that "[n]umerous national flags include distinctive, sacred religious symbols but are not representations of entire religions" and then identifies the flags of multiple Muslim and Christian countries with related symbology. Def.'s Mem. at 23. The problem here is that there are many different Christian and Muslim states, none of which are *uniquely* associated with a single religio-racial group in the way Israel is associated with Jews. For example, the Organization of Islamic Cooperation has 57 member-states, nearly all Muslim-majority,[11] but there remains only one Jewish State and the Jewish Star on the Israeli

---

[10]https://stljewishlight.org/arts-entertainment/did-you-know-louis-armstong-wore-star-of-david/

[11]https://www.aljazeera.com/news/2025/9/15/who-are-the-57-members-of-the-organisation-of-islamic-cooperation

flag represents only one race. On the other hand, the Islamic symbology on the Iranian, Saudi, And Turkish flags do not represent a single race or ethnic group. This Court properly recognized that "[t]he Star of David—emblazoned upon the Israeli flag—symbolizes the Jewish race." ECF No. 26 at 14 (citing Star of David, Encyclopedia Britannica (2025)). There is no comparable Christian or Islamic race. Finally, as the widely accepted IHRA definition of antisemitism recognizes, Ver. Compl. ¶20, Israel is commonly used as a proxy to unleash antisemitism, a determination that seemingly recognizes the way in which anti-Zionism has been used as a cover for antisemitism as originally spearheaded by the Soviet Union, when the Holocaust rendered old school antisemitism unfashionable.[12] In the alternative, there is no definition of racism or even "Islamophobia" whereby disproportionately targeting Turkey for attacks is one of the signifiers. This Court's decision was also not without precedent in the broader context. Many jurisdictions treat as hate crimes the defacement of LGBTQ flags,[13] the symbology of which is also uniquely identified with one group of people.

Defendant further argues that her attack "plausibly can be interpreted as protesting the State of Israel's policies." Def.'s Mem. at 14. However, this Court correctly noted "Ali did not have reason to think Sumrall was herself affiliated with the Israeli government." ECF No. 26 at 15. Moreover, given the inseparable connection between the Jewish race and the Jewish State of Israel, any attack on Jews could be chalked up to mere disagreement with Israel if Defendant's logic is credited, and the same holds true in applying the Jerusalem Statement on Antisemitism. Def.'s Mem. at 14-15. After all, attacking a synagogue or someone wearing a Jewish star necklace could be gaslighted as "a reaction to a human rights violation, or it could be the

---

[12] https://www.cambridge.org/core/journals/slavic-review/article/abs/origins-and-development-of-soviet-antisemitism-an-analysis/99945786B60F74C869F8F1E36BE7280E ("Especially disquieting is the massive anti-Zionist propaganda campaign which incorporates the traditional negative stereotypes of Jews.").

[13] *See* e.g., https://www.nytimes.com/2025/06/24/us/politics/atlanta-hate-crime-pride-flags.html; https://www.bbc.com/news/world-us-canada-50861259

emotion that a Palestinian person feels on account of their experience at the hands of the State."
*Id*. This is the exact line of reasoning Defendant's Code Pink embraced in seeking and failing to dismiss a FACE Act claim for the synagogue attack described in Plaintiff's Verified Complaint. Ver. Compl. ¶22 (citing *StandWithUs Center for Legal Justice* v. *CodePink et al*, 2:24-cv-06253, (C.D. Cal.)). There, Code Pink, much like Defendant here, framed its targeting of the synagogue as essentially a political protest against real estate being sold on "stolen Palestinian land" and having nothing to do with "religion, prayer, worship, nor even" Jewish immigration to Israel. *StandWithUs,* 2:24-cv-06253, ECF No. 98 at 19-20. The court found that:

> CodePink's [social media] posts included the Synagogue's address inside inverted red triangles—symbols that, according to the Complaint, are used "as a target designator to identify Jew and Jewish targets for extermination." Taking that allegation as true, the inclusion of these symbols could plausibly be seen as an attempt to . . . Intimidate Jewish worshipers by conveying a threat of extermination . . . or [i]ncite others to disrupt access to the Synagogue . . . Either theory is sufficient to satisfy the FACE Act . . .

