## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **KIMMARA SUMRALL** | ) | |
| | ) | |
| *Plaintiff,* | ) | **Case No. 1:25-cv-02277** |
| | ) | |
| **v.** | ) | **Jury Trial Demand** |
| | ) | |
| **JANINE ALI** | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

### FIRST AMENDED COMPLAINT

Plaintiff Kimmara Sumrall ("Plaintiff") by and through undersigned counsel, hereby files this First Amended Complaint against Defendant Janine Ali ("Defendant"), as a matter of course under F.R.C.P. 15(a)(1)(B), for violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981; D.C. Code § 22-3704; and common law battery, trespass to chattel, and intentional infliction of emotional distress. Plaintiff seeks to recover monetary damages, attorneys' fees, and costs and obtain injunctive relief.

### JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 as the action arises under 42 U.S.C. § 1981, a law of the United States, and all other claims are part of the same case or controversy per 28 U.S.C. § 1367.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and Defendant may be found in this judicial district.

## PARTIES

3.  Plaintiff Kimmara Sumrall is a Jewish resident of Washington, D.C. who was physically attacked by Defendant Janine Ali.

4.  Defendant Janine Ali is a natural person who physically attacked Plaintiff. She is a Palestinian-American and a devout Muslim.

## FACTS

### Plaintiff's Racial, Religious, and National Origin Ties to Israel

5.  Plaintiff is a Jewish-American who feels and publicly expresses a deep affinity for Israel, her ancestral homeland. Plaintiff identifies Israel as her ultimate place of national origin. Her racial and religious identities as a Jew are also intimately connected to Israel.

6.  Plaintiff's connection to Israel is neither idiosyncratic nor can it be chalked up to mere politics; it is at the core of what makes Plaintiff (and millions of others) Jewish. The Bible itself references this ancient Jewish hope[1] for return to the Jewish sovereign homeland while the Prophets and Writings of the Hebrew Bible repeatedly record this aspiration.[2] From a Jewish law perspective, over half of the Biblical commandments that Jewish people are bound to obey are specifically tied to the Jewish homeland.[3] From a doctrinal point of view, belief in and hope for the return to Zion—a term connoting at once a specific hill and fortress in Jerusalem, the city of Jerusalem, the Temple Mount, and Judea, the nation situated where Israel now exists from which Jews take their name—is literally part of the 13 Principles of Jewish Faith.[4]

---

[1] *See e.g., Deuteronomy* 30:1-5.
[2] *See e.g., Isaiah* 11:11-12; *Jeremiah* 29:14; 20:41-42; *Psalm* 126; *Psalm* 137.
[3] *About Us*, Torah VeHa'aretz Institute, https://en.toraland.org.il/about/.
[4] *Maimonides Introduction to Perek Helek*, Maimonides Heritage Center, https://www.mhcny.org/qt/1005.pdf. (explaining the 12th Fundamental Principle).

7. Indeed, the Jewish religion is predicated on the belief that God promised Abraham that he and his descendants shall live in and maintain sovereignty over the land of Israel,[5] and much of the narrative portions of the Torah and greater Jewish Bible, or Tanakh, detail the tribulations Jews experience when they do not have sovereignty over this land and their resulting struggle to achieve and maintain such sovereignty.

8. These doctrinal aspects of the Jewish religion form part of Plaintiff's sincerely held religious beliefs.

9. Even from a purely secular perspective, the connection to Israel is a core feature of the cultural identity of those of Jewish national origin and race like Plaintiff. Whether one views Plaintiff's Judaism through the prism of religion, race, or national origin, Jewish sovereignty and self-determination in the land of Israel is core to all three identities.

**Defendant's Violent Attack on Plaintiff and its Impact**

10. On November 13, 2024, Plaintiff attended a small pro-Israel demonstration at the U.S. Capitol's Dirksen Senate Building's cafeteria. Plaintiff wore an Israeli flag, tied at her neck, as a cape.

