**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KIMMARA SUMRALL | |
| PLAINTIFF, | |
| **v.** | **CASE NO.** 1:25-cv-02277 (TNM) |
| JANINE ALI | |
| DEFENDANT. | |

**DEFENDANT JANINE ALI'S MEMORANDUM IN SUPPORT
OF HER MOTION TO DISMISS**

i

## **TABLE OF CONTENTS**

Introduction..................................................................................................1

Facts ........................................................................................................3

Summary of Argument..................................................................................4

Legal Standards............................................................................................4

Argument ....................................................................................................7

I.   Plaintiff Fails to State a Plausible Claim Under 42 U.S.C. § 1981,
Depriving the Court of Jurisdiction Over All Claims ...................................7

    A.  The Supreme Court Instructs that § 1981 Prohibits Racial Discrimination
in Contracting, and Is Not a Catch-All Civil Rights Statute..................7

    B.  At Minimum, State Action is Required for a Claim under
§ 1981's Equal Benefits Clause .......................................................10

    C.  Criticism of Israel Does Not Constitute Racial Animus
Towards Jewish People ....................................................................14

II.  The Court Lacks Subject Matter Jurisdiction Over Plaintiff's
State Law Claims Under Rule 12(b)(1) .....................................................28

III. The State Tort Claims Are Specious .........................................................30

    A.  A Single, Momentary Tug on a Flag During a Political Protest Is Not
"Extreme and Outrageous" Conduct as a Matter of Law .....................30

        1.    Ms. Ali's Momentary Conduct Was Isolated, Fleeting, & Innocuous .......30

        2.    Conduct in the Context of a Political Protest Cannot Be
Deemed "Outrageous" ...............................................................31

        3.    Plaintiff's Feelings About this Situation Are Legally Insufficient
for the Emotional Distress Prong of her Claim.........................32

        4.    The First Amendment Also Protects Touching of an Israeli Flag
From Tort Liability for Intentional Infliction of Emotional Distress.........33

5.    Plaintiff's Allegations of IIED Are Belied by Her Behavior ....................33

B.  Plaintiff's Israeli Flag Was Not Damaged; Trespass to Chattels
Fails as a Matter of Law.........................................................................34

C.  Peaceful Protest Against the Ongoing War Is Not Evidence of Any Bias ............35

Conclusion ...............................................................................................38

## TABLE OF AUTHORITIES

**CASES**

*Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015)..............................2

*\*Adams ex rel. Harris v. Boy Scouts of Am.–Chickasaw Council,*
    271 F.3d 769 (8th Cir. 2001) ...............................................................13

*Am. Ass'n of Univ. Professors v. Rubio,*
    2025 U.S. Dist. LEXIS 193069 (D. Mass. Sept. 25, 2025) ..................................26

*Am. Farm Bureau v. EPA,* 121 F. Supp. 2d 84 (D.D.C. 2000)..........................................28

*Application of the Convention on the Prevention and Punishment*
*of the Crime of Genocide in the Gaza Strip (South Africa v. Israel)*,
Order of 26 January 2024, Int'l Ct. Justice........................................................22

*Legal Consequences Arising from the Policies and Practices of Israel*
*in the Occupied Palestinian Territory, Including East Jerusalem,*
Advisory Opinion of July 19, 2024, Int'l Ct. Justice ........................................19

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)................................................................4, 5

*Banks v. C&P Tel. Co.,* 802 F.2d 1416 (D.C. Cir. 1986) ...............................................1, 12

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).....................................................5

*\*Bilello v. Kum & Go, LLC,* 374 F.3d 656 (8th Cir. 2004) ...............................................13

*Brandenburg v. Ohio,* 395 U.S. 444 (1969)................................................................37

*Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263 (1993)....................................11

*Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343 (1988)....................................................29

*Chen v. ICS Protective Servs.,* 2024 U.S. Dist. LEXIS 159936 (D.D.C. 2024)...............32

*Claiborne Hardware Co. v. NAACP,* 458 U.S. 886 (1982)................................................37

*Crowley v. N. Am. Telecomms. Ass'n,* 691 A.2d 1169 (D.C. 1997) ..................................32

*\*Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470 (2006) ..................................... *passim.*

iv

*Estate of Underwood v. Nat'l Credit Union Admin.,* 665 A.2d 621 (D.C. 1995).............31

*Gerwaski v. Nevada ex rel. Bd. of Regents,*
    2025 U.S. Dist. LEXIS 84645 (D. Nev. 2025) .....................................................27

*Grand Lodge of the Fraternal Order of Police v. Ashcroft,*
    185 F. Supp. 2d 9 (D.D.C. 2001)....................................................................6, 28

*Greenpeace, Inc. v. Dow Chem. Co.,*
    2013 D.C. Super. LEXIS 22 (D.C. Super. Ct. 2013).............................................35

*Gustave-Schmidt v. Chao,* 226 F. Supp. 2d 191 (D.D.C. 2002) ..........................................5

*Herzfeld v. Barmada,* 2025 U.S. Dist. LEXIS 150403 (D.D.C. 2025)..................... *passim.*

*Homan v. Goyal,* 711 A.2d 812 (D.C. 1998) ...................................................................30

*\*Humphries v. Newman,* 2021 U.S. Dist. LEXIS 254494 (D.D.C. Mar. 2, 2022) ........9, 10

*Kingman Park Civic Ass'n v. Williams,* 348 F.3d 1033 (D.C. Cir. 2003) ..........................5

*Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375 (1994).................................................28

*Kotsch v. District of Columbia,* 924 A.2d 1040 (D.C. 2007) ............................................32

*Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271 (D.C. Cir. 1994) .......................................5

*\* Landau v. Corp. of Haverford Coll.,* 780 F. Supp. 3d 548 (E.D. Pa. 2025) ..............2, 26

*Loughlin v. United States,* 393 F.3d 155 (D.C. Cir. 2004) ...............................................28

*Lovern v. Edwards*, 190 F.3d 648 (4th Cir. 1999) ........................................................... 30

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)........................................................28

*\*Mahone v. Waddle,* 564 F.2d 1018 (3d Cir. 1977) ........................................................12

*Moini v. Wrighton,* 602 F. Supp. 3d 162 (D.D.C. 2022)...................................................14

*Muhammed v. District of Columbia,* 881 F. Supp. 2d 115 (D.D.C. 2012) .......................32

*Nietzke v. Williams,* 490 U.S. 319 (1989) .........................................................................6

*Ortberg v. Goldman Sachs Grp.,* 64 A.3d 158 (D.C. 2013) ................................30, 31, 33

*Parents v. Liberated Ethnic Stud. Model Curriculum Consortium,*
    2024 U.S. Dist. LEXIS 216929 (C.D. Cal. 2024)...................................................27

*Patterson v. McLean Credit Union*, 491 U.S. 164  (1989)....................................................9

*Pearson v. Dodd,* 410 F.2d 701 (D.C. Cir. 1969) ...............................................................34

*Pietsch v. McKissack & McKissack,* 677 F. Supp. 2d 325 (D.D.C. 2010) .......................30

*Provisional Gov't of the Republic of New Afrika v. Am. Broad. Cos.,*
    609 F. Supp. 104 (D.D.C. 1985) ..............................................................................1, 11

*Sanders v. Murdter,* 869 F. Supp. 2d 30 (D.D.C. 2012)......................................................29

*Scolaro v. D.C. Bd. of Elections & Ethics,* 104 F. Supp. 2d 18 (D.D.C. 2000)..................6

*Shaare Tefila Congregation v. Cobb,*
    785 F.2d 523 (4th Cir. 1986), rev'd on other grounds, 481 U.S. 615 (1987)........13

*Sheppard v. Dickstein, Shapiro, Morin & Oshinsky,* 59 F. Supp. 2d 27 (D.D.C. 1999) ....10

*Snyder v. Phelps,* 562 U.S. 443 (2011) ...............................................................................33

*StandWithUs Center for Legal Justice v. Mass. Institute of Technology*,
    2025 U.S. App. LEXIS 27390, (1st Cir. Oct. 21, 2025) ............................... passim

*StandWithUs Center for Legal Justice v. CodePink*,
    No. 2:24-cv-06253-SVW-PVC, (C.D. Cal. filed July 24, 2024) ...........................36

*Students for Just. in Palestine v. Abbott,* 756 F. Supp. 3d 410 (W.D. Tex. 2024) ...........27

*Texas v. Johnson,* 491 U.S. 397 (1989) ..............................................................................33

*Trimble v. District of Columbia,* 779 F. Supp. 2d 54 (D.D.C. 2011) ................................29

*Tuck v. Pan Am. Health Org.,* 668 F.2d 547 (D.C. Cir. 1981) ..........................................28

*Univ. of Maryland Students for Just. in Palestine v. Bd. of Regents of Univ. of Maryland,*
    2024 U.S. Dist. LEXIS 178359 (D. Md. 2024) ....................................................27

*Waldon v. Covington,* 415 A.2d 1070 (D.C. 1980)...........................................................32

*Warren v. CIA,* 210 F. Supp. 2d 19 (D.D.C. 2002).............................................................5

*Youngblood v. Hy-Vee Food Stores, Inc.,* 266 F.3d 851 (8th Cir. 2001).........................13

*Xunxian Liu v. Kroemer,* 2020 D.C. Super. LEXIS 790 (D.C. Super. Ct. 2020) .............35

**STATUTUES AND RULES**

*42 U.S.C. § 1981 ................................................................................ *passim.*

28 U.S.C. § 1367 ..................................................................................29

D.C. Code § 22-3704 ........................................................................6, 30

**SECONDARY SOURCES RE § 1981**

Dan Morenoff, *Corporate Liability Under Section 1981*, Fed. Soc'y Rev. (2022)...........11

George Rutherglen, *The Improbable History of Section 1981:
          Clio Still Bemused and Confused*, 2003 Sup. Ct. Rev. 303 ...................................11

H.R. Rep. No. 102-40(II) (1991) .........................................................................9

