**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **KIMMARA SUMRALL**,<br>Plaintiff,<br>v.<br>**JANINE ALI**,<br>Defendant. | Case No. 1:25-cv-02277 (TNM) |

# MEMORANDUM ORDER

Kimmara Sumrall and Janine Ali stand on dueling sides of a longtime conflict. Sumrall supports Israel as an expression of her Jewish identity. Ali opposes many of Israel's policies, especially in Gaza. Sumrall alleges that Ali crossed from political dissent into discriminatory violence when she attacked Sumrall at a protest. After an evidentiary hearing, this Court granted Sumrall a preliminary injunction in the form of a narrow stay-away order against Ali. Ali now moves to dismiss Sumrall's Amended Complaint and to reconsider the preliminary injunction.

The Court denies Ali's motion to dismiss on all counts except Sumrall's claim for intentional infliction of emotional distress. Sumrall states a plausible claim under 42 U.S.C. § 1981, which covers discriminatory private violence like the battery that Sumrall alleges. All but one of Sumrall's claims under District of Columbia law also survive. Only her action for intentional infliction of emotional distress fails to clear that tort's high bar. Meanwhile, because Ali's motion to reconsider violates the Court's Standing Order and offers no persuasive ground for reconsideration, the Court denies it in full.

## I. BACKGROUND

Sumrall is "a Jewish-American who feels and publicly expresses a deep affinity for Israel, her ancestral homeland." Am. Compl., ECF No. 38, ¶ 5. In November 2024, she took part in a "pro-Israel demonstration" at the Dirksen Senate Office Building. *Id.* ¶ 10. At that demonstration, Sumrall "wore an Israeli flag, tied at her neck, as a cape." *Id.*

Ali was also there that day, attending "an anti-Israel demonstration." *Id.* ¶ 13. "When [Sumrall] was isolated from her group, [Ali] approached [Sumrall] from behind . . . and yanked on [Sumrall's] Israel flag, having the harmful effect of briefly choking [Sumrall] and causing her pain and disorientation." *Id.* Sumrall then saw Ali "walking away from her" and "yelled for the police to address the situation." *Id.* ¶ 14. U.S. Capitol Police Officer Reed Bonney arrested Ali over her objection that "all [she] did was grab it." *Id.* ¶ 15 (cleaned up).

This was not the parties' first encounter. According to Sumrall, Ali "was present approximately ten times at anti-Israel gatherings that [Sumrall] attended in support of Israel." *Id.* ¶ 30. For example, Ali "was a fixture at the Israeli embassy encampment, and on multiple occasions, as witnessed by [Sumrall], [Ali] verbally attacked the Jews present with slurs such as 'baby killer,' 'committing genocide,' and 'most of you are disgusting ex-IDF soldiers.'" *Id.* ¶ 32. Both women also attended a court hearing involving a rabbi suing individuals who had "us[ed] speakers, sirens, and other sound-emitting devices" to disrupt "a prayer vigil for the hostages outside the Israeli embassy." *Id.* ¶¶ 34–35. During that hearing, Ali "glared furiously at [Sumrall] and other Jews supporting the rabbi." *Id.* ¶ 35.

After the attack, Sumrall felt "unsafe engaging in peaceful support for the State of Israel and the Jewish people." *Id.* ¶ 17. Given the parties' history, Sumrall "fear[ed] for her physical safety if she were again found in [Ali's] presence." *Id.* ¶ 18.

* * *

Sumrall advances five claims against Ali. The first invokes the "Equal Benefit Clause" of 42 U.S.C. § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a); Am. Compl. ¶¶ 58–68. Her other four counts travel under D.C. law—including assault based on a protected trait under D.C. Code § 22-3704, battery, trespass to chattels, and intentional infliction of emotional distress. Am. Compl. ¶¶ 69–86.

Sumrall also moved for preliminary relief in the form of "a modest stay-away order against Ali." *Sumrall v. Ali*, 793 F. Supp. 3d 199, 201 (D.D.C. 2025). The Court granted that request. *Id.* After holding a preliminary injunction hearing with witnesses and evidence, the Court ruled that Sumrall "ha[d] shown a likelihood of success on the merits in two ways: (1) that neither abstention nor claim splitting should dissuade this Court from exercising its jurisdiction over this federal-question case; and (2) that her § 1981 claim and at least one state-tort predicate [we]re likely to succeed." *Id.* at 203–04.

In support of its § 1981 ruling, the Court found that "Sumrall ha[d] sufficiently shown that Ali purposefully discriminated against her on the basis of race." *Id.* at 208. In the Court's eyes, "[a] preponderance of the evidence reveal[ed] that Ali likely committed the battery." *Id.* In particular, the Court credited Officer Bonney's testimony, which "described the event in detail, how Ali committed it, . . . that Sumrall reacted strongly, clearly, and immediately," and "that Ali confessed her behavior as he arrested her." *Id.* Officer Bonney was "highly credible" both due to his "demeanor and responses" and because "[h]e was the only truly neutral witness." *Id.*

In finding that Ali likely battered Sumrall, the Court recognized that "the Superior Court [had] acquitted Ali of simple assault." *Id.* The Court emphasized, however, that a "lower preponderance standard" governs "a civil preliminary injunction." *Id.* Thus, "[a]fter weighing all the evidence before it, the Court discredit[ed] Ali's evidence that contradict[ed] Officer Bonney's testimony." *Id.* "To credit Ali's version of events, the Court would have [had] to assume that both Officer Bonney and Sumrall were committing perjury, even though they ha[d] no prior association and Officer Bonney was unconnected to either side." *Id.*

The Court also found that Ali likely battered Sumrall because of her race. *Id.* It accepted Ali's concession that "Sumrall is part of a racial minority within the meaning of [§ 1981]." *Id.* The Court then concluded that "[p]urposefully yanking on an Israeli flag tied around a Jewish person's neck to choke them is direct evidence of racial discrimination." *Id.* at 209. As the Court reasoned, "[t]he Star of David—emblazoned upon the Israeli flag—symbolizes the Jewish race," and "[b]attery, particularly involving a racial symbol, is strong evidence of racial discrimination." *Id.* By contrast, "Ali ha[d] proffered no 'benign' interpretation whatsoever for choking Sumrall," and the Court found it "hard to imagine one." *Id.*