*Id*., ECF No. 131 at 24-25. The court therefore rejected attempts to paint an Israel-related attack on Jews attending a synagogue as merely political and therefore not sounding in the FACE Act. This is all the more true for an attack on a Jewish person expressing her race in the § 1981 context rather than a mere coded call to attack in *StandWithUs.*

As a further attempt to frame Plaintiff wearing an Israeli flag and Defendant's ensuing attack as political, Defendant argues "[t]he hundreds of thousands of Israeli protestors against the war in Gaza march with the Israeli flag not to show their Jewishness but that they are patriotic and against the Israeli government's policy, i.e., they carry the flag as a political symbol." Def.'s Mem. at 15-16. First, the motives of unnamed protesters in Israel is irrelevant in the face of Plaintiff's sworn testimony, which this Court credited, that she wore an Israeli flag to express her racial identity. Ver. Compl. ¶¶1, 10; ECF No. 26 at 1 ("Sumrall proudly displayed her Jewish

heritage at a protest by tying an Israeli flag around her neck."). Second, the undisputed record is that this case arises not out of a disagreement between fellow patriotic Israelis but between a pro-Israel Jewish group in the United States and an anti-Israel group that Plaintiff has sworn under oath engages in antisemitism. Third, in Israel there is no separation between church and state,[14] and therefore one cannot divorce Israeli politics from the Jewish religion and associated race. Contrary to Defendant's assertion that the protesters "march with the Israeli flag not to show their Jewishness," this is precisely why they march with it. They believe their Jewish identities compel their protest.[15]

As the Jerusalem Statement appropriately recognizes, "hostility to Israel could be an expression of an antisemitic animus, and even if  "judgement and sensitivity are needed in" determining whether such hostility amounts to antisemitism, Def.'s Mem. 15, Plaintiff's Verified Complaint also pleads numerous background circumstances indicating that Defendant was motivated by antisemitic animus, including but not limited to her prominence in a group that does not, under IHRA, criticize "Israel similar to that leveled against any other country," *id*., but rather incites attacks against synagogues and targets the world's only Jewish State using antisemitic tropes, including those related to Jews and money and their having disproportionate influence over the United States. Ver. Compl. ¶21-33. Defendant has also exhibited antisemitism in her personal life by naming her son after "jihad," a term whose origins cannot be divorced from its early roots of "holy war" against Jews, *Id*. ¶34-35, including the mass beheading of 600-900 Jewish tribesmen and the enslavement, presumably including sexual enslavement, of the

---

[14]https://www.jpost.com/opinion/article-729370

[15]https://www.timesofisrael.com/israel-stands-for-hostages-massive-day-of-protest-planned-for-tuesday/
("The deliberate delay in signing a deal for their return goes against the will of the people and *our fundamental values* — mutual responsibility and friendship. This is the *Israeli ethos* — this is our duty.") (emphasis added).

tribe's women and children,[16] with such barbary continuing through the present day with the October 7th massacre, rapes, and taking of Jewish hostages done in the name of jihad. Perhaps the most popular antisemitic slogan in the Muslim world—"Khaybar Khaybar ya yahud" —references early jihad against Jews.[17] Therefore, while Defendant's attack on Plaintiff speaks for itself as direct evidence of antisemitic discrimination, it is untrue that the Court "categorically equates anti-Israel with antisemitic without any further context indicating antisemitic racism." Def.'s Mem. at 15. To the contrary, there is context galore, it just does not suit Defendant.

Defendant also alleges that "the founder of Code Pink—the group Defendant was protesting with—was founded by a Jewish woman, Medea Benjamin, and many of its members are Jewish" and goes on to note "[i]f Ms. Ali was antisemitic, it is hard to believe she would participate in a protest organized in part by Jewish individuals." Def.'s Mem. at 17. First, the antisemitic nature of Code Pink as evidenced by the content of its protests speak for itself. Second, it is not uncommon for antisemites to find common ground with purported Jewish groups in furthering their antisemitic causes. After all, Jewish Voices for Peace ("JVP") worked hand-in-hand with Students for Justice in Palestine ("SJP") in fueling the antisemitic climate that plagued Columbia University.[18] In fact, Defendant's favorite source, the Anti-Defamation League ("ADL"), Def.'s Mot. at 17, has noted "JVP promotes messaging that descends into the antisemitic vilification."[19] If *Jewish* Voices for Peace can be antisemitic, all the more reason for Code Pink. It is well-settled that persons can discriminate against others of their own race. *See*

---

[16] Abū Jaʿfar Muḥammad ibn Jarīr al-Ṭabarī, The History of al-Ṭabarī Vol. 8: The Victory of Islam: Muhammad at Medina, A.D. 626-630/A.H. 5-8 27–41 (Michael Fishbein trans., SUNY Press 1997), available at https://archive.org/details/tabarivolume08_201911/page/n51/mode/2up

[17] https://extremismterms.adl.org/glossary/khaybar-khaybar-ya-yahud

[18] https://news.columbia.edu/news/statement-gerald-rosberg-chair-special-committee-campus-safety

[19] https://www.adl.org/resources/backgrounder/jewish-voice-peace-jvp

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78 (1998) (quoting *Castaneda* v. *Partida*, 430 U.S. 482, 499 (1977)) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of that group.")).