11. The Israeli flag is blue and white—symbolizing the distinctive design of Jewish prayer shawls—and is emblazoned with a large Jewish Star of David, both exclusively associated with the Jewish people in common practice. Similarly, Israel itself, and its flag, is exclusively associated with the Jewish people.

12. As this Court properly recognized: "[t]he Star of David—emblazoned upon the Israeli flag—symbolizes the Jewish race." ECF No. 26 at 14. "The yellow badge that Jews were forced to war in Nazi-occupied Europe invested the Star of David with a symbolism

---

[5] Genesis 12:1-9.

indicating martyrdom and heroism." *Id*. (citing Star of David, Encyclopedia Britannica (2025)).

13. Defendant was also at the Dirksen Senate Building at an anti-Israel demonstration. When Plaintiff was isolated from her group, Defendant approached Plaintiff from behind—with Plaintiff's adorned Jewish symbology in Defendant's line of sight—and yanked on Plaintiff's Israel flag, having the harmful effect of briefly choking Plaintiff and causing her pain and disorientation.

14. Immediately thereafter, Plaintiff witnessed Defendant walking away from her. There were no other persons in the vicinity besides law enforcement. Plaintiff yelled for the police to address the situation.

15. A United States Capitol Police Officer, Reed Bonney, witnessed the attack. Defendant said to Officer Bonney "all I did was grab it." Officer Bonney arrested Defendant.

16. Defendant did not similarly attack any non-Jewish individuals at the rally, nor did she attack any individuals not wearing items associated with the Jewish race, religion, and national origin.

17. Defendant's assault on Ms. Sumrall left her feeling unsafe engaging in peaceful support for the State of Israel and the Jewish people.

18. Based on Defendant's willingness to commit an assault on Plaintiff in plain view of a police officer, and the likelihood that Plaintiff and Defendant will likely continue to attend the same events—Plaintiff had seen Defendant on about ten prior occasions—Plaintiff fears for her physical safety if she were again found in Defendant's presence.

19. Plaintiff would like to have the option to safely continue to attend rallies to demonstrate her support for Israel—an expression of her race, religion, and national origin—at times wearing an Israeli flag tied around her neck.

**Defendant's Antisemitic Animus and Background on Modern Antisemitism**

20. While this Court correctly determined that the circumstances of the above described attack directly evidenced antisemitic racial discrimination, ECF No. 26 at 14, Plaintiff below provides relevant background circumstances to ensure a complete record.

21. The anti-Israel rally attended by Defendant was organized by CODEPINK, a hate group that expresses discriminatory animus towards Jews.

22. Anti-Jewish racism and associated animus—otherwise known as known as antisemitism—is best defined by the International Holocaust Remembrance Alliance ("IHRA"), a multi-governmental organization with 35 member countries, including the United States, with a mission "to strengthen, advance and promote Holocaust education, remembrance, and research worldwide."[6] IHRA defines antisemitism as:

> a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities.

To illustrate antisemitism in practice, IHRA provides several examples with the following preface:

> Manifestations [of antisemitism] might include the targeting of the state of Israel, conceived as a Jewish collectivity. However, criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic. Antisemitism frequently charges Jews with conspiring to harm humanity, and it is often used to blame Jews for "why things go wrong." It is expressed in speech, writing, visual

---

[6] https://holocaustremembrance.com/who-we-are

forms and action, and employs sinister stereotypes and negative character traits.

IHRA further identifies a number of examples illustrative of antisemitism, including but not limited to:

- Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion

- Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective — such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government or other societal institutions.

- Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews.

- Denying the fact, scope, mechanisms (e.g. gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust).

- Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust.

- Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.

- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.

- Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation.

- Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis.

- Drawing comparisons of contemporary Israeli policy to that of the Nazis.