## <u>INTRODUCTION</u>

By admitting that Defendant Janine Ali did not violate her freedom to contract and Ms. Ali's conduct had no nexus to state action, Plaintiff Kimmara Sumrall concedes that her amended lawsuit does not state a plausible claim under 42 U.S.C. § 1981. *See* Pl. Opp. to Reconsider at 3 (ECF No. 35); *Provisional Gov't of the Republic of New Afrika v. Am. Broad. Cos.,* 609 F. Supp. 104 (D.D.C. 1985)*; Banks v. C&P Telephone*, 802 F.2d 1416, 1427 (D.C. Cir. 1986) (confirming that § 1981 was "not designed to provide a remedy for intentional torts such as assaults and batteries"). Without any viable federal claim, there is no federal question jurisdiction, and the First Amended Complaint must be dismissed under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

At the end of the day, Plaintiff's case has little to do with any alleged "flag pulling" incident. Rather, it is a politically motivated effort by an associate of Betar USA, an organization the Anti-Defamation League ("ADL") has classified as extremist, using an alleged flag pulling incident as a pretext, to mislead the Court into equating condemnation of Israel with antisemitism and to silence a critic of the Israeli government. Ms. Ali's protest was against a foreign country's military actions, not a race or religion. There is a massive difference. And however much Plaintiff might wish otherwise, the Court does not have jurisdiction to settle a dispute between two Americans about the Gaza conflict and the morality of what many consider to be Israel's genocide in Gaza. *See StandWithUs Center for Legal Justice v. Mass. Institute of Technology*, No. 24-cv-1800, 2025 U.S. App. LEXIS 27390, at *28-29 (1st Cir. Oct. 21, 2025) (upholding dismissal of case against MIT alleging failure to protect students from antisemitism on campus, largely on grounds that the complained-of speech was protest against actions of State of Israel and Zionist philosophy: "Plaintiffs are entitled to their own interpretive lens equating anti-Zionism (as they define it) and antisemitism. But it is another matter altogether to insist that others be bound by

plaintiffs' view. Plaintiffs' equation finds no consensus support in dictionary definitions. Nor does a review of the academic literature point to any consensus that criticism of Zionism is antisemitic."); *Landau v. Corp. of Haverford Coll.,* 780 F. Supp. 3d 548, 555 (E.D. Pa. 2025) (rejecting that "anti-Israel speech is intrinsically antisemitic, because reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views").

What is before the Court is a simple assault case, of which Ms. Ali was already acquitted in D.C. Superior Court. Realizing that, Plaintiff amended her complaint to add what she claims is antisemitic context to the alleged incident by including a fictionalized history of the Palestinian-Israeli conflict that dates back 1300 years and manages to weave in Hitler, apparently attempting to tie Plaintiff's rendition of history -- and Plaintiff's own biased conclusions therefrom -- to the defendant. This purported history is neither relevant nor accurate. In a shockingly bigoted manner, Plaintiff's account also omits the dispossession, expulsion, and massacres of Palestinians that the creation of Israel entailed, and subsequent wars over territory. Plaintiff smears Palestinians, including Ms. Ali, as inherently antisemitic and motivated entirely by this ostensible bigotry, rather than opposition to the murder and occupation of their people and land.

This case really is about weakening First Amendment protections for anyone who opposes Israel and a textbook example of litigation for which the D.C. Anti-SLAPP Act was designed. Plaintiff filed in federal court precisely to avoid such protections. But as the D.C. Circuit held in *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015), the D.C. Anti-SLAPP Act does not apply in federal court and the Federal Rules provide sufficient safeguards. Accordingly, this Court should apply those Rules to dismiss this meritless case, reaffirm the First Amendment's protections, and let Plaintiff litigate her battery and other claims in the D.C. Superior Court.

## FACTS

On November 13, 2024, Ms. Ali attended a public lobbying demonstration at the Capitol's Dirksen Senate Building organized by three groups, Jewish Voice for Peace, IfNotNow, and CODEPINK. *See First A*mended Complaint, ¶ 13 (ECF No. 38) ("Am. Compl."); May 19, 2025 Trial Transcript 82:23-83:5 (ECF 8-1) (Ms. Ali testifying why she was at the Dirksen Senate Building). CODEPINK is a women-led grassroots organization, founded by Medea Benjamin, who is Jewish,  committed to ending U.S. militarism and promoting human rights worldwide. Silent Procession Through the U.S. Senate, CODEPINK (Nov. 11, 2024), www.codepink.org/senateprocessionnov11. The organization is not anti-Jewish, but critical of Israel's killing of over 68,000 civilians, a number likely to be significantly revised upward once bodies are recovered from the rubble.[1]

Plaintiff joined a counterprotest at the same place, wearing an Israeli flag around her neck as a cape. Am. Compl. ¶ 10. According to Plaintiff, Ms. Ali approached her from behind and yanked on the cape. *Id.* ¶ 13. Plaintiff yelled for police to address the situation and Ms. Ali was arrested. *Id.* ¶¶ 14, 15. Plaintiff concedes that Ms. Ali did not say or do anything else to Plaintiff nor to any other counter protestor supporting Israel. *Id.* ¶ 16. Crucially, Plaintiff does not allege at all that her right to contract was infringed in any way or that any state action was involved.

On May 19, 2025, the government proceeded to trial against Ms. Ali for the alleged simple assault at the demonstration. *United States v. Ali*, 2024-CMD-012091 (D.C. Super. Ct. May 19-20,

---

[1] *See Humanitarian Situation Update #329: Gaza Strip*, UNITED NATIONS OFFICE FOR THE COORDINATION OF HUMANITARIAN AFFAIRS,  (Oct. 9, 2025), https://www.ochaopt.org/content/humanitarian-situation-update-329-gaza-strip (last visited Nov. 12, 2025); Seham Tantesh and William Christou, My Heart Is Broken: Palestinians Begin Searching the Gaza Rubble for Their Dead, THE GUARDIAN (Oct. 12, 2025), https://www.theguardian.com/world/2025/oct/12/my-heart-is-broken-palestinians-begin-searching-the-gaza-rubble-for-their-dead (last visited Nov. 12, 2025).

2025) (ECF No. 8-1, 8-2). On May 20, 2025, the Superior Court determined the government's evidence inconsistent, found Ms. Ali not guilty, and dismissed the case. *Id.* Thereafter, Plaintiff filed this action.

## SUMMARY OF ARGUMENT

Under the case law in this District and the view of the majority of other federal courts, including federal circuit courts, § 1981, which courts use almost exclusively in contract-based matters, does not provide a cause of action for private torts between individuals. Applicable Supreme Court precedent also discourages a reading of § 1981 that would expand the right to bring suit beyond contracts, and certainly when the incident in question lacks any connection to state action. The convoluted and biased rendition of history presented by Plaintiff in her Amended Complaint is filled with innuendo and conclusions and is essentially an *ad hominem* attack on Palestinians and Muslims that is not relevant to the legal dispute between two protestors on opposing sides of the Gaza conflict.

Without § 1981, this Court has no jurisdiction over the remaining state law counts. This case started in state court and should have remained there. In addition, the state court counts, aside from battery, do not state causes of action as a matter of law. Ms. Ali also incorporates herein by reference her Memorandum in Support of her Motion to Reconsider the Court's Order of August 4, 2025 (ECF No. 30-1) and Reply Memorandum (ECF No. 36).

## LEGAL STANDARDS

When ruling on a 12(b)(6) motion to dismiss, the Court must determine whether the plaintiff's complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The purpose of a motion to dismiss is "to test the legal sufficiency of the complaint." *Kingman Park Civic Ass'n v. Williams,* 348 F.3d 1033, 1040 (D.C. Cir. 2003). In deciding a motion to dismiss, "the Court may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice," such as news reports and prior proceedings on the record. *Gustave-Schmidt v. Chao,* 226 F. Supp. 2d 191, 196 (D.D.C. 2002); *Warren v. CIA*, 210 F. Supp. 2d 19 (D.D.C. 2016) (taking judicial notice of news reports). Although the court "must construe the allegations and facts in the complaint in the light most favorable to the plaintiff …," *Gustave-Schmidt,* 226 F. Supp. at 195, the complaint must nevertheless plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Critically, the claims must rise "above the speculative level," *Twombly*, 550 U.S. at 555, and "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint . . . . [nor must it] accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994). The pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action, " *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678.

In short, the Court is not required to accept conclusory allegations unsupported by the alleged facts—to the contrary, such allegations should be rejected. *See Herzfeld v. Barmada*, No. 24-1272, 2025 U.S. Dist. LEXIS 150403 at *6-7 (D.D.C. 2025) ("'mere conclusory statements' are not enough to establish a plausible claim, and courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'") (quoting *Iqbal*, 556 U.S. at 678).

Additionally, a claim that is based on an incorrect legal theory must be dismissed "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Nietzke v. Williams*, 490 U.S. 319, 327 (1989).

Similarly, when deciding a 12(b)(1) motion to dismiss, the court may also consider such materials outside the pleadings as are appropriate to resolve the question of whether it has jurisdiction over the case. *Scolaro v. D.C. Bd. Of Elections & Ethics*, 104 F.Supp.2d 18, 22 (D.D.C. 2000); *see Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F.Supp.2d 9, 14 (D.D.C. 2001) (holding that the district court is not limited to the allegations in the complaint when deciding a 12(b)(1) motion to dismiss). "[T]he plaintiff's factual allegations in the complaint … will bear closer scrutiny in resolving a (12)(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge*, 185 F.Supp.2d at 13-24 (quoting Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, Section 1350 (3d ed. 1998)).

Here, Plaintiff openly acknowledges that Ms. Ali did not violate Plaintiff's freedom to contract and Ms. Ali's conduct had no nexus to state action. Plaintiff's § 1981 theory is therefore unsupported by authorities in this District, the majority of other circuits, and the Supreme Court. As this Court's jurisdiction rests solely on that defective claim, once it is dismissed, the Court must also dismiss the remaining claims for want of jurisdiction. Nor does Plaintiff state a valid claim under applicable standards for Intentional Infliction of Emotional Distress (Count V), Trespass to Chattel (Count IV), or a violation of D.C. Code §§ 22-3704 (Count II).