The closest Ali came was in "contend[ing] that the Israeli flag represents the state of Israel rather than the Jewish race, so her action [wa]s merely anti-Israel, not antisemitic." *Id.* Still, the Court deemed it "quite a stretch to say that yanking on a flag tied around someone's neck is an objection to state policies"; after all, "battery is not a legitimate form of protest." *Id.* As the Court noted, Ali had no "reason to think Sumrall was herself affiliated with the Israeli government." *Id.* Instead, in light of all the evidence presented at the hearing, "it [wa]s much more likely that she was intentionally attacking a Jewish person wearing a Jewish flag as a symbol of her racial heritage." *Id.* Sumrall thus was likely to succeed on her § 1981 claim "that

Ali committed at least one state tort, battery, against her that would not have occurred but for racial discrimination." *Id.*

Finally, the Court held that Sumrall had satisfied the other preliminary injunction factors. In the Court's view, Sumrall had "shown that the 'cognizable danger' of future discrimination, especially given the past battery, me[t] the irreparable harm standard." *Id.* at 204. As for the balance of equities, the Court concluded that "a narrowly tailored injunction" would "respect both Ali and Sumrall's rights to protest." *Id.* (footnote omitted). Accordingly, the Court ordered Ali to stay at least three yards away from Sumrall, to stay at least 100 yards away from Sumrall's home and place of employment, and to have no other contact with Sumrall. *Id.* at 212.

Roughly one month later, Ali moved for the Court to reconsider its grant of the preliminary injunction. Mot. Recons., ECF No. 30, at 1. Ali's argument for reconsideration rests on three pillars: (1) that Sumrall's "claim under 42 U.S.C. § 1981 is unlikely to succeed because she has neither alleged nor presented any evidence of a nexus to state action"; (2) that "the Court erred as a matter of law in categorically equating anti-Israeli political expression with antisemitic discrimination"; and (3) that the Court wrongly evaluated irreparable harm and the other preliminary injunction factors. *Id.*

Along with her bid for reconsideration, Ali also moves to dismiss Sumrall's Amended Complaint. Mot. Dismiss, ECF No. 40, at 1.[1] In support of dismissal, Ali contends that Sumrall's "claim under 42 U.S.C. § 1981 fails as a matter of law and provides no basis for federal-question jurisdiction." *Id.* That is because, Ali asserts, Sumrall "alleges no contractual

---

[1] The Court denied as moot Ali's previous motion to dismiss after Sumrall filed an amended complaint as of right under Rule 15. Min. Order 11/3/2025; *see* Fed. R. Civ. P. 15(a)(1)(B).

relationship, no state action, and no facts plausibly suggesting discriminatory intent." *Id.* Ali also insists that Sumrall's D.C. law claims "largely fail as a matter of law." *Id.*

Both of Ali's motions are ripe for decision. Although they raise overlapping issues, the Court addresses them separately. It begins with the motion to dismiss and then turns to reconsideration.

## II. LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must show that the Court has subject matter jurisdiction over her claims. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). If the Court concludes that it lacks jurisdiction, it must dismiss the claim or action. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

Rule 12(b)(6) demands a complaint that "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up). A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts the complaint's factual allegations as true and grants a plaintiff "all inferences that can be derived from the facts alleged." *Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up).

"There is no motion for reconsideration in the Federal Rules of Civil Procedure." *Bass v. Dep't of Agric.*, 211 F.3d 959, 962 (5th Cir. 2000) (per curiam) (cleaned up). Instead, motions for reconsideration are construed either as motions to alter or amend a judgment under Rule 59(e) or as motions for relief from judgment under Rule 60(b), depending on when they are filed. *See Arabaitzis v. Unum Life Ins. Co. of Am.*, 351 F. Supp. 3d 11, 14 (D.D.C. 2018). When, as

here, the motion is filed within 28 days of the order the movant wants reconsidered, the motion proceeds under Rule 59(e)'s more forgiving standards. *Id.*

"Under Rule 59(e), the court may grant a motion to amend or alter a judgment under three circumstances only: (1) if there is an intervening change of controlling law; (2) if new evidence becomes available; or (3) if the judgment should be amended in order to correct a clear error or prevent manifest injustice." *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018) (cleaned up). Reconsideration motions "are rarely granted and should not be simply an opportunity to reargue facts and theories upon which a court has already ruled." *Defs. of Wildlife v. Salazar*, 842 F. Supp. 2d 181, 184 (D.D.C. 2012) (cleaned up). The burden of proving that reconsideration is appropriate lies with the moving party. *Arabaitzis*, 351 F. Supp. 3d at 14–15.

## III. DEFENDANT'S MOTION TO DISMISS

Ali asserts that Sumrall's § 1981 claim fails as a matter of law, which strips the Court of supplemental jurisdiction over the D.C. law claims. *See* Mot. Dismiss, ECF No. 40-1, at 14–37. She also challenges on their merits all the D.C. law claims except battery. *Id.* at 37–45. The Court denies her motion on all counts except intentional infliction of emotional distress.

Before diving into the substance, the Court deals with one preliminary matter. Ali moves to strike certain portions of the Amended Complaint because she vehemently disagrees with how they portray the Israel-Palestine conflict. *See* Mot. Strike, ECF No. 39-1, at 1–6. Ali invokes Rule 12, which permits "[t]he court [to] strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The decision whether to strike a pleading "is substantially within the discretion of the court." *Fay v. Perles*, 59 F. Supp. 3d 128, 134 (D.D.C. 2014). "[M]otions to strike, as a general rule, are disfavored."

*Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.*, 647 F.2d 200, 201 (D.C. Cir. 1981) (per curiam) (footnote omitted). "Courts in this district have stricken pleadings where the accusations are indefensible, harassing, or detract from the dignity of the Court." *Fay*, 59 F. Supp. 3d at 134 (collecting cases). The Court sees no reason to deploy that "extreme remedy" here. *See id.* Its analysis of the merits focuses on what transpired between the parties—not how either party characterizes any wider geopolitical or ethno-religious conflict. With that settled, the Court turns back to the motion to dismiss.

**A. Section 1981**

"To state a claim for racial discrimination under Section 1981, the plaintiff must allege that (1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate against the plaintiff on the basis of race; and (3) the discrimination concerned an activity enumerated in § 1981." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 91 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020). As before, "[n]either side questions whether Sumrall is part of a racial minority within the meaning of the statute." *See Sumrall*, 793 F. Supp. 3d at 208; *see also Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 618 (1987) (holding that Jews are a racial minority protected by § 1981). The parties quarrel over prongs two and three, which the Court discusses in reverse order.