There was no clear error in this Court exercising its vast discretion to find the attack alone inherently antisemitic, but to the extent Defendant demands additional background circumstances and context, common sense reflection further justifies this Court's holding. Defendant is therefore incorrect when it argues "the Court's reliance on *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886 (11th Cir. 2007) and similar cases holding that racial slurs are direct evidence of discrimination is inapposite because Defendant did not make any racial slur or otherwise speak to Plaintiff." Def.'s Mem. at 16 (citing ECF No. 26 at 14). Defendant's attack on Plaintiff occurred as part of her affiliation with a group and participation in related protests that routinely lean into antisemitism.

Defendant looks out-of-circuit to *Landau* for the proposition that one cannot conclude "that any anti-Israel speech is intrinsically antisemitic, because reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views." Def.'s Mem. at 15 (citing *Landau v. Corp. of Haverford Coll.*, 2025 U.S. Dist. LEXIS 1402, at *4-5 (E.D. Pa. Jan. 6, 2025). There is nothing informative here. Plenty of Zionists regularly criticize the Israeli government, *including members of the Israeli government* who believe they have not gone far enough.[20] The court in *Landau* went on to hold that "when criticism of Israel or promotion of the Palestinian cause veers into antisemitism is necessarily a *fact specific endeavor*, and on that score Plaintiffs' complaint is insufficiently pled." *Landau*, 2025 U.S. Dist. LEXIS

---

[20]https://www.timesofisrael.com/smotrich-says-hes-lost-faith-in-pms-desire-to-win-war-demands-change-to-gaza-plans/

1402, at *10. The court thereafter gave leave to amend. *Id*. at *28. This Court conducted such a factual analysis—one to which it is afforded immeasurably discretion—and found for Plaintiff.

Finally, Defendant looks well outside of the merits of this matter to analysis provided by Plaintiff's counsel and the media. Def.'s Mem. at 16-17. Needless to say, post hoc commentary on the facts giving rise to this case and this Court's analysis have no bearing on what transpired at the Capitol or whether this Court committed clear error in ruling for Plaintiff.

### B.  This Court properly determined that Plaintiff established irreparable harm.

Defendant challenges whether Plaintiff can show irreparable harm by arguing that because Plaintiff is the D.C. head of a purportedly loud and aggressive Islamophobic hate group, Betar USA, and Plaintiff has partaken in such loud and aggressive behavior, then "[i]n no way has Plaintiff been dissuaded from her First Amendment activities." Def.'s Mem. at 18-19. This line of argument is irrelevant under F.R.E. 401, holding that "[e]vidence is relevant if: it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Plaintiff's post-assault affiliation with Betar is irrelevant because this Court found abundant alternative grounds to find irreparable harm. More broadly, this Court considered the threat to Plaintiff's chilled First Amendment activities under its public interest rather than irreparable harm analysis, ECF No. 26 at 18-19, and Defendant does not demonstrate it was clear error to not also weigh this factor in analyzing irreparable harm.

This Court properly determined that "Sumrall alleges two forms of irreparable harm: discrimination and fear of physical assault." *Id*. at 16. Neither of these have to do with Betar or Plaintiff's First Amendment rights. The case law, as recognized by this Court, is unmistakable: "courts have determined that being subjected to discrimination is by itself an irreparable harm."

*Id*. at 16 (collecting cases). The Court also properly found "the discriminatory harm has a high risk of recurrence" as the two are likely to attend the same protests. *Id*. at 16-17. The propriety of this determination is reinforced by the fact that this Court credited testimony that Defendant brazenly attacked Plaintiff in front of a group of law enforcement officers. In order to ensure such an attack never happens again, be it at protests or anywhere else in the galaxy, Plaintiff required and was granted a strong deterrent measure in the form of a preliminary injunction. Defendant now knows that if she so much as comes within striking distance of Plaintiff again, she will be in contempt of a court order and subject to serious consequences. The preliminary injunction accomplishes what even the presence of multiple law enforcement officers could not, and it rightfully extends well beyond protest activities. If Defendant and Plaintiff find themselves at the same grocery store, for example, Betar is not on either's mind, but the fear of assault this Court identified remains. The preliminary injunction ameliorates that, allowing Plaintiff to go about her day with a greater sense of peace.