- Holding Jews collectively responsible for actions of the state of Israel.[7]

As of August 2024, 35 States and the District of Columbia have adopted IHRA.[8]

23. CODEPINK has a history of, or otherwise engages in, acts reflective of the above-described antisemitism.

24. For example, in a June 2024 incident egregious enough to both capture the Department of Justice's attentions and compel it to write a Statement of Interest, CODEPINK (and affiliated hate groups) has been credibly accused of "us[ing] antisemitic and bigoted incitement, intimidation, and violence to physically obstruct access to and from the Adas Torah Synagogue, thus rendering passage to or from the Adas Torah Synagogue unreasonably difficult or hazardous, in violation of the FACE Act." *StandWithUs Center for Legal Justice* v. *CodePink et al*, 2:24-cv-06253-SVW-PVC, ECF No. 119, (C.D. Cal.), at 3. The violence included the use of bear spray in attacking Jewish congregants. *Id*. at 3-5.[9] Per media reports on related litigation, the CODEPINK organized mob shouted things like "slaughter the Jews" and "Hitler didn't finish the job."[10] Prior to the attack, CODEPINK posted a photograph of the synagogue inside of an inverted red triangle, a symbol popularized by Hamas and adopted by fellow travelers to denote targeting Jews for violence.[11]

25. On October 24, 2024, CODEPINK's co-founder, Madea Benjamin, staged a spectacle at the U.S. Capitol in which she dressed up in military fatigues—with a giant Jewish Star on her

---

[7] https://holocaustremembrance.com/resources/working-definition-antisemitism (cleaned up)
[8] https://www.ajc.org/use-of-the-working-definition-in-the-us
[9] https://www.justice.gov/crt/media/1393176/dl
[10] https://www.jns.org/department-of-justice-backs-la-synagogue-goer-in-suit-against-anti-israel-protesters/
[11] https://www.jewishlegalnews.com/code-pinks-social-media-posts-targeting-adas-torah-synagogue-not-protected-by-first-amendment/

shirt—and, with a fake gun, pushed around an almost naked elderly gentleman while yelling at him in a fake Israeli accent. She was trailed by an elderly woman in Holocaust-style pajamas bearing a sign that read "never again." The caption of the video, posted on an official CODEPINK Instagram account, stated: "This is a holocaust."[12] This performance utilized Holocaust imagery and rhetoric to draw a direct comparison between Israel's actions in Gaza and the Nazi genocide of the Jews, a quintessential example of antisemitism under IHRA, not to mention the racial animus expressed by donning a fake foreign accent.

26. CODEPINK routinely draws comparisons between Israel's efforts to combat terrorism and the Holocaust or genocide[13] and labels the Israel Defense Forces ("IDF") the "IOF," an abbreviation of "Israeli Occupation Force," a slur used against the IDF to portray it as an entity of an illegitimate colonialist regime rather than the legitimate nation state of the Jewish people, which constitutes antisemitic Jewish self-determination denial per IHRA.[14]

27. CODEPINK has also linked Israel to California wildfires, in what the Anti-Defamation League called a conspiracy theory,[15] posting on Instagram: "When US taxes go to burning people alive in Gaza, we can't be surprised when those fires come home."[16] It further claimed that funding Israel's so-called "genocide" prevents the U.S. from adequately addressing the climate crisis.[17] By blaming the Jewish State for a domestic disaster and an aspect of climate change, CODEPINK scapegoated Jews collectively, sounding in IHRA-recognized antisemitic tropes that portray Jews as the source of global suffering. CODEPINK's

---

[12] https://www.instagram.com/reel/DBhQY3cpDEl/
[13] *See, e.g*, https://www.instagram.com/p/DMDh1HYPzmz/;
https://www.instagram.com/p/DMAcLvotonx/?img_index=1; https://www.instagram.com/p/DL7-WWtIk5S/.
[14] *See, e.g.*, https://www.instagram.com/p/DMBzVZpiun3/?img_index=1;
https://www.instagram.com/p/DL_CjzvNM3Q/?img_index=1
[15] https://www.adl.org/resources/article/los-angeles-wildfires-trigger-conspiracy-theories-and-hate. *See also*
[16] https://www.instagram.com/p/DEktvw1v5we/?img_index=2
[17] https://www.instagram.com/reel/DEksl1YKYn_/

insinuation that Israel was syphoning critical U.S. funding speaks to tropes about Jews wielding Svengali-like power over the world.