<u>**ARGUMENT**</u>

**I.     Plaintiff Fails to State a Plausible Claim Under 42 U.S.C. § 1981, Depriving the
        <u>Court of Jurisdiction Over All Claims</u>**

The facts alleged in the Amended Complaint, even viewed most favorably to Plaintiff, fail
to establish a viable claim under 42 U.S.C. § 1981 because Plaintiff has not alleged a contractual
relationship or a nexus to state action. Plaintiff also fails to allege facts plausibly stating a claim of
racial discrimination. Criticizing Israel's military actions and related government policies is not
antisemitism. It is political speech directed at a foreign government's actions, not prejudice against
a people or a faith. The precedent Plaintiff seeks to set here by conflating any criticism of Israel
with discrimination against Jewish people generally is extremely dangerous, is inconsistent with
the First Amendment's free speech protections, and should be rejected.

Plaintiff's sole basis for federal jurisdiction is 42 U.S.C. § 1981, and her remaining state-
law claims depend entirely on the Court's supplemental jurisdiction. When the only federal claim
is dismissed, the Court should decline to exercise jurisdiction over remaining state law claims.
There is no reason for this Court to make an exception in this case. Plaintiff has already had her
day in state court, where she lost. Because the Superior Court ultimately acquitted Defendant,
Plaintiff is not-so-subtly seeking a second bite at the apple and attempting to retry her grievances
before this Court. This case's facts weigh heavily in favor of dismissal of all claims.

**A.     The Supreme Court Instructs that § 1981 Prohibits Racial Discrimination in
        <u>Contracting, and Is Not a Catch-All Civil Rights Statute</u>**

Plaintiff's § 1981 claim in Count I should be dismissed under Fed. R. Civ. P. 12(b)(6)
because the Amended Complaint fails to allege facts sufficient to bring it within the scope of the
statute. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) ("Any claim brought

under § 1981 … must initially identify an impaired 'contractual relationship,' under which the plaintiff has rights.").

The plain language of Section 1981's text indicates that its enforcement is limited to situations involving contracts:

> All persons within the jurisdiction of the United States shall have the same right in every State and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and no other.

42 U.S.C. § 1981(a).

Even this Court noted in footnote 11 of its Memorandum Order dated August 4, 2025 (ECF No. 26) that § 1981 has been used almost exclusively in this context. Plaintiff neither alleged nor showed that she attempted to enter into any contract with Ms. Ali, nor that any existing contractual relationship was denied, obstructed, or impaired due to her race. The conduct she describes, an alleged *de minimis* battery,[2] has no contractual context and is entirely disconnected from any commercial, employment, or service transaction.

The Supreme Court has instructed point blank that § 1981 is not a vehicle to litigate all forms of racial animus. In *Domino's Pizza*, the Court explained:

> Consistent with our prior case law, and as required by the plain text of the statute, *we hold that a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract* that he wishes 'to make and enforce.'

---

[2] To be clear, Defendant denies any alleged assault or battery, and was acquitted of criminal charges in a full trial by Judge Campbell, who found that the testimony of Plaintiff and Officer Bonney "conflicts in some respects with other evidence in the case" and found the testimony of Defendant and her witness credible. *See* May 20, 2025 Tr. (ECF 8-2) 22:11-13, 24:12, 25:12.

. . . .

> Nothing in the text of § 1981 suggests that it was meant to provide an omnibus remedy for all racial injustice. If so, it would not have been limited to situations involving contracts. Trying to make it a cure all not only goes beyond any expression of congressional intent but would produce satellite § 1981 litigation of immense scope.

*Domino's Pizza*, 546 U.S. at 476, 479 (emphasis added).

Buttressing Defendant's argument that § 1981 applies only in the context of contracts, the Supreme Court also observed that "[a]bsent the requirement that the plaintiff himself must have rights under the contractual relationship, § 1981 would become a strange remedial provision designed to fight racial animus in all of its noxious forms." *Id.* at 476.

The Supreme Court also noted that if anything, the 1991 Amendments *strengthened* the limitation to contractual settings: "while Congress revised *Patterson*'s [*Patterson v. McLean Credit Union*, 491 U.S. 164, 176 (1989)] exclusion of postformation conduct, it let stand *Patterson*'s focus upon contract obligations. In fact, it positively reinforced that element by including in the new § 1981(b) reference to a '*contractual relationship*.'" *Domino's Pizza*, 546 U.S. at 477. Even the House Committee Report regarding the amendment was specifically entitled, "Restoring Prohibition Against All Racial Discrimination in the Making and Enforcement of Contracts." *See* H.R. Rep. 102-40(II), 35-37.

This Court correctly applied the Supreme Court's analysis in *Humphries v. Newman*, No. 18-2936, 2021 U.S. Dist. LEXIS 254494 (D.D.C. Mar. 2, 2022), where it dismissed a § 1981 claim brought by a grandmother who alleged racially discriminatory treatment by hospital personnel following a dispute over her grandchild's medical care. The Court held:

> Humphries does not identify any contractual relationship with Defendants. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) ("Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship' under which the plaintiff has rights." (quoting § 1981(b)). Nor does

9

she identify any other conduct by Defendants that would be covered by this statute.
So Humphries has failed to state a claim under § 1981.

*Humphries,* 2021 U.S. Dist. LEXIS 254494 at *7. Similarly, Plaintiff has not stated a cause of

action under Section 1981's contract clause, and there is no subject matter jurisdiction over the

remaining state law claims. Thus, the Amended Complaint should be dismissed.

### B.    At Minimum, State Action is Required for a Claim under § 1981's Equal Benefits Clause

To the extent  a minority of federal cases have applied § 1981 in non-contractual settings,

the vast majority still adhere to the limiting principle that where a contract or prospective contract

is not at issue, a nexus to the state is required. *See Sheppard v. Dickstein, Shapiro, Morin &*

*Oshinsky*, 59 F. Supp. 2d 27, n.1 (D.D.C. 1999) (noting that "[m]ost courts have held that 'the

equal benefits' clause does not extend to private discrimination, and thus, requires state action").

 The equal benefits clause of § 1981 guarantees all persons "the full and equal benefit of

all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

42 U.S.C. § 1981(a). Plaintiff's claim under the "equal benefits" clause of 42 U.S.C. § 1981(a)

fails because she does not allege any nexus to state action, either by denial of the benefit of state

laws or proceedings. The alleged battery does not amount to a denial of the equal benefits of the

D.C. battery and assault laws (or any other laws) because Plaintiff was not denied the benefit of

those protections. She was able to enforce those laws by having Defendant prosecuted in D.C.

Superior Court. Having lost there and her testimony been found inconsistent by the judge (in

contrast to Defendant, whom the judge found credible), Plaintiff seeks an alternative venue to

repeat litigation and turn a personal grievance into a federal case.

Section 1981 traces its origin to § 1 of the Civil Rights Act of 1866, enacted under

Congress's Thirteenth Amendment authority to abolish the badges and incidents of slavery. To

ensure the statute rested on firm constitutional footing, Congress soon proposed and ratified the Fourteenth Amendment and, in 1870, reenacted § 1981's antecedent pursuant to its new enforcement power. *See* Dan Morenoff, *Corporate Liability Under Section 1981*, Fed. Soc'y Rev. (2022) (citing George Rutherglen, *The Improbable History of Section 1981: Clio Still Bemused and Confused*, 2003 Sup. Ct. Rev. 303, 348 ("On the most probable reading of both statutes, they now have the following effect: section 1981 reaches private action with respect to contracts, but not with respect to other rights that have a 'state action' component")). This reenactment reflects that the statute's "equal benefits" clause, like the Equal Protection Clause of the Fourteenth Amendment, concerns equality in the administration of state law, not private conduct.

This interpretation of Section 1981 accords with Justice Scalia's caution that civil-rights statutes do not apply, "to private conspiracies that are aimed at a right that is by definition a right only against state interference," but apply "only to such conspiracies as are aimed at interfering with rights ... protected against private, as well as official, encroachment." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 278 (1993). The "equal benefit" clause of § 1981 must be read in harmony with the Fourteenth Amendment's text and structure; it presupposes state action, not private disagreement. Thus, Congress and the Supreme Court have clarified that §1981 covers private contractual-based claims, such as those related to employment or services, but not purely private tort claims.

The District of Columbia and the majority of federal courts have adopted this originalist approach and determined that a plaintiff must allege some nexus to government action to state a claim under the equal benefits clause. Purely private conduct, even if allegedly racially motivated, is insufficient. For example, in *Provisional Gov't of the Republic of New Afrika v. Am. Broad. Cos.*, 609 F. Supp. 104 (D.D.C. 1985), this Court dismissed a § 1981 equal benefits clause claim brought

by a separatist Black nationalist organization against a private television network. The plaintiffs

alleged that news coverage broadcast by the network associated them with criminal activity and

violated their civil rights. *Id.* at 110. The Court rejected the equal benefits clause claim because

the plaintiffs failed to allege that the broadcaster acted under color of state law. *Id.* at 109. The

Court held:

> The two major clauses -- the contracts clause and the equal benefits
> clause -- are intended to enforce two distinct sets of rights. The
> specific assertions in plaintiffs' complaint show that their claims
> arise under the equal benefits clause. Because this clause does not
> reach purely private discrimination, the element of state action must
> be alleged and proved. Here, the plaintiffs' vague allegations of state
> action rest on the fact that the federal government regulates the
> broadcasting industry. The fact that the government has granted
> NBC a broadcast license is not sufficient to constitute state action
> and the plaintiffs' claim under § 1981 must be dismissed. *Id.* at 109
> (internal citations omitted).

The Court emphasized that without state action, plaintiffs did not have a claim under § 1981. *Id.*

Likewise, the D.C. Circuit in *Banks v. C&P Telephone*, 802 F.2d 1416 (D.C. Cir. 1986) confirmed

that although § 1981 provided remedies for a broad range of actions, the statute was "not designed

to provide a remedy for intentional torts such as assaults and batteries." *Id.* at 1427. The Court is

bound by this important qualification of § 1981 rights set forth by the D.C. Circuit.