**1. Section 1981's Reach**

This case hinges on whether Sumrall's suit falls under § 1981. Originally enacted as part of the Civil Rights Act of 1866, the statute reads:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). After a 1991 amendment, the statute now also specifies that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." *Id.* § 1981(c).

Ali proffers two reasons why § 1981 does not authorize Sumrall's action. She first insists that § 1981 "is limited to situations involving contracts." Mot. Dismiss at 15. She then retreats to the narrower argument that, "at minimum, state action is required for a claim under § 1981's equal benefits clause." *Id.* at 17. Whatever Ali's ultimate position, the Court disagrees. It holds that § 1981 authorizes Sumrall to sue Ali for battering her because of her race. Text, history, and precedent counsel as much.

Section 1981's text declares its broad reach. Recall that the statute grants all persons "the same right . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). On its face, the Equal Benefit Clause foils Ali's contention that § 1981 protects only the right to contract. Nor does § 1981 contain a state action requirement, whether for the Equal Benefit Clause or any of its other protections. The statute instead spells out that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination." *Id.* § 1981(c). Among those is the "right . . . to the full and equal benefit of all laws and proceedings for the security of persons and property." *Id.* § 1981(a). Like the other § 1981 rights, then, the "equal benefit" right is protected against private action that would infringe someone's "security" or "property" on account of race. *Id.*

The historical backdrop further suggests that the Equal Benefit Clause guards against private discriminatory attacks on "the security of persons and property." Remember that § 1981 was part of the Civil Rights Act of 1866—"an immediately post-Civil War legislative effort to

ensure that newly freed slaves received the same rights as other citizens." *Historical Background*, Congress.gov [https://perma.cc/4GU3-MQQX]. In the Reconstruction Era, freed slaves were systematically targeted by the Ku Klux Klan and other Southern Democrats to prevent them from exercising their newfound rights. *See* Tiffany R. Wright, Ciarra N. Carr, & Jade W.P. Gasek, *Truth and Reconciliation: The Ku Klux Klan Hearings of 1871 and the Genesis of Section 1983*, 126 Dick. L. Rev. 685, 699–702 (2022). The Southern states at the time were largely run by Republican "carpetbaggers" and freed slaves, but these state and local governments were impotent to quash the private acts of racial violence and intimidation. *See* Detlev F. Vagts, *Military Commissions: The Forgotten Reconstruction Chapter*, 23 Am. Univ. Int'l L. Rev. 231, 235–238 (2008). In short, most of the racial violence was perpetrated by private actors looking to prevent former slaves from re-electing Republican officeholders, not by government officials subjugating their supporters. This is the harm § 1981 sought to remedy.

The Supreme Court's analysis confirms as much. It canvassed the 1866 Civil Rights Act's history in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968). That case dealt with one of § 1981's companion provisions, which states that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982; *see Jones*, 392 U.S. at 412. Looking at the statute's text, the Court held that "it must encompass every racially motivated refusal to sell or rent and cannot be confined to officially sanctioned segregation in housing." *Id.* at 421–22.

The *Jones* respondents resisted "so literal a reading" of § 1982, contending "that Congress cannot possibly have intended any such result." *Id.* at 422. But the Court was unmoved: Its "examination of the relevant history" confirmed "that Congress meant exactly

what it said." *Id.* In the Court's eyes, the 1866 Civil Rights Act's history revealed that its protections "might be infringed not only by 'State or local law' but also by 'custom, or prejudice.'" *Id.* at 423. As the Court noted, "one of the most comprehensive studies then before Congress stressed the prevalence of *private* hostility toward Negroes and the need to protect them from the resulting persecution and discrimination." *Id.* at 428 (footnote omitted, emphasis added).

That report, written by then-future Senator Carl Schurz, documented the "lawless acts of brutality directed against Negroes who traveled to areas where they were not wanted." *Id.* at 429 (citing Carl Schurz, *Report on the Condition of the South*, S. Exec. Doc. No. 2, 39th Cong., 1st Sess. 18 (1865)). As one of too many examples, take this anecdote:

> While I was there, 9th and 10th of August, several negroes came into town with bullet and buckshot wounds in their bodies. From their statements, which, however, were only corroborating information previously received, it appeared that the reckless and restless characters of that region had combined to keep the negroes where they belonged. Several freedmen were shot in the attempt to escape, others succeeded in eluding the vigilance of their persecutors; large numbers, terrified by what they saw and heard, quietly remained under the restraint imposed upon them, waiting for better opportunities.

Schurz, *Report on the Condition of the South*, 1st Sess. 18; *see also* Barry Sullivan, *Historical Reconstruction, Reconstruction History, and the Scope of Section 1981*, 98 Yale L.J. 541, 552 (1989) ("Equally, if not more troublesome [than the Black Codes], however, was the presence of pervasive and entrenched private discrimination. Rooted in the customs and mores of the white South, private discrimination relegated racial equality in civil rights to the status of 'a mere abstraction recognized technically, but utterly inoperative to secure [for blacks] the exercise of the cardinal right of a freeman or citizen.'" (citation omitted)).

"In this setting" of private racist violence, the *Jones* majority reasoned, "it would have been strange indeed if Congress had viewed its task as encompassing merely the nullification of

racist laws in the former rebel States." *Jones*, 392 U.S. at 429. As the Court emphasized, "the same Congress that wanted to do away with the Black Codes *also* had before it an imposing body of evidence pointing to the mistreatment of Negroes by private individuals and unofficial groups, mistreatment unrelated to any hostile state legislation." *Id.* at 427. "'Accounts in newspapers North and South, Freedmen's Bureau and other official documents, private reports and correspondence were all adduced' to show that 'private outrage and atrocity' were 'daily inflicted on freedmen . . . .'" *Id.* (quoting Jacobus tenBroek, *Equality Under Law* 181 (1965 ed.)). The Court also highlighted that "[t]he congressional debates [we]re replete with references to private injustices against Negroes," including "white citizens who assaulted Negroes or who combined to drive them out of their communities." *Id.* at 427–28 (footnotes omitted). Viewing the entire historical backdrop, the Court thus found it "clear that the [1866 Civil Rights] Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein." *Id.* at 436.