### C. This Court properly determined the balance of equities favors Plaintiff.

In balancing the equities, this Court noted "[e]vidence of past physical harm can tip the balance of hardships *sharply* in the harmed party's favor." ECF No. 26 at 18 (citing *Int'l Ass'n Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 452 (7th Cir. 2022)) (emphasis added). Properly applying this consideration, this Court reached the only obvious conclusion that "the history of battery favors an order against Ali." *Id*. Defendant does not dispute this rule, nor does she identify any clear error in this Court's reliance, and instead argues that Plaintiff primarily counterprotests "pro-Palestine" events and "because Defendant cannot know precisely which events Plaintiff will attend, she will likely curtail protesting in the D.C. area for fear of being found in violation of the injunction," thus chilling her First Amendment right. Def.'s Mem.

at 19. The Court squarely addressed this concern, noting the preliminary injunction's "narrowness ensures both women can still be present at the same event." ECF No. 26 at 18. Using Defendant's logic, any preliminary injunction that contains a stay away order for a defendant likely to encounter a plaintiff in the future equally prevents the defendant from going to the grocery store, post office, bank, or ever leaving her house because Defendant can never be absolutely certain whether Plaintiff will be there. Of course, she can go to all of these places, protests included. She just cannot come within striking distance of Plaintiff.

Defendant's allegation that Plaintiff "tr[ies] to exercise a heckler's veto over the views of anti-Israeli voices," Def.'s Mem. at 19-20, does not remove Defendant's obligation to keep her hands off Plaintiff, and to the extent Defendant suggests she might feel provoked by Plaintiff exercising her First Amendment right to counterprotest, that is squarely Defendant's problem and she would be better suited seeking relief in anger management therapy rather from this Court. Moreover, this Court properly found "[t]here is no history of Sumrall seeking out Ali to repel her from events." ECF No. 26 at 18. In fact, Defendant readily admits "[t]here was never any contact between the parties at any rallies before this incident and Plaintiff has not documented any such." Def.'s Mem. at 20. In other words, whereas Defendant has a track record of attacking Plaintiff unprovoked, both parties agree Plaintiff has no track record of provoking Defendant to violence.

Defendant also attempts to relitigate or otherwise double down extraneous material previously presented to the Court without making any showing that reconsideration of this straightforward material is warranted. The only possible relevant grounds for reconsideration under Rule 54(b) on this issue are clear error or if "the court patently misunderstood a party," and the applicability of Rule 59(e) here is confined to clear error. None of these considerations apply to the Court's consideration of, for example, "the video presented to the Court where she was

asked to leave a discussion in a restaurant with Norman Finkelstein" or "the video of events surrounding the incident presented to the Court." Def.'s Mem. at 20. Plaintiff's post-assault social media posts Defendant offers for purposes of this motion are more of the same.

Defendant further argues "Plaintiff cannot seek injunctive relief under § 1981 based on the alleged harm that the absence of a stay away order will prevent her from exercising her First-Amendment rights." Def.'s Mem. at 20. Plaintiff's cause of action, however, arises under § 1981's prohibition on discrimination (and ensuing harm) and the right to corresponding injunctive relief rather than First Amendment considerations. Whatever arguments Plaintiff may have previously made implicating her First Amendment rights, this Court found the equities tipped in Plaintiff's favor because Defendant assaulted her on discriminatory grounds. Defendant does not show the Court was erroneous. This Court's consideration of the First Amendment in balancing the equities did not concern the grounds of Plaintiff's right to relief but was rather focused on preserving *both parties'* First Amendment rights in light of the relief granted. ECF No. 26 at 18.