28. CODEPINK also participated in a conference in Iran, a state sponsor of terror (largely directed at Jews), in which participants blamed Israeli intelligence for September 11 and CODEPINK's co-founder spoke on a panel about strategies in opposing the "Zionist regime,"[18] a racial slur for the Jewish State.

29. Defendant not only is an activist with the CODEPINK hate group, which alone is probative and indicative of her antisemitic animus, but Defendant is, in fact, a fixture in Washington, D.C. area anti-Israel activities. She has attended numerous CODEPINK and other anti-Israel group's events.

30. Over the period of time between October 7, 2023, and November 12, 2024, Defendant was present approximately ten times at anti-Israel gatherings that Plaintiff attended in support of Israel.

31. From approximately March 2024 through the summer of 2024, individuals camped outside the Israeli embassy in Washington D.C., yelled anti-Israel and antisemitic slurs, and poured fake blood on the street as the Israeli embassy employees were leaving work for the day.

32. Defendant was a fixture at the Israeli embassy encampment, and on multiple occasions, as witnessed by Plaintiff, Defendant verbally attacked the Jews present with slurs such as "baby killer," "committing genocide," and "most of you are disgusting ex-IDF soldiers" or words to that effect. These false accusations sound in IHRA's recognition that blaming individual Jews for the real or imagined actions of other Jews is antisemitic.

33. Defendant attended many of these anti-Israel protests in the company of Hazami Barmada and Atafeh Rokhvand.

---

[18] https://ngo-monitor.org/reports/ngo_activists_including_stephen_sizer_attend_antisemitic_conference_in_iran/

34. In May 2024, Barmada and Rokhvand were sued for using speakers, sirens, and other sound-emitting devices to produce siren-like sounds to injure a local rabbi engaged in a prayer vigil for the hostages outside the Israeli embassy.

35. Plaintiff attended a court hearing in the above-referenced case in support of Rabbi Herzfeld. Defendant attended the same court hearing and glared furiously at Plaintiff and other Jews supporting the rabbi.

36. Defendant's commitment to antisemitism and violence against Jews is personal. For example, she named her son "Jehad," an altered spelling of "jihad," which Webster's dictionary primarily defines as "a holy war waged on behalf of Islam as a religious duty."[19]

37. Jews are often the target of jihad, and Hamas and affiliated organizations carried out October 7 as an act of jihad. In fact, the second largest Palestinian terrorist organization involved in October 7 is called "Islamic Jihad."

38. Defendant has long sympathized with jihad. For example, a photograph from 2002 depicts her holding a sign that says, "A suicide bomber is a poor man's F-16."[20]

39. Defendant continues to attend antisemitic rallies. For example, in or about March 2025, she posed with a sign with the words "Israel uses US tax dollars to kill Palestinian children" at a Washington D.C. event in which someone dressed up as Uncle Sam and threw dollar bills in on a street soaked with fake blood. This person was trailed by Madea Benjamin and another individual, wearing military fatigues prominently featuring the Jewish symbology of the Israeli flag, picking up the bloody dollar bills.[21] This incident evoked several antisemitic

---

[19] https://www.merriam-webster.com/dictionary/jihad
[20] https://www.gettyimages.com.mx/detail/fotograf%C3%ADa-de-noticias/janine-ali-walks-with-a-sign-as-she-protes ted-fotograf%C3%ADa-de-noticias/97197038
[21] https://www.instagram.com/p/DHY1uoIRotq/

tropes including stereotypes about a Jewish obsession with money and Jewish control over the United States and its finances.