Other circuit courts have followed a similar rationale in limiting the equal benefits clause

to situations involving state action. The Third Circuit in *Mahone v. Waddle*, 564 F.2d 1018 (3d Cir.

1977), emphasized that such claims necessarily require state involvement. The court explained:

> The words 'full and equal benefit of all laws and proceedings for the security of
> persons and property,' on the other hand, suggest a concern with relations between
> the individual and the state, not between two individuals. The state, not the
> individual, is the sole source of law, and it is only the state acting through its agents,
> not the private individual, which is capable of denying to blacks the full and equal
> benefit of the law. Thus, while private discrimination may be implicated by the

contract clause of section 1981, the concept of state action is implicit in the equal benefit clause. *Id.* at 1029.

The Fourth Circuit also unequivocally confirmed, in *Shaare Tefila Congregation v. Cobb*, 785 F.2d 523 (4th Cir. 1986), *rev'd on other grounds*, 481 U.S. 615 (1987), where a synagogue alleged § 1981 violations after being vandalized with antisemitic graffiti by private individuals, that "state action is required" to support such an equal benefits claim. *Id.* at 525.

The Eighth Circuit has consistently reaffirmed the same rule. In *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851 (8th Cir. 2001), the plaintiff, a Black customer, alleged that a store falsely accused him of shoplifting and wrongfully detained him. The Eighth Circuit affirmed dismissal of the § 1981 equal benefits clause claim because the store was a private actor, and the plaintiff failed to show that its conduct was attributable to the state. *Id.* at 855. Likewise, in *Bilello v. Kum & Go, LLC*, 374 F.3d 656 (8th Cir. 2004), the plaintiff alleged racially discriminatory denial of access to restroom facilities. The court affirmed dismissal of the equal benefits clause claim because the plaintiff did not allege "state action caused him to be denied the full and equal benefit of laws." *Id.* at 661. Further, in *Adams ex rel. Harris v. Boy Scouts of Am.–Chickasaw Council*, 271 F.3d 769 (8th Cir. 2001), the court again affirmed dismissal where the plaintiffs, Black campers and their guardians, alleged racially motivated mistreatment at a private camp. The court emphasized that no state actor had participated and no actionable conspiracy with state officials had been shown. *Id.* at 777-778.

Taken together, these decisions reflect the majority view in the federal circuit courts, which precedent from the U.S. District Court in the District of Columbia has followed, that § 1981's equal benefits clause does not reach purely private action.

This lawsuit presents exactly the sort of overbroad theory the Supreme Court warned against in *Domino's*. Here, Plaintiff sues a private individual, Janine Ali, and does not allege that

13

any governmental official, police officer, or court was involved in the alleged incident, or that Plaintiff was denied the ability to enforce any D.C. laws against Defendant. According to the Amended Complaint, Ms. Ali yanked on Plaintiff's Israeli flag and walked away during a protest. *See* Am. Compl. ¶¶ 13-14. Even taking this allegation as true, which Defendant denies, Plaintiff neither alleged nor demonstrated anything more than a private interaction between the parties. There is no allegation nor showing that Plaintiff was denied protection of the laws or discriminated against by state officials in any capacity. To the contrary, she had Ms. Ali prosecuted in Superior court; she simply was unhappy with the outcome. Under the prevailing authority across multiple circuits, such allegations cannot support a claim under the equal benefits clause.

Because Plaintiff has not alleged a nexus to state action, her claim under 42 U.S.C. § 1981 fails as a matter of law. Absent a viable § 1981 claim, the Court lacks subject-matter jurisdiction over the remainder of the case. Accordingly, the Court should dismiss all claims in this action under Fed. R. Civ. Procedure 12(b)(1) and 12(b)(6).

**C.    Criticism of Israel Does Not Constitute Racial Animus Towards Jewish People**

To state a claim under § 1981, even in a contract context, a claimant must prove (1) that the plaintiff is a member of a racial group; (2) that the defendant intended to discriminate against the plaintiff on the basis of race; and (3) that the discrimination concerned an activity enumerated in § 1981. *Moini v. Wrighton*, 602 F. Supp. 3d 162, 172 (D.D.C. 2022). Plaintiff's § 1981 claim fails to meet the statutory requirements of discrimination, providing yet another reason this Court lacks subject matter jurisdiction over her claim.

The vast majority of Plaintiff's Amended Complaint is devoted to conflating criticism of Israel with antisemitism. Yet, criticism of the State of Israel's policies is not equivalent to antisemitism and the false equivalence Plaintiff makes in this case collapses the distinction

14

between political disagreement and racial discrimination. Israel is a modern state with a parliamentary government and a population that includes Jews, Christians, and Muslims. The blue star of David on a white cloth the shape and size of a flag, symbolizes the State of Israel, *not* Judaism broadly. Many Jewish individuals—both within and outside Israel—have long criticized Israeli government actions. Indeed, even within the early Zionist movement, there was dissent about establishing a secular Jewish state.[3]  In fact, there are even sects of ultra-orthodox Jews that oppose the existence of Israel because they do not believe it is based on the torah and commandments.  *See Not All Jews Are Zionists*, TORAH JEWS, https://torahjews.org/ (last visited Nov. 12, 2025).

Ms. Sumrall details her own attachment to Israel as a result of her Jewish faith but appears unconcerned with or unaware of Ms. Ali's attachment to the same region—Ms. Ali's parents were Palestinian and Southern Lebanese, she has many relatives remaining there, and she still owns property in the area. Ms. Sumrall's claims are based on a demand that her feelings about the land that constitutes Israel and Palestine be recognized by this Court as more valid than Ms. Ali's, to the point where Ms. Ali's views effectively subject her to prosecution under civil rights law.

To begin, the new "facts" Plaintiff alleges to support her legal claims are based on racist assumptions about Ms. Ali, Muslims and Palestinians more broadly:  that they simply harbor ingrained antisemitic attitudes and their objection to Israel's mass murder of civilians in Gaza is a mere smokescreen. Courts should not accept such bigoted claims about any group of people, much less impute individual actions and beliefs to such bigotry. Asking the Court to recognize race-based generalizations, and impute actions and beliefs to Ms. Ali, undermines Plaintiff's case and our legal system, which is predicated on assessments of individual actions. Plaintiff's approach

---

[3] *See* David Vital, *The Origins of Zionism* (Oxford University Press 1975).

harkens back to the Jim Crow South, where judgments about legal guilt were tarnished with assumptions about individuals based upon their race.  For this reason, Defendant moved to strike those portions of the amended Complaint, *see* ECF No. 39,  but if this Court for some reason denies that motion, it should at least disregard these scandalous assertions.

Setting aside the shocking bigotry permeating Plaintiff's amended complaint: many of the facts that Plaintiff alleges are simply untrue, least of all debunked claims alleging, in effect, that the dispute between Jewish Israelis and Palestinians stems purely from antisemitic animus on the part of the latter, and denying the ethnic cleansing, expulsion, and massacres of Palestinians that occurred to create a Jewish majority state in the region. Am. Compl. ¶¶ 40-51. Notably, the mere fact that Plaintiff is effectively asking this Court to adjudicate the Palestinian-Israeli conflict in her favor in order to prevail on her case is itself a red flag that this case should not have been filed. *See StandWithUs*, No. 24 1800, 2025 U.S. App. LEXIS 27390, at *29 ("[t]his absence of consensus [about antizionism v. antisemitism] reflects ongoing debate as to the relationship between anti-Zionism and antisemitism – debate that our constitutional scheme resolves through discourse, not judicial fiat.").

Furthermore, although at this stage the facts alleged surrounding the alleged incident are to be construed in Plaintiff's favor, that does not mean she is entitled to rewrite history so as to prevail on her legal claims. Plaintiff paints a distorted history of antisemitism among Muslims and Palestinians to conclude implausibly that Ms. Ali's actions are inherently antisemitic, instead of motivated by her opposition to Palestinian men, women and children in Gaza being slaughtered on an ongoing basis (for over one year by November 2024) by U.S. taxpayer-supported military forces. Even without any substantial dispute over land, antisemitism has a long and virulent history

in Europe and in the United States, but no one would plausibly claim that Europeans or Americans are inherently antisemitic based on such history.

Ms. Sumrall's rendition of the historical events surrounding Israel's creation is so fanciful it does not fall within the realm of a legitimate factual dispute and does not deserve consideration, even if it were relevant. To start, the claim that there were few Palestinian Arabs living in what is now Israel, Gaza, and the West Bank at the turn of the century is simply a fabrication. The most authoritative source on population data in Ottoman Palestine estimates that at the turn of the 20th century, 475,261 Muslim Palestinians lived in the region, around 60,000 Christian Palestinians, and 20,117 Jews. *See* Justin McCarthy, *The Population of Palestine: population history and statistics of the late Ottoman period and the mandate* (Columbia University Press, 1990), p. 10.

In order to perpetuate her false and racist narrative, Plaintiff completely ignores essential facts surrounding the creation of the State of Israel. In 1947, in light of growing violence between the Jewish and Palestinian Arab populations resulting from British support[4] for a Jewish homeland that would inevitably result in the dispossession of indigenous Palestinians, the United Nations ("UN") proposed a partition plan: an independent Arab state, an independent Jewish state, and the City of Jerusalem (under an international trustee). *See Israel and the Palestinians: History of the conflict explained*, BBC (Oct. 14, 2025), https://www.bbc.com/news/articles/ckgr71z0jp4o (last visited Oct. 24, 2025).

---

[4] To note, the sole Jewish member of British Cabinet at the time of the Balfour Declaration, Edwin Samuel Montagu, strongly opposed Britain's policy, describing Zionism as a "mischievous political creed" designed to make being Jewish incompatible with British citizenship. Edwin Samuel Montagu, *Memorandum on the Anti-Semitism of the Present (British) Government* (Aug. 1917), reprinted in Jewish Virtual Library, https://www.jewishvirtuallibrary .org/montagu-memo-on-british-government-s-anti-semitism.