The Supreme Court later extended *Jones*'s reasoning to § 1981. In *Runyon v. McCrary*, 427 U.S. 160 (1976), the Court confronted whether § 1981's contract right "prohibits private schools from excluding qualified children solely because they are Negroes." *Id.* at 163. The majority's answer was yes. *Id.* at 161–62. The *Runyon* Court recapped *Jones*'s analysis of the 1866 Civil Rights Act, "from which both [§] 1981 and [§] 1982 derive." *Id.* at 170. *Jones*'s "statutory holding" thus "necessarily implied that the portion of [§] 1 of the 1866 Act presently codified as 42 U.S.C. [§] 1981 likewise reaches purely private acts of racial discrimination." *Id.* "In light of the historical interrelationship between [§] 1981 and [§] 1982," the Court saw "no reason to construe these sections differently." *See id.* at 171 (cleaned up).

One more case is instructive. In *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Court addressed the reach of 42 U.S.C. § 1985(3). With roots tracing back to the Civil Rights Act of 1871, *see id.* at 98–99, that provision offers a cause of action against "two or more persons in any State or Territory [who] conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws," 42 U.S.C. § 1985(3). This law was a direct response to Klansmen and their ilk. *See Griffin*, 403 U.S. at 101. As the Court ruled, § 1985(3) applied to purely private conspiracies. *Id.* at 101–02. In the Court's view, "text, companion provisions, and legislative history" all "point[ed] unwaveringly" toward that outcome. *Id.* at 101.

The *Griffin* Court rejected the idea that § 1985(3)'s reference to "the equal protection of the laws" implied a state action requirement. *Id.* at 97. As the Court acknowledged, "[a] century of Fourteenth Amendment adjudication ha[d] . . . made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons." *Id.* "Yet there is nothing inherent in the phrase that requires the action working the deprivation to come from the State." *Id.* "Indeed," the Court reasoned, "the failure to mention any such requisite" was "an important indication of congressional intent to speak in [§] 1985(3) of all deprivations of 'equal protection of the laws' and 'equal privileges and immunities under the laws,' whatever their source." *Id.*

*Griffin* also emphasized that § 1985(3)'s reach into private conspiracies did not transform it into "a general federal tort law." *Id.* at 102. That was because private conspiracies were actionable only if motivated by "some racial, or perhaps otherwise class-based, invidiously

discriminatory animus." *Id.* That limitation was built into "[t]he language requiring intent to deprive of equal protection, or equal privileges and immunities." *Id.*

To be sure, the Supreme Court has not ruled on whether § 1981's Equal Benefit Clause protects against private discrimination. In an effort to bolster her contract-only reading, Ali gestures toward *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006). *See* Mot. Dismiss at 14–16. To no avail. The plaintiff there, who was "the sole shareholder and president" of a company, sued Domino's Pizza under § 1981, alleging "that Domino's had broken its contracts with [the plaintiff's company] because of racial animus toward [the plaintiff]." *Domino's Pizza*, 546 U.S. at 472–73.

The Court held that the action could not proceed. *Id.* at 479–80. After all, "it is fundamental corporation and agency law . . . that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts." *Id.* at 477. Because the plaintiff had no "rights under the existing (or proposed) contract that he wishe[d] 'to make and enforce,'" § 1981 offered him no relief. *Id.* at 479–80. It is in that contract setting that the Court stated that "[a]ny claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' under which the plaintiff has rights." *Id.* at 476 (cleaned up). *Domino's Pizza* did not offhandedly bar all non-contract § 1981 actions. *Accord Mazloum v. D.C. Metro. Police Dep't*, 522 F. Supp. 2d 24, 37 (D.D.C. 2007) ("*Domino's* does not require a contractual relationship for a Section 1981 claim, but only requires that where a contract is the basis of a Section 1981 claim, the plaintiff must have rights to assert under the contract"); *cf. Brown v. Davenport*, 596 U.S. 118, 141 (2022) ("This Court has long stressed that the language of an opinion is not always to be parsed as though we were dealing with the language of a statute." (cleaned up)).

The D.C. Circuit has discussed § 1981's reach only in passing. In *Banks v. Chesapeake & Potomac Telephone Co.*, 802 F.2d 1416 (D.C. Cir. 1986), the court held that "the three-year statute of limitations applicable to personal injuries suits controls actions brought under § 1981 in the District of Columbia." *Id.* at 1417. In reaching that ruling, the D.C. Circuit characterized "§ 1981 claims as personal injury actions." *Id.* at 1422. Without further elaboration, the panel stated that "§ 1981 provide[s] remedies for a broad range of actions that could be characterized as various state torts." *Id.* at 1421.

The *Banks* court later rejected applying D.C. law's one-year limitations period for certain "enumerated intentional torts" to § 1981 claims. *Id.* at 1426. Because neither party had raised the issue, the panel "consider[ed] [it] in dicta only," in response to a concurring opinion. *Id.* at 1427; *see id.* at 1431–43 (Buckley, J., concurring in the judgment). In this setting, the court reasoned that "§ 1981 is best characterized as a remedy for personal injury torts" but "was *not* designed to provide a remedy for intentional torts such as assaults or batteries." *Id.* at 1428. The panel later clarified that its "review of the Civil Rights Act le[d] [it] to believe that Congress intended § 1981 to be a personal injury remedy, but not solely for *intentional* personal injuries." *Id.* at 1428 n.21.

Other appellate courts have weighed in more directly—and on opposite sides. Three circuits are more or less in Ali's camp, led by the Third Circuit in *Mahone v. Waddle*, 564 F.2d 1018 (3d Cir. 1977). The *Mahone* plaintiffs alleged that Pittsburgh police officers had "verbally and physically abused them, falsely arrested them, and g[iven] false testimony against them" because of their race. *Id.* at 1028. The Third Circuit ruled that these allegations "f[e]ll within the broad language of both the equal benefits and like punishment clauses of section 1981." *Id.* (footnote omitted). As the court recognized, "a natural and commonsense reading of the statute

compel[led] the conclusion that section 1981 has broad applicability beyond the mere right to contract." *Id.*

In light of the statute's "plain meaning" and Supreme Court precedents like *Runyon*, the panel confronted the city's concern "that a broad construction of section 1981 w[ould] give rise to a federal cause of action for every racially motivated private tort." *Id.* at 1029. The court "s[aw] no such danger" because it "perceive[d] a fundamental distinction" between contract-based cases like *Runyon* and "cases arising under the equal benefit and like punishment clauses." *Id.* Unlike § 1981's contract language, "[t]he words 'full and equal benefit of all laws and proceedings for the security of persons and property' . . . suggest a concern with relations between the individual and the state, not between two individuals." *Id.* As the panel reasoned, "[t]he state, not the individual, is the sole source of law, and it is only the state acting through its agents, not the private individual, which is capable of denying to blacks the full and equal benefit of the law." *Id.* The court thus concluded that "while private discrimination may be implicated by the contract clause of section 1981, the concept of state action is implicit in the equal benefit clause." *Id.* Because the plaintiffs' complaint alleged state action by the police officers, the panel "need[ed] [to] decide no more in this case." *Id.* at 1030.