Looking to *Herzfeld*, a case recently decided by another judge in this district, Defendant argues "Plaintiff cannot repeatedly insert herself into anti-Israeli protests, act belligerently, and claim that she will suffer irreparable harm from anti-Israeli protestors." Def.'s Mem. at 21 (citing *Herzfeld v. Barmada*, 2025 U.S. Dist. Lexis 150403 (D.D.C. Aug. 5, 2025)). In *Herzfeld*, a rabbi alleged several torts, including assault and battery, after he, along with everyone else in the vicinity, were subjected to high volume sirens by anti-Israel protesters at the Israeli embassy. The court concluded that because the rabbi "consented to being contacted by the soundwaves created by the pro-Palestinian protestors, he has not stated a claim for assault or battery." 2025 U.S. Dist. LEXIS 150403, at *11. Plaintiff, however, has never consented to Defendant attacking, rendering

*Herzfeld* inapposite. Critically, the court noted the rabbi failed to allege the defendant "told the protestors to use the devices right next to his ears or to chase him after he left the area—conduct that would likely be outside the implicit consent conveyed by entering an active protest." *Id*. at *18. Therefore, *Herzfeld* actually supports Plaintiff as choking crosses the line of implied consent.

Defendant's final argument that the balance of harm favors her centers on laudatory commentary on Defendant's Code Pink group and criticism on Plaintiff's Betar, but Plaintiff was not involved with Betar until after Defendant's assault, and in any event neither of these groups are party to the case. Defendant argues for innocence by association by pointing out Code Pink's "moniker is 'Women for Peace'" and it "advocates for peace and social justice." Def.'s Mem. at 21. Using that logic, North Korea is democratic because it calls itself the Democratic People's Republic of Korea. In reality, Code Pink is credibly accused of organizing a violent attack on a synagogue and regularly plays on antisemitic tropes in its spectacles. There is also nothing wrong with Betar USA's promoting a vision of 'Jews Fight Back,'" Def.'s Mem. at 21. 1,400 years of jihad—which Defendant seems to admire on a personal level—support the need for organizations like Betar, but even Betar could not deter Defendant's attack in a way the ongoing preliminary injunction does.

### D. This Court properly determined public interest considerations favor Plaintiff.

In finding that the public interest favored an injunction, this Court considered that there "is a 'public interest' in the 'promotion of free expression and robust debate'" and credited Plaintiff's testimony that the "her fear of repeated battery has 'chill[ed her] freedom to express herself.'" ECF No. 26 at 18-19 (quoting first *Belushi v. Woodward*, 598 F. Supp. 36, 37 (D.D.C.

1984) and second PI Hr'g Tr. at 57:22–58:1). Defendant can show no clear error in this determination.

In disputing whether this Court properly found its modest preliminary injunction is in the public interest, Defendant once again leans into the floodgate hysteria Def.'s Mem. at 22, which *Bostock* rejects. Defendant also argues upholding the preliminary injunction will have a chilling effect such that "Americans will be fearful of attending pro-Palestine protests out of concern they might end up in Ms. Ali's shoes," Def.'s Mem. at 22, but in reality all they need to fear is attacking Jewish people engaged in unmistakable racial expression in front of a highly credible police officer, or more broadly, engaging in acts of racial violence that deny victims their right to equal benefit of laws for the protection of persons. Defendant, of course, says nothing about the chilling effect rescinding the preliminary injunction will have: Jews across the United States will be fearful of expressing their race—by protesting for their nation state and racial homeland or otherwise—out of concern they might end up victims of violence.

## IV.    Conclusion

In *Chapman*, this Court noted: "I understand the factual and procedural footing of this case, as well as the positions of both parties. Mr. Chapman has submitted no arguments that warrant reconsideration, and I discern no change in the relevant law or facts since I rendered my decision. For these reasons, I conclude that justice does not require reconsideration." *Chapman*, 2018 U.S. Dist. LEXIS 244092, at *2 (McFadden, J.) The same applies here, and covers even Defendant's objection that this Court purportedly borrowed applicable language used in stalking cases. Def.'s Mem. at 6. If it gets the job done, it gets the job done. This Court soundly determined that Defendant attacked Plaintiff on discriminatory grounds sounding in federal law

and that all considerations of a preliminary injunction tipped in Plaintiff's favor. There are no proper grounds for revisiting this decision.

**Date**: September 29, 2025

Respectfully submitted,

**National Jewish Advocacy Center**
3 Times Square
New York, NY 10036

  /s/      *Matthew Mainen*

Matthew Mainen
D.D.C. Bar No. MD0200
D.C. Bar No. 90021723
Phone: (301) 814-9007
Email: matt@njaclaw.org

Abra Siegel
IL Bar No. 6279548*
Phone: (312) 487-1281
Email: abra@njaclaw.org

*practicing pro hac vice.

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September 2025, a copy of the foregoing was served electronically via the Court's e-filing system on all counsel of record.

      *Matthew Mainen*
      Matthew Mainen