The Israeli-Palestinian Conflict is an Ethno-Religious rather than Political Conflict

40. Expert testimony, historical treatises, public documents, and/or judicially noticeable material will establish that the Israeli-Palestinian conflict is largely a religious war against Jews, an ethno-religious rather than political conflict. Opposition to Israel or being "pro-Palestine," or in this case more appropriately termed "anti-Israel," therefore cannot properly be described only as "political." The context of the conflict is critical and the ethno-religious dimension must be examined. Taking sides in the conflict, especially through acts of violence disguised as mere "political" protest against Israel, need be considered through the lens of jihadist antisemitism. This is especially true when the purported "protester" falls on the Palestinian Muslim side of the ethno-religious divide and the victim is on the Jewish side. Since Day 1 of the Jewish people's mass return to their indigenous homeland in the late 1800s, violent opposition to Israel and its people was deeply linked to antisemitism.

41. At the time Jews began returning to Israel in the late 19th century, many non-Jewish Arabs from neighboring lands also immigrated to what would become Israel, taking advantage of the economic opportunities brought by Jewish settlement. These Arab immigrants and their descendants ultimately came to form a meaningful portion of the people who today are called Palestinians. However, the small, indigenous, overwhelmingly Muslim, Arab population took virtually no issue with these fellow Arab immigrants, instead focusing the entirety of their efforts to drive out the Jewish immigrants and their descendants, launching a campaign of terror now well into its second century. As racial-religious considerations largely determined which immigrants would be welcomed and which would not, the origins of the

Israeli-Palestinian are ethno-religious and not political. The conflict was not born out of a dispute over, for example, whether communism or capitalism would govern the land. Rather, it was born out of one group's desire to maintain ethno-religious (racial) dominance in the face of widespread and legal immigration by another racial group.

42. Local opposition to Jewish (and only Jewish) immigration to the land of Israel was rooted in deep historical animosities tracing back to 7th century Medina and a jihad against the local Jewish population resulting in the expulsion of two of the Jewish tribes and the mass execution of all post-pubescent male of the third, the tribe's women and children being distributed as slaves. Thereafter, Jews finding themselves under Islamic rule were granted a second-class citizenship status (dhimmitude), whereby in exchange for paying an apartheid tax (jizya) and exhibiting other signs of submission, Jews were permitted to remain in conquered lands and continue practicing their religion. The emergence of a well-funded and ultimately well-armed Jewish self-determination movement in their indigenous homeland, after centuries of Islamic dominion, threatened the millennium of  stable Arab-Islamic dominance.

43. Islamism, an extremist and antisemitic interpretation of Islam to which Hamas and fellow October 7 terrorist organizations adhere, emerged in the late 1920s as violence against Jewish immigrants in the British Mandate of Palestine escalated. Islamism soon became the core Palestinian governing narrative, the antisemitism of which pervades much of Palestinian society to this day, even those elements which in theory have renounced violence.

44. The growth of Islamism was coupled with the appointment of Haj Amin al-Husseini as the Grand Mufti of Jerusalem, the de facto leader of the Palestinians in the British Mandate. Clearly understanding that opposition to Israel had deep racial elements, he formed a close

partnership with Adolf Hitler and the Third Reich, both parties understanding that opposition to Jewish self-determination in Israel was not just a matter of mere politics.

45. Crystallizing the basis of opposition to Jewish self-determination in Israel, al-Husseini gave a 1938 speech entitled "Islam and the Jews," in which he directly linked events in the British Mandate to the history between Jews and Muslims in Medina. Again, the widely popular al-Husseini and the local population who adored him understood the conflict in ethno-religious terms and not mere politics. Jews were inherently an enemy of Islam (and therefore the overwhelming majority of Palestinians) rather than a group of people with different ideas on determining how a state's resources are distributed (politics).

46. During his exile in Nazi Germany, al-Husseini cemented what would become a mainstream narrative of Palestinian opposition to Israel, much later encapsulated in the Hamas Charter and exhibited by the Palestinian population enthusiastically electing Hamas in parliamentary elections and later standing in solidarity with the terrorist organization's decision to carry out its October 7 jihad.