All Arab nations, and the Palestinians, opposed this plan because it gave Israel more land despite having a substantially smaller population. *Id.* In May 1948, the British withdrew, and Israel declared statehood, leading to war with its neighboring Arab nations. *Id.* Egypt was left occupying the Gaza Strip, while Jordan took control of the West Bank and East Jerusalem. *Id.* Altogether, these areas are currently home to as many as 5 million Palestinians, at least before the current conflict. *Id.*

The Israeli army at the time of Israel's founding expelled over 700,000 Palestinians, beginning with the destruction of villages Al-Khisas and Baad al-Shakyh in what is now Israel in 1948; these Palestinians lost their homes forever and became refugees in Gaza, the West Bank, and adjacent Arab countries, including Jordan, Syria and Lebanon. *Id.* Over 200 villages were destroyed in total. During the Deir Yassin massacre, Zionist paramilitaries attacked the village near Jerusalem, killing at least 107 villagers, including women and children. *See* Uri Milstein, HISTORY OF ISRAEL'S WAR OF INDEPENDENCE 267 (Zmora-Bitan, Volume 4, 1991). Palestinians call May 15, 1948, the "Nakba," which means "catastrophe" in Arabic, while Israel celebrates that date as its day of independence.

Plaintiff's denial of these events (by omission) must be news to the United States Department of State, which recently made public a then-secret 1949 memo from the Coordinator on Palestine Refugee Matters to the Under Secretary of State stating that as a result of the establishment of the State of Israel, on May 15, 1948, "almost the entire Arab population of Palestine fled or was expelled from the area under Jewish occupation. These Arabs, now estimated at 725,000, took refuge in Arab-controlled areas of Palestine and in the neighboring Arab states." *See Memorandum by the Coordinator on Palestine Refugee Matters (McGhee) to the Under Secretary of State (Webb)*, OFFICE OF THE HISTORIAN (Mar. 15, 1949), https://history.

state.gov/ historicaldocuments/frus1949v06/d533 (last visited Nov. 12, 2025). The Coordinator described the situation for Palestinians as "acute," and explained that the United Kingdom has "indicated its mounting concern at the refugee problem, realizing as it does how the presence of 700,000 demoralized and hungry people can threaten the entire stability of the strategic Middle East in which the United Kingdom has a vital interest." *Id.* Israel had "no intention of taking back more than a portion of the refugees," and had "followed a systematic program of destroying Arab houses in such cities as Haifa and in village communities[.]" *Id.*

As part of its ongoing effort to expand territory, Israel occupied Gaza, and together with France and Britain, invaded Egypt up to the Suez Canal in 1956; the United States effectively forced a withdrawal of Israeli forces to its 1948 borders, as well as a withdrawal of France and Britain from Egypt. Later, Israel staged a preemptive strike that destroyed Egypt's air-force, which set off the 1967 six-day war. *See Israel and the Palestinians: History of the conflict explained*, BBC (Oct. 14, 2025), https://www.bbc.com /news/articles/ckgr71z0jp4o (last visited Oct. 24, 2025). Within days, Israel had captured the Sinai Peninsula, Gaza, the West Bank, the Golan Heights, and East Jerusalem, and continues to occupy many of these areas to this day. *Id.* Although the Palestinian Authority runs day-to-day operations in many of the towns and cities in the West Bank, Israel maintains overall control. *Id.* About 700,000 Israeli settlers have now moved into formerly Palestinian areas and live in settlements in the West Bank and East Jerusalem. *Id.* The International Court of Justice ruled that these settlements are illegal under international law,[5] but

---

[5] *Legal Consequences Arising from the Policies and Practices of Israel in the Occupied Palestinian Territory, Including East Jerusalem*, Advisory Opinion of July 19, 2024, https://www.icj-cij.org/case/186, ¶ 261 ("The sustained abuse by Israel of its position as an occupying Power, through annexation and an assertion of permanent control over the Occupied Palestinian Territory and continued frustration of the right of the Palestinian people to self-determination, violates fundamental principles of international law and renders Israel's presence in the Occupied Palestinian Territory unlawful.").

the Israeli government disputes this characterization and claims that the West Bank belongs to Israel. *Id.*

Many human rights organizations, including Amnesty International, Human Rights Watch, and several Israeli organizations, consider the system in the West Bank to meet the legal definition of apartheid, since "Israeli authorities maintain a two-tiered legal system: methodologically privileging Israelis, who have the same rights and privileges wherever they live, while repressing Palestinians to varying degrees wherever they live." Lama Fakih and Omar Shakir, *Does Israel's treatment of Palestinians rise to the level of apartheid?* LOS ANGELES TIMES (Dec. 5, 2023), https://tinyurl.com/3vk7pyhz (last visited Oct. 28, 2025). One feature of this system is that Israel may demolish the homes of Palestinians arbitrarily, for any or no reason. *Id.*

Another such feature is that Palestinians (but not Jewish Israelis) may be held in administrative detention indefinitely without charge and without having committed an offense on the grounds that they may break the law in the future. *See Administrative Detention*, B'TSELEM, https://www.btselem.org/administrativedetention (last visited Oct. 28, 2025). At the end of last year, Israeli Prison Services ("IPS") was holding 3,327 Palestinians in administrative detention, including 112 minors. *See Statistics on administrative detention in the Occupied Territories*, B'TSELEM, (Mar. 3, 2025), https://www.btselem.org/administrative_detention (last visited Oct. 28, 2025). While Israel physically withdrew from Gaza territory in 2005, it maintained control of the borders, airspace, and sea, giving it near total power over the movement of people and goods. *See Israel and the Palestinians*, BBC, https://www.bbc.com/news/articles/ckgr71z0jp4o. Even before October 7, 2023, Gaza had one of the highest unemployment rates in the world and many people lived below the poverty line. The year 2023 was the deadliest year on record for Palestinian children, with at least 38 children in the West Bank and 6 in Gaza killed by Israeli forces from

January 1 to September 18, 2023. *See 2023 Marks Deadliest Year on Record for Children in the Occupied West Bank*, SAVE THE CHILDREN (Sept 18, 2023), https://www.savethechildren.net/news/2023-marks-deadliest-year-record-children-occupied-west-bank (last visited Nov. 2, 2025) (explaining that 2023 was the second year in a row designated deadliest for Palestinian children, indicating that violence by Israel against Palestinian children is escalating).

On October 7, 2023, Hamas launched an attack across the border from the Gaza Strip, resulting in the deaths of around 1,200 Israelis, including civilians, and took around 250 Israelis hostage. *See Israel and the Palestinians*, BBC, https://www.bbc.com/news/articles/ckgr71z0jp4o. In response, launched a massive military operation in Gaza that has continued for more than two years. At least 68,000 Palestinians, mostly civilians, have been killed to date, although that number is likely a significant undercount since it is derived from recovered bodies, and there are bodies trapped beneath the rubble. *See* United Nations Office for the Coordination of Humanitarian Affairs, *Humanitarian Situation Update #329*: *Gaza Strip*, UNITED NATIONS OFFICE FOR COORDINATED HUMANITARIAN AFFAIRS (Oct. 9, 2025), https://tinyurl.com/2hkbsayb (last visited Oct. 21, 2025); Seham Tantesh and William Christou, *My Heart Is Broken: Palestinians Begin Searching the Gaza Rubble for Their Dead*, THE GUARDIAN (Oct. 12, 2025), https://tinyurl.com/5n746ehb (last visited Oct. 21, 2025).

Israel's actions in retaliation for October 7, 2023, have been categorized as a genocide by many human rights organizations and scholars, including the United Nations Special Committee, the International Association of Genocide Scholars, Amnesty International, and Israeli human rights organizations B'Tselem and Physicians for Human Rights Israel. *See generally StandWithUs*, 2025 U.S. App. LEXIS 27390, at *34 (rejecting plaintiffs' claim that accusing Israel of committing genocide is inherently antisemitic; "even prominent Israelis have lodged the same

accusation") (citing Omer Bartov, *I'm a Genocide Scholar. I know It When I See It*, THE NEW YORK TIMES (July 15, 2025), https://tinyurl.com/44y83jky (last visited Nov. 6, 2025)).

In December of 2023, South Africa brought a case in the International Court of Justice ("ICJ"), accusing Israel of committing genocide against the Palestinians of Gaza. The ICJ ruled that the allegation is plausible and allowed the case to move forward on that basis. *Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel)*, Order of 26 January 2024, Int'l Ct. Justice, https://www.icj-cij.org/case/192 (last visited Nov. 12, 2025).

On October 10, 2025, Israel and Hamas reached a ceasefire agreement, and in accordance with its terms, Hamas returned all living hostages to Israel. *See* Cachella Smith, *Israel launches strikes on Gaza after Netanyahu orders 'powerful' attacks*, BBC (Oct. 28, 2025), https://www.bbc.com/news/live/c891ex72nj7t (last visited Oct. 29, 2025). Just weeks later, on October 28, 2025, Israel carried out heavy airstrikes on Gaza in alleged retaliation for Hamas' mishandling of a deceased hostage. The strikes killed 104 people, including 46 children. *Id.*

Plaintiff wants to adjudicate the question of whether Ms. Ali's motivations stem from a history of antisemitism in the Middle East and/or Europe, or from Defendant's opposition to Israel's treatment of Palestinians over the past 75 years, especially the killings and destruction by Israeli armed forces in Gaza over the last two years, enabled by U.S. arms transfers. The Gaza conflict is a matter of public interest, subject to protests by both sides. It is implausible and misleading, to say the least, to attribute these protests to a distorted 1300-year history of antisemitism, leaving critical facts out of her amended complaint, ignoring the death and destruction suffered over the past two years abetted by U.S. arms sales, and substituting these facts with whitewashed fabrications.

But Plaintiff's falsehoods don't end with her rendition of history. She also incorrectly describes the keffiyeh as a symbol of "anti-Israel" beliefs. Am. Compl. ¶ 41. The keffiyeh is traditional headdress throughout the Middle East and has been around for millennia -- since the Mesopotamian era -- significantly longer than the modern State of Israel, *Israel and the Palestinians*, BBC, https://www.bbc.com/news/articles/ckgr71z0jp4o (last visited Nov. 12, 2025).[6] Plaintiff also claims that Defendant naming her son "Jehad" is indicative of an antisemitic mindset because the word means "a holy war waged on behalf of Islam as a religious duty." Actually, the primary meaning of "Jehad" or "jihad" for Arabic speakers is struggle, usually denoting an inner turmoil.