The Fourth and Eighth Circuits have adopted *Mahone*'s state action rule without additional analysis. In *Shaare Tefila Congregation v. Cobb*, 785 F.2d 523 (4th Cir. 1986), *rev'd on other grounds*, 481 U.S. 615 (1987), the Fourth Circuit "agree[d] with the Third Circuit's interpretation of the 'full and equal benefit' clause of section 1981 and conclude[d] that state action is required in order to assert a claim under that statute." *Id.* at 525–26. Because the plaintiff in that case conceded the lack of state action, the court affirmed the district court's dismissal of the § 1981 claim. *Id.* at 526. The Eighth Circuit, meanwhile, cited *Mahone* in

concluding that the defendant's "actions did not constitute state action and [the defendant] was therefore entitled to summary judgment on [the plaintiff's] claim under the full-and-equal-benefit clause." *See Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001); *see also Provisional Gov't of Republic of New Afrika v. Am. Broad. Companies, Inc.*, 609 F. Supp. 104, 109 (D.D.C. 1985) (citing *Mahone* and stating, without more elaboration, that "[b]ecause th[e] [Equal Benefit Clause] does not reach purely private discrimination, the element of state action must be alleged and proved").

Two circuits have rejected *Mahone*'s reasoning in more recent opinions. Take *Phillip v. University of Rochester*, 316 F.3d 291 (2d Cir. 2003). That case involved a § 1981 suit against a private university for the actions of its security officers. *Id.* at 292–93. In that setting, the court "h[e]ld that plaintiffs may sustain a claim for breach of the equal benefit clause without making a traditional state action showing." *Id.* at 292. Considering the statute's plain text, especially § 1981(c)'s reference to "nongovernmental discrimination," it was "clear" to the Second Circuit that "[n]o state action is required for a Section 1981 claim." *Id.* at 294. Meanwhile, the court did not find *Mahone* or its offshoots "sufficiently persuasive to displace the clear words of the statute." *Id.* In particular, the panel disagreed with *Mahone*'s "dicta," reasoning instead that "the state is not the only actor that can deprive an individual of the benefit of laws or proceedings for the security of persons or property." *Id.* at 294–95. In the Second Circuit's eyes, *Mahone* did not grapple with the history behind § 1981's enactment, which abounded with "racial abuses that [private] individuals perpetrated." *Id.* at 295–96.

Joining the Second Circuit is the en banc Sixth Circuit in *Chapman v. Higbee Co.*, 319 F.3d 825 (6th Cir. 2003) (en banc). The plaintiff there sued a department store after its "security officer stopped and searched her," asserting "that the stop and search were racially motivated and

violated her right to the 'full and equal benefit of the law' under 42 U.S.C. § 1981." *Id.* at 828. The district court granted the defendant summary judgment on the ground "that section 1981 does not protect against private impairment of its equal benefit clause." *Id.* A divided panel initially affirmed. *Id.* But after rehearing the case, the en banc Sixth Circuit reversed. *Id.*

The majority looked first and foremost to text. As the court saw it, "Section 1981 is unambiguous": "According to subsection (c), the rights protected by section 1981 are 'protected against impairment by nongovernmental discrimination.' Section 1981 explicitly protects the right 'to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens;' therefore, that right is 'protected against impairment by nongovernmental discrimination.'" *Id.* at 829–30.

The Sixth Circuit was unpersuaded by *Mahone*. Aside from the statutory text, the court highlighted the Supreme Court's decision in *Griffin*, which "expressly rejected the notion that the concept of state action is implicit in an equal protection provision." *Id.* at 831 (citing *Griffin*, 403 U.S. at 97). To the en banc majority, *Griffin*'s textual reading "suggest[ed] that section 1981's analogous clause would protect against private impairment even absent subsection (c)'s explicit instruction." *Id.*

Finally, the Sixth Circuit shot down the department store's contention that recognizing the Equal Benefit Clause's full textual reach "would have the 'absurd' result of federalizing state tort law." *Id.* at 832. As a first limitation, the court pointed to "[t]he 'security of persons and property' language," ruling that "[a] litigant must demonstrate the denial of the benefit of a law or proceeding protecting his or her personal security or a cognizable property right." *Id.* (footnote omitted). In this context, the majority endorsed the "[s]everal cases" that had greenlit § 1981 claims premised on "serious threats to a person's security in the form of physical

violence." *See id.* at 832 n.5 (citing *Carey v. Rudeseal*, 703 F. Supp. 929, 930 n. 1 (N.D. Ga. 1988); *Hawk v. Perillo*, 642 F. Supp. 380, 386–87, 390 (N.D. Ill. 1986)). As a second buffer, the court emphasized the fact that a § 1981 plaintiff still "must prove intentional discrimination on the basis of race, which involves a high threshold of proof." *Id.* at 832–33. And whatever its reach, the text was clear and controlling: "[S]ection 1981 plainly protects against impairment of its equal benefit clause by private discrimination." *Id.* at 833.

* * *

On its own review of text, history, and precedent, this Court sides with the more recent circuit decisions. Section 1981's text covers private acts that deny a person the benefit of security or property because of that person's race—including the racially motivated battery that Sumrall alleges. The 1866 Civil Rights Act's historical backdrop of pervasive private violence against freedmen reinforces that reading. So does Supreme Court precedent on several companion provisions. *Mahone* and its progeny rest on an assumption that the text does not support and *Griffin* rejects. Of course, recognizing that § 1981 protects against private acts does not mean that the statute encompasses all manner of private disputes. Rather, the statute remains limited to acts of intentional racial discrimination. It is to that requirement the Court now turns.

**2. Intentional Discrimination**

As the final element of her § 1981 claim, Sumrall must plausibly allege that Ali "intended to discriminate against [her] on the basis of race." *Wilson*, 417 F. Supp. 3d at 91. She meets that burden.