47. For example, al-Husseini would claim that Jewish people started World War II and that the world would never be at peace until the Jewish race was exterminated. In 1944, al-Husseini gave a broadcast urging followers to "kill the Jews where you find them. This pleases God, history and religion." Years later, the popularly supported Hamas would adopt the roots of this plea, a saying the historical record attributes to the early days of Islam, reading in relevant part: "The Day of Judgement will not come about until Moslems fight the Jews (killing the Jews), when the Jew will hide behind stones and trees. The stones and trees will say . . . there is a Jew behind me, come and kill him."[22]

---

[22] https://avalon.law.yale.edu/21st_century/hamas.asp

48. After the war, al-Husseini escaped to Egypt. In 1946, Hassan al-Banna, the founder and leader of the Muslim Brotherhood, referred to al-Husseini as a "hero who challenged an empire and fought Zionism, with the help of Hitler and Germany. Germany and Hitler are gone but Amin El-Husseini will continue the struggle . . . There must be a divine purpose behind the preservation of the life of his man, namely, the defeat of Zionism." Of course, al-Husseini did not have a "road to [Jerusalem] moment" and suddenly realized that his true enemy was Zionism all along (which would have made no difference given the inseparable link between Judaism and Zionism described above). That purportedly divine purpose came to light when, in a full circle, the al-Husseini influenced Muslim Brotherhood established its Palestinian branch, better known as Hamas, in 1987.

49. After a twenty year campaign of varying degrees of antisemitic terrorism, leaving the Palestinian people with no illusion about what Hamas stood for, the organization won the 2006 Palestinian legislative elections, and its terrorism remained widely popular with the Palestinian population through October 7. For example, "[a]lmost three in four Palestinians believe the Oct. 7 attack by Hamas on Israel was correct."[23]

50. In summary, the Israeli-Palestinian conflict has never been about politics. From the outset, it centered on Arab-Islamic ancient animosities towards Judaism and opposition to Jews re-immigrating to and decolonizing their indigenous homeland, terminating over one-thousand years of second class citizenship including but not limited to features of apartheid. To this day, the Palestinian cause includes support of jihad against Jews, including but not limited to the overwhelming majority of Palestinians supporting the October 7 massacre.

---

[23]https://www.reuters.com/world/middle-east/poll-shows-palestinians-back-oct-7-attack-israel-support-hamas-rises-2023-12-14/

51. Defendant's anti-Israel positions, especially including her resorting to physical violence against a Jewish person associating with Israel, cannot be divorced from the greater jihadist opposition to the Jewish State from the earliest days of Israel's re-birth. Defendant's attack was not politically motivated as the conflict both sides were protesting is not political but rather an ethno-religious conflict.

**Events Subsequent to the Attack**

52. On or about December 16, 2024, a hearing was held in D.C. Superior Court on Ms. Sumrall's request for an order that Defendant stay away from her.

53. Ten days after this hearing, an indicative of the dangerous circle Defendant runs in, a man called Ms. Sumrall's cell phone and said: "You stupid white bitch, do you know what the fuck could happen to you?"

54. The following week, on two separate nights, unfamiliar vehicles idled outside Plaintiff's residence with their engines running late at night. On the second night, Plaintiff's partner with a phone to his ear and calling 911, exited the house to approach the vehicle, which sped off.

55. On or about February 4, 2025, a man with keffiyeh completely wrapped around his face, except for his eyes, approached Ms. Sumrall on a public sidewalk and said, "I would stab you and leave you dead in the street if I could," or words to that effect. The keffiyeh is a symbol of the anti-Israel movement, and this encounter emphasized to Plaintiff the murderous rage found in Defendant's ideological circle.

56. On or about Sunday, February 16, 2025, Plaintiff opened her back door in the evening and saw flashing lights, which turned out to be coming from  a drone in her backyard. She

inquired with her neighbors as to whether the drone belonged to any of them.  Her neighbors all said it did not.

57. Due to Plaintiff's fear for her safety following Defendant's attack on her and the  subsequent threatening phone call, Plaintiff installed upgraded security cameras on her property at her own expense.