Next, Plaintiff spends multiple pages conflating Defendant with CODEPINK and attributing any action by any member to her. Plaintiff smears Medea Benjamin, its Jewish founder, as an antisemite, and the organization as a terrorist hate group, in part because Ms. Benjamin has drawn comparisons between Israel's conduct in Gaza and the Nazi Holocaust. *See* Am. Compl. ¶¶ 25-26. The smearing of Ms. Benjamin and misrepresentation of CODEPINK's activities as antisemitic is merely Plaintiff's opinion; it is not a fact. CODEPINK, is an anti-war group that explicitly eschews violence; Ms. Benjamin is a Jewish-American peace activist who has received multiple humanitarian honors, including the U.S. Peace Memorial Foundation's 2014 Peace Prize and the Martin Luther King, Jr. Peace Prize, in recognition of her lifelong commitment to nonviolent advocacy. CODEPINK is widely known for its peaceful protests and political street theater, activities squarely protected by the First Amendment. Although some may object to comparisons between Israel and Nazi Germany or claims that the state of Israel is a racist endeavor,

---

[6] *See* Rajrupa Das, *The Story of the Keffiyeh*, The Markaz, (March 3, 2024) https://themarkaz.org/the-story-of-the-keffiyeh/.

such views are political opinions that are protected by the First Amendment. Objections to Israel's conduct do not amount to hate against Jews, any more than objections to Iran's conduct constitute hate against Muslims. And Plaintiff has not—because she cannot—point to a single instance of a CODEPINK endorsing violence.

Equally specious as support of antisemitism is Plaintiff's allegation that CODEPINK has linked Israel to wildfires in California, because the group posted on Instagram "When US taxes go to burning people alive in Gaza, we can't be surprised when those fires come home." *See* Am. Compl., ¶ 27. Again, characterizing this statement as antisemitic defies logic and reason. The point  that the Instagram post makes is that U.S. military assistance to Israel, which amounts to billions of dollars each year and is an indisputable fact, ends up being money that cannot be spent at home. While one can debate the truth of the latter assertion, it does not involve animus towards individuals because of their religious beliefs, ethnicity, or national origin. In any event, it is not even a statement attributed to Ms. Ali specifically, but rather an organization with which she is loosely associated by virtue of having attended a protest the group organized. *StandWithUs*, No. 24-cv-1800, 2025 U.S. App. LEXIS 27390, at *32 ("We therefore reject plaintiffs' claimed right to stifle anti-Zionist speech by labeling it inherently antisemitic). IfNotNow, another sponsor of the vigil attended by Defendant Ms. Ali at the Dirksen building on the day of the alleged assault, is an explicitly Jewish organization.  *See* www.ifnotnowmovement.org.

Both organizations' unimpeachable record of nonviolent messaging and action stand in stark contrast to the organization Plaintiff proudly serves:  Betar USA.  Betar has been  designated a hate group by the unapologetically pro-Israel Anti-Defamation League, and unabashedly

embraces violence against pro-Palestinian activists to accomplish its aims.[7]   For example, the group openly threatens to hand pagers—a reference to Israel's recent operation in Lebanon, in which exploding devices were placed in pagers, killing and injuring those who used them (including some children who picked up their parents pagers)—to ideological opponents, including Norman Finkelstein and Peter Beinart, both of whom are Jewish.   Yet in the up-is-down world Plaintiff resides in, organizations that reject violence are  bigoted, while her group, which is open about its endorsement of violence and belief that Jews are superior to Palestinians, is not.

Ms. Sumrall also recounts some incidents of harassment that have nothing to do with Ms. Ali. For example, she alleges that a man in a keffiyeh approached her on the street and threatened her. She claims that another time, a drone flew in her backyard.   Ms. Sumrall at no point even alleges,  let alone provides evidence, that these incidents were linked to Ms. Ali.   Thus, the facts alleged, even viewed in the light most favorable to Plaintiff, do not establish any pattern of harassment or threats against Ms. Sumrall by Ms. Ali.

To a large extent, Plaintiff relies upon using the International Holocaust Remembrance Alliance's (IHRA) definition of antisemitism to in turn characterize Ms. Ali's protest of Israel's military campaign in Gaza as bigotry rather than a perspective on foreign policy that differs from her own. *See* Am. Compl. ¶ 22. As even Kenneth Stern, who penned the IHRA definition of antisemitism has acknowledged, it was never intended to be used for purposes of legal interpretation or law enforcement. Rather, it provides examples of attitudes or speech that *may* be indicative of antisemitism.[8]

---

[7] *See* Excerpt from ADL Website, Exhibit D of Mem. in Support of Reconsider (ECF No. 30-5); Etan Nechin, '*Embraces Islamophobia, Harasses Muslims': ADL Lists Far-right Betar USA as Hate Group*, Haaretz (February 21, 2025).

[8] *See, e.g.*, Eyal Press, "The Problem with Defining Antisemitism," The New Yorker (Mar. 13, 2024) (explaining that Stern himself testified at a congressional hearing that he "believed that

The alleged pulling of an Israeli flag-cape worn by a counter-demonstrator at a lobbying event protesting the war in Gaza, where Defendant said nothing to Plaintiff, cannot reasonably be interpreted as direct evidence of antisemitic motive. Such conduct, even if it occurred, reflects political protest, not racial hatred.

Both the *Jerusalem Statement on Antisemitism* and the *International Holocaust Remembrance Alliance* (IHRA) definition on which Plaintiff relies confirm this distinction. The Jerusalem Statement explains:

> So, for example, hostility to Israel could be an expression of an antisemitic animus, or it could be a reaction to a human rights violation, or it could be the emotion that a Palestinian person feels on account of their experience at the hands of the State. In short, judgement and sensitivity are needed in applying these guidelines to concrete situations.[9]

Similarly, the IHRA definition provides:

> Manifestations might include the targeting of the state of Israel, conceived as a Jewish collectivity. However, criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic.[10]

In analyzing similar circumstances, courts around the country, have recognized and applied this distinction. In *Landau*, 780 F. Supp. 3d 548 at 555, the Court flat out rejected "Plaintiffs' embedded proposition that any anti-Israel speech is intrinsically antisemitic, because reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views." Likewise, in *Am. Ass'n of Univ. Professors v. Rubio*, 2025 U.S. Dist. LEXIS 193069 (D. Mass., Sept 25, 2025), the court upheld the rights of anti-Israel protestors over claims by the government defendants equating anti-Israel actions with antisemitism. Despite the government's claims, the court noted that the State Department's own website clarified that anti-

---

enshrining [the IHRA definition] into law would have dangerous consequences" and a bill proposing to do that posed "a clear threat to academic freedom").

[9] https://jerusalemdeclaration.org/

[10] https://holocaustremembrance.com/resources/working-definition-antisemitism

Israel protests were not antisemitic. *Id.* at 36-37 (also explaining that as a member of the federal judiciary, his role was to "safeguard[] the rights of all persons lawfully present in this country. This includes the freedom of speech that allows those people to understand each other and to debate. If 'terrorist' is interpreted to mean 'pro-Palestine' or 'anti-Israel' and 'support' encompasses pure political speech, then core free speech rights have been imperiled"); *see also Gerwaski v. Nevada ex rel Board of Regents*, 2025 U.S. Dist. Lexis 84645 (D. Nev. 2025) (dismissing case despite claims that anti-Israel protests were antisemitic hate); *Univ. of Maryland Students for Just. In Palestine v Bd. of Regents of Univ. of Maryland*, 2024 U.S. Dist. Lexis 178359 (D. Md. 2024) (affirming rights of anti-Israel protestors over antisemitism allegations).

Further, courts have rightly rejected equating criticism of Israel with antisemitism on First Amendment grounds. *E.g.*, *Students for Just. In Palestine v. Abbott*, 756 F. Supp. 3d 410, 425 (W.D. Texas 2024) (finding that adopting the IHRA definition of antisemitism for purposes of enforcing civil rights law in public universities in Texas likely chills protected speech); *Parents v. Liberated Ethnic Stud. Model Curriculum Consortium*, No. 22-3243, 2024 U.S. Dist. LEXIS 216929 (C.D. Cal. 2024) (dismissing lawsuit seeking to prohibit teaching of anti-Zionist views or views that include criticism of Israel as, *inter alia*, Plaintiffs sought an unconstitutional prior restraint against protected speech; later awarding Defendants' attorneys' fees in anti-SLAPP countersuit). Ms. Ali's participation in the CODEPINK protest last November falls squarely within the First Amendment's guarantees of free speech, assembly, and association. Plaintiff's attempt to characterize Ms. Ali's attendance at protests to support a claim under § 1981 and state law torts, even assuming that, as Plaintiff alleges, Defendant yanked on her cape, is an improper attempt to weaponize the judicial system against an ideological opponent.

Accordingly, Defendant's alleged yanking of the Israeli flag during a protest concerning Gaza, while walking from behind Plaintiff, without any accompanying statement, cannot plausibly be construed as antisemitic discrimination. Indeed, CODEPINK includes many Jewish members. If Ms. Ali were motivated by antisemitism, it is implausible that she would join a demonstration organized and attended by Jewish activists who share her opposition to the Israeli government's policies.

Because Plaintiff alleges no facts showing a plausible claim of racial or religious discrimination, her Amended Complaint fails to state a claim and should be dismissed.