To assess whether a § 1981 claim survives dismissal, the D.C. Circuit applies "the pleading standards" from "the familiar *McDonnell Douglas* rubric for alleging a prima facie case of purposeful employment discrimination." *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461,

467 (D.C. Cir. 2017) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). A plaintiff "can show unlawful discrimination with either direct or indirect evidence." *Moini v. Wrighton*, 602 F. Supp. 3d 162, 171 (D.D.C. 2022), *aff'd sub nom. Moini v. Granberg*, No. 22-7101, 2024 WL 2106214 (D.C. Cir. May 1, 2024).

Direct evidence is like "a smoking gun," *Amadeo v. Zant*, 486 U.S. 214, 226 (1988), which "itself shows racial or gender bias," *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam). As direct evidence is "hard to come by," *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1293 (D.C. Cir. 1998) (en banc) (cleaned up), its presence "generally entitle[s] a plaintiff to a jury trial," *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (Kavanaugh, J.).

When a plaintiff's case rests on indirect or circumstantial evidence of discrimination, courts apply the *McDonnell Douglas* burden-shifting framework—which "has three parts." *Moini*, 602 F. Supp. 3d at 172. "First, a plaintiff must establish a prima facie case of racial discrimination." *Id.* "Next, the burden shifts to the [defendant] to produce a 'legitimate, non-discriminatory reason' for [her] actions." *Id.* (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (Kavanaugh, J.)). If the defendant carries that burden, the plaintiff must finally "show that the [defendant's] explanation was not [her] true reason and instead was pretextual." *Id.* To make it past the dismissal stage, the plaintiff must merely meet her prima facie burden, which "is not onerous." *See Nanko Shipping*, 850 F.3d at 467 (cleaned up); *see also Fennell v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011) ("The pleading burden is not great, and courts in this Circuit have consistently recognized the ease with which a plaintiff claiming employment discrimination can survive a motion to dismiss." (cleaned up)).

Sumrall's allegations withstand dismissal. She plausibly alleges that Ali battered her because she is Jewish—"approach[ing] [her] from behind . . . and yank[ing] on [her] Israel flag, having the harmful effect of briefly choking [her] and causing her pain and disorientation." Am. Compl. ¶ 13. As the Court reasoned before, "[t]he Star of David—emblazoned upon the Israeli flag—symbolizes the Jewish race." *Sumrall*, 793 F. Supp. 3d at 209. And "[b]attery, particularly involving a racial symbol, is strong evidence of racial discrimination." *Id.* In granting the preliminary injunction, the Court thus found that Ali's attack amounted to "direct evidence of racial discrimination," and the Court reaffirms that finding here. *Id.*

At the very least, Ali's battery constitutes powerful circumstantial evidence of racial discrimination—especially in light of Sumrall's other allegations about the parties' history. Recall, for example, that Ali "was present approximately ten times at anti-Israel gatherings that [Sumrall] attended in support of Israel." Am. Compl. ¶ 30. At one of those encounters, Ali "verbally attacked the Jews present with slurs such as 'baby killer,' 'committing genocide,' and 'most of you are disgusting ex-IDF soldiers.'" *Id.* ¶ 32. On another occasion, Ali "glared furiously at [Sumrall] and other Jews supporting [a] rabbi" during a court hearing. *Id.* ¶ 35. Taken together and considered along with the battery itself, these allegations surmount the dismissal stage's prima facie bar. *See Moini*, 602 F. Supp. 3d at 172; *see also, e.g.*, *Hawk*, 642 F. Supp. at 392 (concluding that plaintiffs adequately pled a § 1981 claim premised on racially motivated beating).

As she did at the preliminary injunction stage, Ali asserts that her actions were motivated by politics, not race. *See Sumrall*, 793 F. Supp. 3d at 209. She insists that "criticism of Israel does not constitute racial animus towards Jewish people." *See* Mot. Dismiss at 21–35. But that argument is misplaced at the dismissal stage, where the Court credits Sumrall's allegations and

grants her "all inferences that can be derived from the facts alleged." *See Xia*, 865 F.3d at 649 (cleaned up). Whether Ali can rebut Sumrall's prima facie case of racial discrimination is a matter for discovery and summary judgment. *See Ho v. Garland*, 106 F.4th 47, 55 (D.C. Cir. 2024).

Even if Ali's explanation were cognizable at this stage, the Court would still be skeptical. After all, Ali did much more than simply criticize Israel's actions or "express hostility to or even burn the Israeli flag." *See* Mot. Dismiss at 43. According to Sumrall's allegations, Ali battered someone wearing the Israeli flag. Am. Compl. ¶¶ 10, 13. As the Court found before and emphasizes again, "it is quite a stretch to say that yanking on a flag tied around someone's neck is an objection to state policies; battery is not a legitimate form of protest." *Sumrall*, 793 F. Supp. 3d at 209; *see also Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) ("[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment.").

* * *

Considering all three elements, the Court holds that Sumrall has stated a viable claim under § 1981's Equal Benefit Clause. The Court now proceeds to the D.C. law counts.

**B. D.C. Law Claims**

On top of her § 1981 action, Sumrall advances four D.C. law claims: intentional infliction of emotional distress, trespass to chattels, assault based on a protected trait, and battery. Am. Compl. ¶¶ 69–86. In light of its ruling that the § 1981 claim survives, the Court concludes that it has supplemental jurisdiction over the D.C. law counts because they "form part of the same case or controversy" arising from the alleged battery. *See* 28 U.S.C. § 1367(a).

Aside from her jurisdictional challenge, Ali contends that all the D.C. law claims except battery fail on 12(b)(6) grounds. *See* Mot. Dismiss at 11. The Court agrees only on one count,

holding that Sumrall's claim for intentional infliction of emotional distress cannot proceed. The other two claims surmount dismissal.

**1. Intentional Infliction of Emotional Distress**

Start with intentional infliction of emotional distress, "a very narrow tort with requirements that are rigorous, and difficult to satisfy." *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 93 (D.D.C. 2015) (cleaned up). "In order to prove the tort of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff to suffer severe emotional distress." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013) (cleaned up).

"The requirement of outrageousness is not an easy one to meet." *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994). "Liability will be imposed only for conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (cleaned up). Courts consider "the specific context in which the conduct took place, for in determining whether conduct is extreme or outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred." *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993) (cleaned up). Even at the pleading stage, "the allegations of the complaint must afford a basis for concluding that the plaintiff may be able to prove conduct of the required enormity." *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 53 (D.D.C. 2019) (cleaned up).