## CAUSES OF ACTION

### COUNT I
### Violation of the Civil Rights Act of 1866
### 42 U.S.C. § 1981

58. Plaintiff incorporates all foregoing paragraphs as if stated fully herein.

59. 42 U.S.C. § 1981(a) reads in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to . . . the full and equal benefit of all laws . . . for the security of persons and property as is enjoyed by white citizens."

60. By attacking Plaintiff, Defendant deprived Plaintiff of the full and equal benefit of D.C. Code § 22–404(a)(1), reading "Whoever unlawfully assaults, or threatens another in a menacing manner, shall be fined not more than the amount set forth in § 22-3571.01 or be imprisoned not more than 180 days, or both."

61. By attacking Plaintiff, Defendant also deprived Plaintiff of the full and equal benefit of D.C. Code § 22–404.04, reading "A person commits the offense of strangulation if that person knowingly, intentionally, or recklessly restricts the normal circulation of the blood or breathing of another person, either by applying pressure on the throat, neck, or chest of another person, or by blocking the nose or mouth of another person."

62. By attacking Plaintiff, Defendant deprived Plaintiff of the full and equal benefit of D.C. Code § 22–3312.01, reading "It shall be unlawful for any person to . . . desecrate . . . a religious or

secular symbol . . . without the permission of the owner." Defendant desecrated the Israeli flag, containing both the religious and secular racial symbol of the Jewish people, when she used it as a ligature to choke Plaintiff or otherwise handled it without Plaintiff's permission.

63. By attacking Plaintiff, Defendant deprived Plaintiff of the full and equal benefit of D.C. Code § 22-3703, proscribing "bias related crime[s]," which as defined under D.C. Code § 22-3701 includes targeting someone on the basis of their race for assault or injury to property.

64. Defendant deprived Plaintiff of the full and equal benefit of D.C. Code § 22-3704 as described more fully below in Count II.

65. Defendant deprived Plaintiff the full and equal benefit of D.C.'s common law civil prohibition on battery, as described more fully below in Count III.

66. Defendant deprived Plaintiff the full and equal benefit of D.C's common law civil prohibition on trespass to chattel, as described more fully below in Count IV.

67. Defendant did not similarly deprive white citizens the full and equal benefit of aforestated laws.

68. As a direct and proximate result of Defendants' actions, Plaintiff experienced financial loss, physical pain, emotional distress, humiliation, and embarrassment.

<u>**COUNT II**</u>
**Violation of D.C. Code § 22-3704**

69. Plaintiff incorporates all foregoing paragraphs as if stated fully herein.

70. D.C. Code § 22-3704(a) reads in relevant part "any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice based on the actual or perceived race . . . religion, national origin . . . personal appearance . . .

or" other characteristics[24] "of a victim of the subject designated act shall have a civil cause of action in a court of competent jurisdiction for appropriate relief."

71. D.C. Code § 22-3701(2) defines a "designated act" in relevant part as "a criminal act, including . . . assault [and] injury to property."

72. Defendant assaulted Plaintiff as defined under D.C. Code §§ 22–404(a)(1) and 22–404.04 as described above. Defendant injured Plaintiff's property as defined under § 22–3312.01 and described above. In attacking Plaintiff, Defendant was motivated by Plaintiff's race, religion, national origin, personal appearance, and/or other protected characteristics as evidenced by, *inter alia*, Defendant identifying Plaintiff as having such protected Jewish and/or Israeli attributes in virtue of her wearing an Israeli flag and thereafter attacking Plaintiff but no one perceivably lacking such attributes. This attack is contextualized by Defendant's presence at the Capitol in coordination with an antisemitic hate group, of which Defendant is an integral activist.

73. As a direct and proximate result of Defendants' actions, Plaintiff experienced financial loss, physical pain, emotional distress, humiliation, and embarrassment.