## II.    The Court Lacks Subject Matter Jurisdiction Over Plaintiff's State Law Claims Under Rule 12(b)(1)

Federal district courts have limited jurisdiction. *Kokkonen v. Guardian Life Insurance*, 511 U.S. 375, 377 (1994). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden of proving that the Court has subject matter jurisdiction to hear her claims. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). "Subject matter jurisdiction 'is, of necessity, the first issue for an Article III court,' for '[t]he federal courts are courts of limited jurisdiction, and they lack the power to presume the existence of jurisdiction in order to dispose of a case on any other grounds.'" *Loughlin v. United States*, 393 F.3d 155, 170 (D.C. Cir. 2004) (quoting *Tuck v. Pan Am. Health Org.*, 668 F.2d 547, 549 (D.C. Cir. 1981)); *see also Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000) ("The court cannot address any issue if it lacks subject matter jurisdiction . . . .")*.* A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

When deciding whether or not to exercise supplemental or pendent jurisdiction over state law claims, federal courts should consider "judicial economy, convenience, and fairness to

28

litigants." *Sanders v. Murdter,* 869 F. Supp. 2d 30, 33 (D.D.C. 2012).  Nonetheless, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine … will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id*. (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)).  *See also Trimble v. D.C.*, 779 F. Supp. 2d 54, 60 (D.D.C. 2011) ("Typically, if all federal law claims have been dismissed, the factors counsel against exercising supplemental jurisdiction.").

As Plaintiff acknowledges in the Amended Complaint, she relies on pendent jurisdiction for her state law claims based upon the theory this Court has subject matter jurisdiction under § 1981. *See* Am. Compl., ¶ 1. Since the Court lacks jurisdiction under § 1981, it should decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367 for the D.C. claims. *Sanders,* 869 F. Supp. 2d at 33 (courts "may decline to exercise supplemental jurisdiction over state claims that 'form part of the same case or controversy' as federal claims over which they have original jurisdiction."). *See* 28 U.S.C. § 1367; Fed. R. Civ. P. 12(b)(1).  That is especially the case because this civil lawsuit is Plaintiff's attempt at another go: having failed to obtain a guilty verdict in criminal court, Plaintiff is trying to use the federal civil system to silence Defendant for her First Amendment protected activity.

To note, Plaintiff previously brought the same civil claims arising from the same nucleus of facts in D.C. Superior Court, *Sumrall v. Ali*, No. 2024-CAB-007244 (July 21, 2025), which she voluntarily dismissed under Rule 41(a)(1)(A)(ii). Her attempt to refile those identical claims here constitutes impermissible forum shopping using § 1981 as a pretext for federal question jurisdiction. As Defendant noted at the beginning of this case "[F]ederal courts must guard against the litigant who frames a pretextual federal issue solely for the purpose of having a state-law claim

adjudicated in the federal system; Article III of the Constitution forbids this practice." *Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999).

III.  **The State Tort Claims Are Specious**

The Amended Complaint also fails to state causes of action for Intentional Infliction of Emotional Distress (Count IV), Trespass to Chattels (Count V), and a violation of D.C. Code §§ 22-3704 (Count II). Ms. Ali disputes she yanked on any flag at the November 13 demonstration. But in any case, such conduct is  nowhere close to "outrageous" under District of Columbia law. Nor has Plaintiff suffered or likely will suffer any physical harm. Again, opposing Israel's genocide is not protected by any law – federal or state. Plaintiff's add-on tort claims should be dismissed.

A.  **A Single, Momentary Yank on a Flag During a Political Protest Is Not "Extreme and Outrageous" Conduct as a Matter of Law**

To bring a claim for intention infliction of emotional distress ("IIED"), a plaintiff must prove "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff to suffer severe emotional distress." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013).  The emotional distress must be so severe that physical harm is likely to result. *See id.* at 164.

The standard is exceptionally high. As the D.C. Court of Appeals explained, liability attaches only to conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998). Plaintiff's allegations, even as exaggerated, fail to meet this standard.

1.  **Ms. Ali's Momentary Conduct Was Isolated, Fleeting, & Innocuous**

Repeated and frequent harassment, not a single fleeting incident, typically marks the threshold for IIED. *See Pietsch v. McKissack & McKissack*, 677 F. Supp. 2d 325, 329–30

(D.D.C. 2010). And even repeated conduct is often not enough. In *Ortberg*, for example, the plaintiff initially obtained a preliminary injunction against protestors who allegedly harassed him at home and work for weeks. Even then, the D.C. Court of Appeals reversed, finding that even with repeated harassment, there was no IIED claim.

Here, Plaintiff alleges only one momentary incident, an alleged yank on a flag at a political protest. Even taken as true, that act does not approach the sustained or personal harassment found insufficient in *Ortberg*. Nor does the Amended Complaint allege sufficient facts that Plaintiff was physically harmed or that Ms. Ali personally targeted Plaintiff. Indeed, Plaintiff concedes that Ms. Ali approached from behind and would not have seen her face before walking past her to join CODEPINK protestors.

### 2. Conduct in the Context of a Political Protest Cannot Be Deemed "Outrageous"

Courts must assess alleged conduct in context. *Estate of Underwood v. Nat'l Credit Union Admin*., 665 A.2d 621, 641 (D.C. 1995). Here, the alleged flag-yanking occurred in the midst of a public demonstration protesting Israel's military actions -- core political expression protected by the First Amendment.

Even conduct far more confrontational has been deemed non-actionable. In *Herzfeld v. Barmada*, 2025 U.S. Dist. LEXIS 150403, at *11  (D.D.C. Aug. 5, 2025), for instance, this Court held that an alleged "assault by sound" on a praying rabbi outside the Israeli Embassy at over 100 decibels did not constitute IIED. Plaintiff alleged in that case that he was targeted by an increase in sound amplification devices due to his being a praying rabbi, but that was still inadequate to state a tort, whether for IIED or under the D.C. anti-bias statute. A key factor was that the parties were strangers interacting solely within the context of a political protest. *Id*. The same is true here.

Likewise, in *Chen v. ICS Protective Services*, 2024 U.S. Dist. LEXIS 159936, at *9 (D.D.C. 2024), the Court held that even assault and battery do not necessarily satisfy the "extreme and outrageous" element. Not every tort that makes a Plaintiff feel bad supports IIED.

### 3. Plaintiff's Feelings About this Situation Are Legally Insufficient for her the Emotional Distress Prong of her Claim

Even if the alleged flag-yanking occurred, Plaintiff's claimed emotional distress does not meet the required severity. The distress must be "of so acute a nature that harmful physical consequences might be not unlikely to result." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007). "Recovery is not allowed merely because conduct causes mental distress." *Crowley v. N. Am. Telecomms. Ass'n*, 691 A.2d 1169, 1172 (D.C. 1997). Embarrassment or indignation is likewise insufficient. *See Waldon v. Covington*, 415 A.2d 1070, 1078 (D.C. 1980). There is no prospect of any serious physical consequences here, and Plaintiff has not alleged that she suffered any long-term or serious injury. She neither requested medical assistance at the time of the incident nor provided a medical report of an injury to the prosecution. May 19, 2025 Trial Transcript 71:25-72:5 (ECF 8-1) (Ms. Sumrall testifying under cross examination). Plaintiff had a confrontation with a motorist after a late dinner just weeks later, on December 8, and allegedly suffered a severe beating that night. Any possible, serious physical harm would have resulted from that incident, not the incident with Ms. Ali. The Court nevertheless acquitted that defendant in an alleged case of criminal assault against Plaintiff. *See United States v. Mobley*, 2025 CMD 001592, District of Columbia Superior Court, September 30, 2025.

In *Muhammed v. District of Columbia*, 881 F. Supp. 2d 115, 124–35 (D.D.C. 2012), even an unprovoked "violent push" was held not outrageous enough to support an IIED claim. The same reasoning forecloses Plaintiff's claim here.

### 4.    The First Amendment Also Protects Touching of an Israeli Flag From Tort Liability for Intentional Infliction of Emotional Distress

Finally, the First Amendment bars tort liability for political expression, even when that expression is provocative or offensive. In *Snyder v. Phelps*, 562 U.S. 443 (2011), the Supreme Court held that protests at military funerals, though deeply distressing, were constitutionally protected and could not support a claim for intentional infliction of emotional distress. Similarly, in *Texas v. Johnson*, 491 U.S. 397 (1989), the Court held that burning the U.S. flag is protected speech.

Here, the alleged yanking of an Israeli flag occurred during a protest addressing Israel's military conduct, which is an issue of intense public concern. Defendant's participation in that protest falls squarely within the protections recognized in *Snyder* and *Johnson*. As the Court in *Herzfeld* observed, such disputes are "part and parcel of the frictions and irritations and clashing of temperaments incident to participation in community life—especially in a society that recognizes a right to public political protest." *Herzfeld*, *supra*, quoting *Ortberg*, 64 A.3d at 163–64.

Because the Amended Complaint alleges at most a brief, symbolic act of political expression, not "extreme and outrageous" conduct or severe emotional distress, Plaintiff fails to state a claim for intentional infliction of emotional distress. The claim should be dismissed.

### 5.    Plaintiff's Allegations of IIED Are Belied by Her Behavior

Plaintiff alleges in support of her IIED claim that she "is fearful of outwardly expressing her Jewish identity in the same way she did prior to the attack, and such fear would not exist had she simply been subjected to an attack unconnected to her Jewish identity." Am. Compl. ¶ 84. This allegation is belied by her behavior post-November 13, 2024. Videos introduced at the preliminary injunction hearing and included with the motion for reconsideration confirm that

33

Plaintiff has not at all been fearful about expressing her Jewish identity after the alleged battery. These videos show Plaintiff not simply attending protests for Israel, but actively seeking out anti-Israeli protestors and taunting and attacking them--including a Hasidic rabbi. *See* Memorandum at 15.[11] Plaintiff's activities include arguing with police officers who try to separate her from anti-Israel protestors, wearing an ICE cap and trying to point officers toward protestors to be deported, making rude hand gestures at protestors, assaulting a protester herself by grabbing a phone to try to stop recording, and behaving obstreperously at a restaurant during a presentation by Norman Finkelstein. The videos played before the Court at the preliminary injunction hearing and incorporated by referenced from the motion for reconsideration show that Plaintiff is intrepid and undeterred in seeking confrontation to express her Jewish identity, belying her contention to have suffered emotional distress.

**B.    Plaintiff's Israeli Flag Was Not Damaged; Thus, Trespass to Chattels Fails as a Matter of Law**

Plaintiff has not and cannot claim that her Israeli flag was damaged because Ms. Ali purportedly yanked it. Mere contact, temporary interference, or symbolic handling of an object is insufficient to plead this tort.