In support of her claim, Sumrall states that Ali's "intentionally targeting [her] for violence on the basis of her race, religion, and national origin was extreme and outrageous,

causing her severe emotional distress." Am. Compl. ¶ 84. Although Sumrall's allegations overcome dismissal on all other fronts, they do not amount to "conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *See Homan*, 711 A.2d at 818.

Several cases demonstrate this tort's particularly high bar. Confronting a protest situation in *Ortberg*, for example, the D.C. Court of Appeals reversed the trial court's preliminary injunction, holding instead that the defendants' conduct "was not extreme and outrageous" where they protested with a bullhorn several times outside one plaintiff's home and "chanted a slogan that included the phrase 'we know where you sleep at night.'" 64 A.3d at 161–64. D.C. courts also consistently dismiss claims as "insufficiently extreme and outrageous" even where the plaintiff's "allegations are sufficient to support claims for assault [and] battery" *See Chen v. ICS Protective Servs.*, 2024 WL 4103700, at *3 (D.D.C. Sept. 5, 2024) (collecting cases); *see also, e.g.*, *Joyner v. Sibley Mem'l Hosp.*, 826 A.2d 362, 373 (D.C. 2003) (affirming summary judgment for defendant because plaintiff "ha[d] cited no authority that intentionally closing the office door on [plaintiff's] hand in an attempt to prevent her departure from the February 7 disciplinary meeting, even though seemingly excessive if true, by itself [wa]s sufficient to constitute intentional infliction of emotional distress, and [the court was] aware of none"). So too here.

Sumrall likens this case to *Kurd*, but that analogy breaks down. *See* Opp'n Mot. Dismiss, ECF No. 43, at 47. The conduct in *Kurd* took place at "a peaceful protest over Turkey's treatment of its Kurdish minority." 374 F. Supp. 3d at 54. The plaintiffs alleged that, "during th[eir] protest, [the] [d]efendants yelled threats and ethnic slurs at them." *Id.* The complaint

"further allege[d] that [the] [d]efendants twice pushed past law enforcement in order to repeatedly physically attack the protesters." *Id.* Those physical attacks included "repeated[] punch[ing]," "bypass[ing] the police cordon and chas[ing], kick[ing], punch[ing], and grabb[ing] protesters," and shouting at protesters that the defendants "would make life miserable for the Kurds." *Id.* (cleaned up).

In holding that the plaintiffs' allegations rose to intentional infliction of emotional distress, the *Kurd* court emphasized that they did not "occur[] during a bar brawl or during a street fight." *Id.* at 53. "Instead, these actions occurred during an attack which included Turkish government agents, in America's capital, to stifle the First Amendment rights of people protesting the treatment of a minority group in Turkey." *Id.* (cleaned up). Further "[h]ighlighting the extreme and outrageous nature of [the] [d]efendants' alleged actions," the court noted that "40 members of the United States Congress [had] sent a letter to then-Attorney General Jeff Sessions and then-Secretary of State Rex Tillerson expressing their outrage over the remorseless acts of violence inflicted upon individuals exercising their Constitutionally-protected First Amendment right to free speech." *Id.* (cleaned up). Taken together, those circumstances supported a plausible claim of intentional infliction of emotional distress. *Id.* at 56.

*Kurd* does not help Sumrall evade dismissal here. This case exhibits neither the amount nor the intensity of violence in *Kurd*. Nor did Ali's conduct come with the alleged support of foreign government agents or the express threat of further ethnic violence. Ultimately, Sumrall's allegations fall closer to those in cases like *Ortberg*, *Chen*, and *Joyner*. Although Ali's alleged conduct is blameworthy, it does not sustain Sumrall's claim of intentional infliction of emotional distress.

**2. Other D.C. Law Claims**

Ali does not succeed in her 12(b)(6) challenge to Sumrall's other two D.C. law claims.

"A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." *Pearson v. Dodd*, 410 F.2d 701, 707 n.30 (D.C. Cir. 1969) (quoting Restatement (Second) of Torts § 217 (1965)). There are four ways someone might become liable for trespass to chattels: "(a) he dispossesses the other of the chattel, or (b) the chattel is impaired as to its condition, quality, or value, or (c) the possessor is deprived of the use of the chattel for a substantial time, or (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest." Restatement (Second) of Torts § 218; *see also Pearson*, 410 F.2d at 707 n.32 ("To support an action of trespass to a chattel where the invasion of interests does not result in its destruction or in a dispossession thereof, it was early held there must be some physical harm to the chattel or to its possessor." (cleaned up)).

Sumrall states a plausible claim for trespass to chattels. She pleads that Ali "intentionally used or intermeddled with" Sumrall's Israeli flag by yanking on it. Am. Compl. ¶ 80. That "intermeddling caused bodily harm to [Sumrall], briefly strangling her and causing her pain and disorientation." *Id.* Those allegations contain all the necessary elements.

Ali contends that Sumrall's claim must fail because she "has not and cannot claim that her Israeli flag was damaged." *See* Mot. Dismiss at 41–42. That argument ignores the separate and independent ground for liability that exists if the defendant's trespass causes physical injury to the plaintiff. Ali relies on stray language from *Pearson*, but that case about copying documents did not involve any bodily harm. *See Pearson*, 410 F.2d at 707. In any event, *Pearson* recognized physical injury as a separate theory of liability. *See id.* at 707 n.32. And so

does the Second Restatement, which *Pearson* cited approvingly. Restatement (Second) § 218; *see Pearson*, 410 F.2d at 707 n.30. Having presented no caselaw foreclosing Sumrall's claim for trespass to chattels, Ali cannot obtain dismissal.

Finally, consider Sumrall's claim under D.C. Code § 22-3704. That statute provides:

> Irrespective of any criminal prosecution or the result of a criminal prosecution, any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice based on the actual or perceived race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, homelessness, disability, matriculation, or political affiliation of a victim of the subject designated act shall have a civil cause of action in a court of competent jurisdiction for appropriate relief . . . .

D.C. Code § 22-3704(a). The statute also specifies that the intentional "act need not solely be based on or because of an accused's prejudice." *Id.* § 22-3701(1A).

Ali's alleged actions fall under § 22-3704. "Based on the clear statutory language, [Sumrall] ha[s] a civil cause of action under § 22-3704 because [she] [was] the victim[] of a designated act, . . . battery." *See Kurd*, 374 F. Supp. 3d at 57. Sumrall plausibly alleges that she "incur[red] injury to . . . her person . . . as a result of an intentional act that demonstrate[d] [Ali's] prejudice" against her as a Jewish person. *See* D.C. Code § 22-3704(a).