## COUNT III
### Battery

74. Plaintiff incorporates all foregoing paragraphs as if stated fully herein.

75. "A battery is an intentional act that causes a harmful or offensive bodily contact." *District of Columbia v. Jackson*, 810 A.2d 388, 392 (D.C. 2002).

76. Defendant pulling on Plaintiff's Israeli flag around her neck, causing strangulation, was an intentional act that caused harmful and offensive bodily contact with Plaintiff.

---

[24] The totality of protected characteristics are: "actual or perceived race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, homelessness, disability, matriculation, or political affiliation." D.C. Code § 22-3704(a).

77. As a direct and proximate result of Defendants' actions, Plaintiff experienced financial loss, physical pain, emotional distress, humiliation, and embarrassment.

## COUNT IV
### Trespass to Chattel

78. Plaintiff incorporates all foregoing paragraphs as if stated fully herein.

79. "A trespass to a chattel may be committed by intentionally . . . using or intermeddling with a chattel in the possession of another." Restat 2d of Torts, § 217(b). Liability attaches if "bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest." *Id*. at § 217(d); *see further Hornbeck Offshore Transp., LLC v. United States*, 563 F. Supp. 2d 205, 212 n.8 (D.D.C. 2008) (citing *Pearson v. Dodd,* 133 U.S. App. D.C. 279, 410 F.2d 701, 707 & n.30 (D.C. Cir. 1969) (looking to Restatement for trespass to chattel claim).

80. Defendant intentionally used or intermeddled with Plaintiff's chattel, her Israeli flag. This intermeddling caused bodily harm to Plaintiff, briefly strangling her and causing her pain and disorientation.

81. As a direct and proximate result of Defendants' actions, Plaintiff experienced financial loss, physical pain, emotional distress, humiliation, and embarrassment.

## COUNT IV
### Intentional Infliction of Emotional Distress

82. Plaintiff incorporates all foregoing paragraphs as if stated fully herein.

83. "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restat 2d of Torts, § 46; *see further Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (looking to the Restatement).

84. Defendant intentionally targeting Plaintiff for violence on the basis of her race, religion, and national origin was extreme and outrageous, causing her severe emotional distress. The emotional distress of being targeted for violence on the basis of her Jewish identity is separate from the emotional distress arising from the act of violence itself. For example, Plaintiff is fearful of outwardly expressing her Jewish identity in the same way she did prior to the attack, and such fear would not exist had she simply been subjected to an attack unconnected to her Jewish identity. Plaintiff was physically harmed by Defendant's attack.

85. As a direct and proximate result of Defendants' actions, Plaintiff experienced financial loss, physical pain, emotional distress, humiliation, and embarrassment.

86. Plaintiff pleads this claim concurrently to the fullest extent permitted by law and otherwise in the alternative.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment in her favor and against Defendant, and award the following relief:

A. Compensatory damages in an amount to be determined by the Court, for financial losses, physical pain, emotional distress, loss of enjoyment of life, and interference with Plaintiff's personal property;

B. Punitive damages in an amount sufficient to punish Defendant for her intentional and malicious conduct;

C. Pre-judgment and post-judgment interest as permitted by law;

D. Costs of this action, including reasonable attorneys' fees and litigation expenses;

E. An injunction that Defendant have no contact with Plaintiff by any means whatsoever; ordering Defendant to remain at least 5 yards away from Plaintiff, and 100 yards from

Plaintiff's home and place of employment, and not communicate or attempt to communicate with Plaintiff, either directly or through any other person (except through Defendant's lawyer), by telephone, written message, electronic message, pager, on any form of social media, or otherwise; and

F.   Such other and further relief as the Court deems just and proper.


**Date**: October 29, 2025                                    Respectfully submitted,

                                                             **National Jewish Advocacy Center**
                                                             3 Times Square
                                                             New York, NY 10036


                                                               /s/        *Matthew Mainen*

                                                             Matthew Mainen
                                                             D.D.C. Bar No. MD0200
                                                             D.C. Bar No. 90021723
                                                             Phone: (301) 814-9007
                                                             Email: matt@njaclaw.org