In *Pearson v. Dodd*, 410 F.2d 701 (D.C. Cir. 1969), the very case cited in Paragraph 79 of Plaintiff's Amended Complaint, the D.C. Circuit held that "there could be no summary judgment for [plaintiff] on the theory of trespass to chattels without an undisputed showing of actual damages to the property in question." *Id.* at 707. The court emphasized the "stringent standards for damages" applicable to both conversion and trespass to chattels. In *Pearson*, political operatives had stolen private records from a U.S. Senator's office, copied them, and returned them intact. Because the

---

[11] Available at: https://www.dropbox.com/scl/fo/mt97nggyr69uhne9fxbrz/ADpKBvZSaW-ByhH_AlhOPRI?rlkey=9ht568a4bc2v6wm00n1i4ppyh&st=y18xqcpc&dl=0

records were undamaged and the plaintiff's property rights were unimpaired, the court found no basis for conversion or trespass to chattels.

D.C. courts have repeatedly followed *Pearson*'s reasoning. In *Greenpeace, Inc. v. Dow Chemical Co.*, 2013 D.C. Super. LEXIS 22 at 4 (D.C. Super. Ct. 2013), the court dismissed a trespass-to-chattels claim arising from ostensibly stolen documents, because Greenpeace failed to allege "even one dollar of compensable damages." The court likewise dismissed the related conversion claim, and Greenpeace did not appeal the dismissal of its trespass-to-chattels count. Similarly, in *Xunxian Liu v. Kroemer*, 2020 D.C. Super. LEXIS 790 (D.C. Super. Ct. 2020), the Superior Court again dismissed a trespass-to-chattels claim for failure to allege any actual damages, citing *Pearson* as controlling precedent.

Here, Plaintiff alleges no damage to the flag, no loss of possession of the flag, and no measurable injury. At most, she describes a fleeting and symbolic contact during a protest. This type of conduct, as a matter of law, cannot support a claim for trespass to chattels and Plaintiff's claim must be dismissed.

### C.     Peaceful Protest Against the Ongoing War Is Not Evidence of Any Bias

For purposes of Count II, Plaintiff's claim under the D.C. anti-bias statute, Plaintiff recites conclusory allegations alleging that CODEPINK's many protests for peace and opposition to U.S. tax dollars funding Israeli military activities are actually based on religion, as opposed to an ongoing war in which civilians, including men, women and children, were being killed every day by the Israeli military. Although the Court has to accept disputed facts as true, generally, it is not required to recognize opinions and conclusory assertions, or alleged facts that are plainly untrue. For example, a court in deciding a motion to dismiss is not required to accept the contention that the sky is green or the earth is flat.  Likewise, the Court should not accept the illogical conflation

Plaintiff seeks to make here between antisemitism and protest against the State of Israel.

Plaintiff also relies on Defendant's protesting and support of Hazami Barmada and Atefeh Rokhvand, protestors outside the Israeli Embassy who, as Plaintiff notes, were sued by a rabbi who was praying outside the Israeli embassy. *See* Am. Compl., ¶¶ 33-35. But these protests were not based on racial or religious bias, but against Israel's mass killings in Gaza. Another judge of this Court dismissed that case under Rule 12(b)(6) without leave to amend. *Herzfeld*, *supra*.

The Plaintiff also repeats unproven allegations from *StandWithUs Center for Legal Justice v. CodePink*, No. 2:24-cv-06253-SVW-PVC, (C.D. Cal. filed July 24, 2024)*,* a California case where Plaintiff accused various defendants of obstructing access to a synagogue during a protest against Israeli settlements on formerly Palestinian-owned land in the West Bank. That Court dismissed part of the case on a Rule 12(b)(6) motion, and one Defendant has moved for sanctions against Plaintiff. Plus, there is no claim here of obstructed access to a synagogue. More important, none of that discussion has anything to do with Defendant Ms. Ali. Although Ms. Ali has participated in protests sponsored by CODEPINK; CODEPINK is not a defendant in this lawsuit.

Plaintiff does raise the specter of an attack on the Israeli flag as showing racial discrimination. In protesting the actions of the Israeli military, however, antiwar protestors have no other flag to protest but the Israeli flag. Am. Compl., ¶¶ 70-72. As noted in Defendant's memorandum in support of motion for reconsideration, Israeli soldiers with gear and equipment also regularly display the Israeli flag in Gaza while carrying out their armed actions, which are not religious. *See* Exhibit A to Reply in Support of Motion for Reconsideration.

If one can burn the American flag in protest of American policy, as affirmed by the Supreme Court, one also should be able to express hostility to or even burn the Israeli flag. Under the First Amendment, the Ku Klux Klan has a right to protest and even engage in what might

otherwise be considered hate speech. *Brandenberg v. Ohio*, 399 U.S. 444 (1969). In *Claiborne Hardware*, 458 U.S. 886 (1982), white merchants filed suit against the NAACP and other boycott participants for "force, violence, or threats" against the merchants and alleging that the "management" of the boycott could be held liable. *Claiborne Hardware Co. v. NAACP,* 458 U.S. 886, 916 (1982). The Supreme Court held that "the boycott clearly involved constitutionally protected activity" and that "[t]he fact that such activity is constitutionally protected…imposes a special obligation on this Court to examine critically the basis on which liability was imposed." *Id.* at 911, 915 (emphasis added).

Any attack on the Israeli flag must be similarly protected from civil liability, based on the Israeli flag being used in armed military activities as the symbol of a nation-state engaged in war. Otherwise, the anti-bias statute would impose unconstitutional restrictions on the First Amendment. In the context of protests and counter-protests during 2024 regarding the Gaza conflict, where it is undisputed that Plaintiff is a strong and aggressive supporter of Israel and its actions, and was wearing an Israeli flag at a pro-Israeli protest looking at a pro-Palestinian Gaza protest mere yards away, it should be indisputable that the flag was allegedly yanked from behind due to the Israeli government's actions and the association of the flag with the Israeli government, not the Jewish religion. Indeed, many Jewish supporters of Israel now dissociate themselves from the Israeli flag, based on the current Israeli government's actions.[12] According to the Complaint, Ms. Ali approached Plaintiff from behind; there is no allegation that Ms. Ali knew it was Ms. Sumrall wearing the flag, or even knew the person wearing the flag was Jewish. Many evangelical

---

[12] *See* Heller, Stanley, Awful Court Decision Says Jews and the Israeli Flag Are the Same, New Politics, August 25, 2025; Toi Staff, *Poll: Nearly four in 10 US Jews say Israel has committed genocide in Gaza*, THE TIMES OF ISRAEL (Oct. 5, 2025) https://www.timesofisrael.com/poll-nearly-four-in-10-us-jews-say-israel-has-committed-genocide-in-gaza/ (explaining that four in 10 American Jews believe Israel is committing genocide in Gaza).

and conservative Christians also strongly support Israel in its Gaza war. *See* NPR, May 26, 2024, https://www.npr.org/2024/05/26/1244131702/conservative-christians-are-lending-support-and-cash-to-israel-at-war.

<u>**CONCLUSION**</u>

Plaintiff's § 1981 claim fails as a matter of law and provides no basis for federal-question jurisdiction. Without a viable federal cause of action, the Court must dismiss the Amended Complaint under Rules 12(b)(6) and 12(b)(1) and decline to exercise supplemental jurisdiction over the remaining state-law claims. The D.C. Superior Court is the appropriate forum to pursue claims related to the alleged battery.

This case involves two protestors on different sides of the Gaza massacre. What Plaintiff seeks here is not redress for discrimination, but the judicial endorsement of a dangerous proposition: that disagreement with the policies of a foreign government may be punished as racial discrimination. Opposing protests and associated tensions represent "part and parcel of the frictions and irritations and clashing of temperaments incident to participation in a community life," as Judge Kelly noted in *Herzfeld*. Plaintiff has alleged a claim for battery, but the plain language of § 1981, the Supreme Court and majority of Circuit Courts' interpretation of the same, the Constitution, and common sense argue strongly against Plaintiff's position as to Section 1981, requiring dismissal of that count and depriving this Court of jurisdiction. Plaintiff alleges no contract, no state action, and no facts plausibly suggesting discriminatory intent. Having already failed to persuade a court of competent jurisdiction on these same allegations, Plaintiff's attempt to mislead this Court through racist *ad hominem* attacks against Palestinians designed to taint Ms. Ali should not be entertained further. The Amended Complaint should be dismissed in its entirety.

Dated: November 12, 2025.                     Respectfully Submitted,

                                              /s/ *George R.A. Doumar*
                                              George R.A. Doumar, D.C. Bar No. 415446
                                              Raj H. Patel, D.C. Bar No. 240973
                                              Doumar Martin, PLLC
                                              1530 Wilson Boulevard, Suite 1060
                                              Arlington, Virginia 22209
                                              Tel: (703) 243-3737
                                              gdoumar@doumarmartin.com
                                              rpatel@doumarmartin.com

                                              /s/ *Frank Panopoulos*
                                              Frank Panopoulos, DC Bar No. 459365
                                              26 Trailridge Ct.
                                              Potomac, MD 20854
                                              Tel: (301) 956-4249
                                              fpanopoulos@icloud.com

                                              /s/ *Jenin Younes**
                                              Jenin Younes, DC Bar No. 90021577
                                              National Legal Director
                                              American-Arab Anti-Discrimination
                                              Committee
                                              910 17th Street Northwest
                                              Washington, DC 20006
                                              Tel: (646) 592-5877
                                              jyounes@adc.org

                                              **admitted pro hac vice only*

                                              *Counsel for Defendant*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 12, 2025, I caused a true and correct copy of the foregoing

Memorandum to be served via ECF upon all counsel of record via the Court's CM/ECF system.

*<u>/s/ George R.A. Doumar</u>*
George R.A. Doumar, D.C. Bar No. 415446
Raj H. Patel, D.C. Bar No. 240973
Doumar Martin, PLLC
1530 Wilson Boulevard, Suite 1060
Arlington, Virginia 22209
Tel: (703) 243-3737
gdoumar@doumarmartin.com
rpatel@doumarmartin.com

*Counsel for Defendant*