To contest this claim, Ali largely rehashes her assertion that protesting Israel, including by damaging the Israeli flag, does not constitute prejudice against Jewish people. *See* Mot. Dismiss at 42–45. But once again, "draw[ing] all reasonable inferences" in Sumrall's favor, the Court rejects Ali's contention. *See Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (cleaned up). After all, Ali did not merely criticize Israel or even burn its flag; she attacked someone wearing it. At the dismissal stage, Sumrall has plausibly pleaded that Ali battered her because she is Jewish. That is a far cry from "peaceful protest." *See* Mot. Dismiss at 42. Sumrall's § 22-3704 claim may proceed.

* * *

In sum, the Court holds that Sumrall has stated a viable action under § 1981's Equal Benefit Clause. This confers supplemental jurisdiction over the D.C. law counts. As for those, the Court dismisses only the claim for intentional infliction of emotional distress. The rest of Sumrall's D.C. law claims make it past dismissal. Having addressed the motion to dismiss, the Court turns to Ali's bid for reconsideration.

## IV. DEFENDANT'S MOTION TO RECONSIDER

Ali moves for the Court to reconsider its preliminary injunction on three grounds: (1) Sumrall's "claim under 42 U.S.C. § 1981 is unlikely to succeed because she has neither alleged nor presented any evidence of a nexus to state action"; (2) "the Court erred as a matter of law in categorically equating anti-Israeli political expression with antisemitic discrimination"; and (3) the Court wrongly weighed irreparable harm, the equities, and the public interest. Mot. Recons. at 1. The Court declines to reconsider its ruling.

For starters, Ali's reconsideration motion is too long. The Court's Standing Order dictates that "[m]otions for reconsideration of prior rulings . . . **shall not exceed ten pages in length**." Standing Order, ECF No. 4, ¶ 15 (bold in original). Ali's memorandum supporting reconsideration clocks in at 20 pages, and she did not seek permission for that excess length. *See* Mot. Recons., ECF No. 30-1, at 5–24. This deficiency independently justifies denial. *See* Standing Order ¶ 15 (warning that "[m]otions not in compliance with these instructions may be stricken"); *cf. Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) (recognizing "that district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases").

Ali's bid for reconsideration also falters on the merits. The Court explains at length above why § 1981's Equal Benefit Clause provides a viable cause of action to Sumrall. *Supra* Part III.A. Ali's contention that the Equal Benefit Clause contains a state action requirement finds no support in text, history, or precedent. More, at least in this part of the reconsideration motion, Ali again infringes the Standing Order by presenting "arguments which should have been previously raised." *See* Standing Order ¶ 15. In her opposition to Sumrall's motion for a preliminary injunction, Ali contested § 1981's reach only perfunctorily, without citing the authorities she now marshals. *See* Opp'n Mot. Prelim. Inj., ECF No. 8, at 14–15. There is no excuse for that failure. *See CFTC v. McGraw-Hill Companies, Inc.*, 403 F. Supp. 2d 34, 36 (D.D.C. 2005) ("The Court will deny the [reconsideration] motion, however, if the movant uses the motion to argue theories that were or could have been presented in the initial matter.").

Ali also fails to show any clear error in the Court's conclusion that Ali likely battered Sumrall because she is Jewish. *See* Mot. Recons. at 14–17. Ali zeroes in on the Court's finding that the attack on Sumrall was direct evidence of discrimination. *Id.* at 14; *see Sumrall*, 793 F. Supp. 3d at 208–09. The Court stands by all its findings in the preliminary injunction order, which it made after an evidentiary hearing and thus receive "special deference" on appeal. *See City of Las Vegas v. Lujan*, 891 F.2d 927, 931 (D.C. Cir. 1989). As the Court emphasized then and repeatedly in this opinion, there is a world of difference between political disagreement and violence: "[B]attery is not a legitimate form of protest." *Sumrall*, 793 F. Supp. 3d at 209.

More, and in any event, the "distinction between direct and indirect or circumstantial evidence" of discrimination is "often subtle and difficult." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 324–25 (2025) (Thomas, J., concurring) (cleaned up). That is why direct and circumstantial evidence stand on equal footing, and "[c]ircumstantial evidence is not only

sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (cleaned up). The Court explains above that Sumrall has put forward enough evidence of discrimination to state a plausible § 1981 claim. *Supra* Part III.B. That evidence, whether direct or circumstantial, matches the Court's factual findings at the evidentiary hearing and justifies its stay-away order.

In her briefing on the remaining preliminary injunction factors, Ali spills her ink attacking Sumrall's character and painting a parade of horribles. *See* Mot. Recons. at 18–23. Nowhere does she establish any "clear error" in the Court's judgment. *See Leidos*, 881 F.3d at 217. The Court reaffirms its holding that Sumrall demonstrated irreparable harm with "the compelling combination of racial discrimination and fear of physical assault." *Sumrall*, 793 F. Supp. 3d at 211. It also stands by its ruling that "the balance of equities and the public interest favor a modest, three-yard stay away order." *Id.* As the Court reasoned then, "the history of battery favors an order against Ali; its narrowness ensures both women can still be present at the same event." *Id.* That calculus has not changed. The Court declines to reconsider the preliminary injunction.

## V. CONCLUSION

Sumrall states a plausible claim under § 1981's Equal Benefit Clause. Text, history, and precedent counsel that § 1981 covers racially motivated attacks like the one Sumrall plausibly alleges. Sumrall does not, however, overcome dismissal on her claim for intentional infliction of emotional distress because Ali's alleged conduct is insufficiently extreme to meet that narrow tort's demands. Sumrall's other D.C. law claims survive. As for Ali's motion for reconsideration, the Court denies it both for violating the Court's Standing Order and for failing to persuade on the merits.

For all these reasons, it is hereby

**ORDERED** that the [30] Motion for Reconsideration is **DENIED**; it is further

**ORDERED** that the [39] Motion to Strike is **DENIED**; it is further

**ORDERED** that the [40] Motion to Dismiss is **GRANTED IN PART** as to Count V and **DENIED IN PART** as to all remaining counts; and it is further

**ORDERED** that Count V of the [38] Amended Complaint is **DISMISSED** without prejudice.

**SO ORDERED.**

2026.08.18
11:07:03 -04'00'

Dated: August 18, 2026 TREVOR N. McFADDEN, U.S.D.J.